UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 1:26-cv-04776-JSR<br><br>Related to Civil Action No. 1:26-cv-04014-JSR |

**PLAINTIFF HORNBECK OFFSHORE OPERATORS, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL DOCUMENTS FOR PRODUCTION**

# TABLE OF CONTENTS

I. BACKGROUND ........ 1

II. LEGAL STANDARD ........ 3

III. ANALYSIS ........ 3

A. Documents relating to the negotiations for the Replacement Vessel will show GERE's standard negotiating practices and establish at what point GERE considers itself bound. ........ 4

B. GERE has acknowledged that these documents are relevant by putting them at issue. ........ 6

C. GERE's production show that GERE itself considers these documents to be relevant. ........ 7

IV. CONCLUSION ........ 9

# TABLE OF AUTHORITIES

**Cases**

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
314 F.R.D. 85 (S.D.N.Y. 2016) ........................................ 3

*Trilegiant Corp. v. Sitel Corp.*,
272 F.R.D. 360 (S.D.N.Y. 2010) ........................................ 3

**Rules**

FED. R. CIV. P. 26 ........................................ 3

Just as Hornbeck and GERE reached a binding fixture in this case, GERE received an unsolicited offer from a different vessel owner for a different vessel (the "Replacement Vessel"). Almost immediately, GERE began to distance itself from the deal to which it had just agreed, and, days after a GERE negotiator toured the Replacement Vessel, GERE repudiated the parties' contract. GERE argues that these documents lack any bearing on the issues in this case.

GERE is wrong for three reasons. First, GERE points to certain alleged defects in the negotiations between Hornbeck and GERE to support its position that the parties never reached a binding fixture. But GERE simultaneously negotiated and closed a charter for the same vessel needs with another owner. If that deal closed without the formalities GERE claims were essential here, GERE's own practice undercuts its argument. Second, GERE put these negotiations at issue itself when two GERE personnel suggested that GERE could not have bound itself to a fixture with Hornbeck because it was considering other offers. Finally, GERE itself has twice acknowledged that these documents are relevant, first when a GERE negotiator preserved these documents for then-pending litigation and again when GERE produced certain documents relating to GERE's efforts to charter the Replacement Vessel. These documents are relevant, and Hornbeck respectfully requests that the Court issue an order compelling GERE to produce documents responsive to Hornbeck's Requests for Production Nos. 2, 16, and 17.[1]

## I. BACKGROUND

This case arises from the breach of a maritime charter party. In June 2025, GERE contacted Hornbeck through broker Clarksons Shipping Services USA LLC ("Clarksons") about chartering a vessel for GERE's work on Vineyard Wind 1, a utility-scale offshore wind project off the coast

---

[1] Counsel for Hornbeck and GERE met and conferred on these issues on September 10, 2026, and again on September 16, 2026. The meet and confer was successful as to many issues, but the parties were unable to resolve the issues raised in this motion.

of Massachusetts. Over the next five months, the parties negotiated a charter party.[2] Pierre Furic ("Furic") and Tyler Spofford ("Spofford") of GERE and Jonathan Lints ("Lints") and Tyler Bojé ("Bojé") of Clarksons negotiated the charter party on behalf of GERE, and Jason Dennis ("Dennis") and others negotiated the charter party on behalf of Hornbeck. As is common in the maritime industry, that negotiation proceeded in two stages: a fixture, which binds the parties to the essential terms and is itself an enforceable contract, followed by a long-form charter party setting out the full details.

The parties steadily agreed to essential term after essential term until, on November 13, 2025, they agreed to the final essential term, thereby creating a binding fixture. They then turned to finalizing the long-form charter party. The same day, however, and unbeknownst to Hornbeck at the time, GERE began communicating with a Hornbeck competitor about its vessel needs for Vineyard Wind 1. *See* Dec'l Ex. D at 10. Immediately after, GERE began delaying the final execution of the long-form charter party. During this period of delay, Spofford of GERE traveled to Louisiana to tour the Replacement Vessel.[3] Days later, GERE repudiated the parties' contract and, upon information and belief, chartered Hornbeck's competitor's vessel for Vineyard Wind 1.

Following GERE's repudiation, Hornbeck sent a letter to GERE pursuant to the charter party informing it of its intention to pursue legal action if GERE continued its repudiation.[4] When

---

[2] A charter party is a contract for the use and rental of a vessel for a period of time.

[3] This is reflected in GERE's documents produced as GERE_00003778 through GERE_00003779, which have been designated confidential or highly confidential. The briefing schedule for this motion did not allow Hornbeck to seek leave to file confidential or highly confidential materials under seal in the time required by this Court's Individual Rules of Practices. Should the Court wish to review these documents, Hornbeck will promptly make it available to the Court and GERE by email.

[4] This is reflected in Hornbeck's documents produced as Hornbeck_002489 and Hornbeck_009718 through Hornbeck_009797, which were designated confidential or highly confidential. The briefing schedule for this motion did not allow Hornbeck to seek leave to file confidential or highly confidential materials under seal in the time required by this Court's Individual Rules of Practices.

it became clear that GERE would not honor its obligations under the charter party, Hornbeck initiated arbitration proceedings against GERE with the International Chamber of Commerce pursuant to the terms of the charter party. Dec'l Ex. A. In response, GERE filed a Petition for Stay of Arbitration, Injunctive Relief, and Declaratory Judgment, which was assigned to this Court. Dec'l Ex. B. GERE then filed a Motion for Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, which was fully briefed by both parties. Dec'l Ex. C. At the hearing on GERE's motion for injunctive relief, both parties agreed to proceed before the Court as to the merits of Hornbeck's breach of contract claim. Dec'l Ex. E at 1. At the Court's direction, Hornbeck filed the instant action as a related case. ECF 1.

## II. LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). Relevance is an extremely low bar. *See Trilegiant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 366 (S.D.N.Y. 2010) (citation modified) ("Relevance for the purposes of discovery is an extremely broad concept."). "If a party objects to discovery requests, that party bears the burden of showing why discovery should be denied." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 314 F.R.D. 85, 87 (S.D.N.Y. 2016) (citation modified).

## III. ANALYSIS

Hornbeck propounded three requests for production seeking documents concerning GERE's efforts to charter the Replacement Vessel for Vineyard Wind 1. Dec'l Ex. F at 7, 9–10. Request for Production No. 2 seeks "All Documents concerning GERE's efforts to hire the Replacement Vessel for the Vineyard Wind 1 project, including all solicitations, bids, offers,

---

Should the Court wish to review these documents, Hornbeck will promptly make them available to the Court and GERE by email.

negotiations, and finalized charter parties." *Id.* at 7. Request for Production No. 16 seeks "All Documents concerning the visit by Tyler Spofford to Port Fourchon, Louisiana, as described in paragraph 46 of Hornbeck's Complaint, including the purpose of the visit, any activities during the visit, and all Communications before, during, or after the visit relating to the Replacement Vessel."[5] *Id.* at 10–11. And Request for Production No. 17 seeks "All Documents concerning GERE's evaluation, selection, and decision to charter the Replacement Vessel for the Vineyard Wind 1 project, including the timing of and reasons for GERE's decision." *Id.* at 11.

GERE objected to each request on relevance grounds, insisting that "[t]he issue in this matter is limited to the discussion of a potential charter party between GERE and Hornbeck for the Hornbeck vessel BRIARWOOD." Dec'l Ex. H 4–5, 10–11. But GERE's position fails because these documents will show GERE's standard negotiating practices, GERE has put these documents at issue, and GERE itself has twice deemed these issues relevant.

**A. Documents relating to the negotiations for the Replacement Vessel will show GERE's standard negotiating practices and establish at what point GERE considers itself bound.**

GERE argues that this Court cannot find that the parties reached a binding fixture because, among other things, the parties failed to agree to various essential terms, the parties did not exchange a formal fixture recap, Spofford and Furic did not have the authority to agree to essential terms or otherwise bind GERE to a fixture with Hornbeck, and there were outstanding supplier requirements. Dec'l Ex. C at 21–27; Dec'l Ex. D at 5, 9.

[5] Paragraph 46 of Hornbeck's Complaint reads: "On November 20, Hornbeck learned that Spofford had traveled to Port Fourchon, Louisiana, the dominant nationwide hub for offshore supply vessels. Hornbeck came to understand that Spofford's visit was for the purpose of touring the competitor's vessel." ECF 1 at ¶ 46.

But these very arguments are precisely why the negotiation documents between GERE and the owner of the Replacement Vessel and GERE's internal communications relating to the negotiations are relevant and discoverable. Comparing the documents relevant to the Hornbeck/GERE charter party with those of the GERE/Replacement Vessel charter party will help determine whether the alleged deficiencies in the Hornbeck/GERE charter party reflect genuine impediments to formation or are instead post-hoc litigation positions manufactured to avoid an otherwise binding agreement.

First, the documents will show whether GERE's own negotiating practice requires a formal fixture recap before a charter becomes binding. GERE has taken the position that a formal fixture recap is a prerequisite to a fixture. But if GERE's negotiations with the vessel owner it ultimately chartered from proceeded, and closed, without a formal recap, that fact directly rebuts GERE's theory that a recap is a necessary formality in its ordinary course of dealing. This is not a question of what the maritime industry generally requires; it is a question of what GERE itself requires, and GERE's own conduct in a contemporaneous, comparable negotiation is the best evidence of that practice.

Second, the documents will show who within GERE customarily negotiates and finalizes charters, and through what chain of authority. GERE argues that Spofford and Furic lacked authority to bind the company to a fixture with Hornbeck. If the negotiation with the owner of the Replacement Vessel followed the same reporting and approval structure—the same personnel occupying the same roles, exercising the same degree of authority to negotiate and commit terms—that evidence undercuts GERE's claim that Spofford and Furic's involvement here was somehow unusual or insufficient to bind GERE.

Third, the documents will show what terms GERE actually treated as essential when it came time to finalize a charter. GERE contends that the parties here never agreed on various terms it has suggested were essential to any binding fixture. But if the charter party GERE ultimately executed with the other owner failed to treat these terms as essential, that is direct evidence that GERE does not, in its own practice, treat those terms essential. In other words, the executed charter party is the best available evidence of what GERE considers essential versus what it considers details to be worked out later—and Hornbeck is entitled to test GERE's litigation position against GERE's own contemporaneous conduct.

Taken together, this evidence goes to GERE's course of dealing and regular practice, which will support Hornbeck's position that GERE acted in conformity with that practice in its dealings with Hornbeck. GERE should not be permitted to put its negotiating practices at issue as a shield while withholding the very documents that would allow Hornbeck to show that those practices were followed here.

**B. GERE has acknowledged that these documents are relevant by putting them at issue.**

More fundamentally, GERE has put these documents squarely at issue. In support of its motion for injunctive relief in the related case, GERE personnel swore to several statements relating to the idea that GERE could not have bound itself to a fixture with Hornbeck because it was entertaining other offers. *See* Dec'l Ex. D at 6, 9, 10. Pierre Furic, one of the GERE contract negotiators, disputed that he told Hornbeck on November 18, 2025, that the parties had a contract, arguing that GERE's discussions with Hornbeck's competitor would have prevented such a statement:

> I did not say to HORNBECK that "we have a contract." There is no way that I would have done so. I was aware at that time that GERE had received a potentially better proposal from another vessel owner and that GERE was actively reviewing that proposal, so I could not possibly agree to a charter with Hornbeck.

*Id.* at 6. Furic and Spofford both alleged that GERE could not have bound itself because GERE was simply collecting offers to present to management. *Id.* at 5, 6, 9.

By invoking GERE's ongoing negotiations with the owner of the Replacement Vessel as the very reason Furic and Spofford could not have bound GERE to Hornbeck, GERE has made the content, timing, and status of those negotiations a central factual issue in this case. Furic swore that the existence and posture of the competing negotiation on November 18, 2025 made it impossible for him to have told Hornbeck that the parties had a contract. Furic's specific claim about what GERE and the Replacement Vessel owner had discussed and how far those discussions had progressed entitles Hornbeck to test that claim against the negotiation documents and GERE's internal communications relating to the negotiation. GERE used the negotiations with the owner of the Replacement Vessel to explain away statements that would otherwise evidence a binding agreement. GERE cannot now shield the underlying documents from discovery on relevance grounds.

### C. GERE's production show that GERE itself considers these documents to be relevant.

Perhaps most tellingly, GERE's own production undermines its relevance objections. On December 8, 2025, Hornbeck sent GERE a formal letter reminding it of its obligations under the charter party and warning of its intent to pursue legal action if GERE did not honor that agreement.[6] The very next day, Spofford sent himself three emails, each containing screenshots of text message

[6] This is reflected in Hornbeck's documents produced as Hornbeck_002489 and Hornbeck_009718 through Hornbeck_009797, which were designated confidential or highly confidential. The briefing schedule for this motion did not allow Hornbeck to seek leave to file confidential or highly confidential materials under seal in the time required by this Court's Individual Rules of Practices. Should the Court wish to review these documents, Hornbeck will promptly make them available to the Court and GERE by email.

exchanges between himself and Bojé, Lints, or Dennis.[7] Of the twenty-one screenshots Spofford sent himself of conversations between him and Bojé, eleven screenshots include partial redactions and four screenshots are completely redacted on the grounds that they are allegedly non-responsive pursuant to one of GERE's relevance objections.

But GERE cannot have it both ways. The day after receiving Hornbeck's letter, Spofford preserved these communications because he recognized their significance to the then-possible litigation. Having personally identified these documents as relevant enough to preserve for litigation, GERE cannot now credibly claim they are irrelevant or withhold them on that basis. Spofford's own conduct as a central player in the negotiation and breakdown of the Hornbeck/GERE charter party is the clearest evidence of what GERE actually believes to be relevant, and it forecloses GERE's relevance objections.

Moreover, GERE has already produced documents relevant to these very requests. For example, GERE produced a conversation in which Spofford and Furic discuss a tour of the Replacement Vessel, along with emails evidencing meetings between GERE and the Replacement Vessel's owner to discuss the proposed charter party.[8] This selective production in response to

[7] This is reflected in GERE's documents produced as GERE_00003872 through GERE_00003893, GERE_00003832 through GERE_00003834, and GERE_00002649 through GERE_00002666, which were designated confidential or highly confidential. The briefing schedule for this motion did not allow Hornbeck to seek leave to file confidential or highly confidential materials under seal in the time required by this Court's Individual Rules of Practices. Should the Court wish to review these documents, Hornbeck will promptly make them available to the Court and GERE by email.

[8] This is reflected in GERE's documents produced as GERE_00003778 through GERE_00003779, GERE_00003717 through GERE_00003718, and GERE_00003620 through GERE_00003621, which were designated confidential or highly confidential. The briefing schedule for this motion did not allow Hornbeck to seek leave to file confidential or highly confidential materials under seal in the time required by this Court's Individual Rules of Practices. Should the Court wish to review these documents, Hornbeck will promptly make them available to the Court and GERE by email.

Requests for Production Nos. 2, 16, and 17 opens the door to discovery of all other documents responsive to those requests. Either GERE produced these documents because it deemed them responsive or it chose to produce only those responsive documents favorable to its case. The first scenario would entirely undercut GERE's relevance objections. The second would amount to using responsive documents as both sword and shield—wielding the helpful ones while shielding those potentially damaging to its case. Under either scenario, Hornbeck is entitled to production of the remaining documents.

## IV. CONCLUSION

The documents Hornbeck seeks will inform GERE's standard negotiating practices, bearing directly on GERE's argument that the Hornbeck/GERE negotiations suffered from fatal deficiencies. GERE has also put these very negotiations at issue by relying on them to explain away statements that would otherwise evidence a binding agreement. Finally, GERE itself confirmed that these documents are relevant by preserving them for litigation and selectively producing some of them. Hornbeck respectfully requests that the Court grant its motion and order GERE to produce all documents responsive to Hornbeck's Requests for Production Nos. 2, 16, and 17.

Dated: September 21, 2026

Respectfully submitted,

*s/ Lauren M. Perry*

Daniel H. Charest (*pro hac vice* applicant)
BURNS CHAREST LLP
901 Main Street, Suite 5800
Dallas, Texas 75202
Tel.: (469) 904-4550
Fax: (469) 444-5002
dcharest@burnscharest.com

Claire B. Curwick (*pro hac vice* applicant)
Lauren M. Perry (*pro hac vice* applicant)
BURNS CHAREST LLP
201 St. Charles Avenue, Suite 2900
New Orleans, Louisiana 70170
Tel.: (504) 799-2845
Fax: (504) 881-1765
ccurwick@burnscharest.com
lperry@burnscharest.com

Matthew Tripolitsiotis (MT9413)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, New York 10017
Tel.: (469) 895-5269
Fax: (469) 444-5002
mtripolitsiotis@burnscharest.com

Counsel for Hornbeck Offshore Operators, LLC

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT-LIMITATIONS**

I, Lauren M. Perry, pursuant to Local Rule 7.1(c), hereby certify that this document contains 3,305 words. This word count does not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes or endnotes. I relied on the word count of the word-processing program used to prepare the document.

Dated: September 21, 2026

*s/ Lauren M. Perry*

Lauren M. Perry (*pro hac vice* applicant)