**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 26-cv-04776 |

# GE RENEWABLES US LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**


I PRELIMINARY STATEMENT ..... 1

II FACTUAL BACKGROUND ..... 2

A Background ..... 2

B GERE's Initial Review of the SOV Market in Early 2025 ..... 2

C GERE begins work to develop a proposal for the BRIARWOOD to take to management ..... 3

D GERE works to finalize the Hornbeck proposal to take to management ..... 5

E GERE management decides to charter the ROSS CANDIES, not the BRIARWOOD ..... 6

III LEGAL STANDARDS ..... 7

A Standard for Summary Judgment ..... 7

B Standard for a formation of a charter contract ..... 8

1. A maritime contract is reviewed under maritime law, which incorporates common law principles ..... 8

2. Industry customs ..... 9

3. "Essential" terms to a charter party include terms important to a party ..... 10

4. Whether a charter party must be signed is determined by the parties ..... 11

5. No charter is formed until Owner's conditions are lifted ..... 11

IV ARGUMENT ..... 12

A Hornbeck itself recognized that no charter existed as of November 17, 2025. ..... 12

B GERE made clear that it was preparing a proposal to management ..... 13

1. The SUPPLYTIME 2017 drafts incorporated GERE's "NO PO NO PAY" Policy ..... 14

2. Hornbeck was directly informed of the GERE "NO PO NO PAY" Policy by email on October 15, 2025 ..... 14

C Hornbeck itself did not commit to a binding charter ........ 15

1. Hornbeck's offer was "subject to vessel availability" and confirmation by a written "Vessel Order Confirmation" ........ 15

2. Hornbeck confirmed that it would not be bound until "All details of a Time Charter have been agreed" ........ 16

3. Neither party is bound unless both parties are bound ........ 17

D Hornbeck did not commit the BRIARWOOD to GERE ........ 17

E Hornbeck's Complaint misapprehends the applicable law ........ 18

F This is not a Great Circle Lines case ........ 19

G The parties never came to agreement on the essential terms ........ 19

H The so-called "Delivery Date" claimed by Hornbeck is an unenforceable term ........ 20

1. The proposed contract "deal" - for owner to deliver a vessel and charterer to pay for it – requires an actual delivery date ........ 20

2. Hornbeck's proposed "Delivery Date" was an open-ended "no sooner than" term to which GERE did not agree ........ 21

3. No contract exists where a term is too indefinite to be enforceable ........ 21

I The record plainly shows that the parties did not intend to be bound to a contract ........ 22

1. The Second Circuit has set out factors to determine the intent to be bound ........ 22

2. Those factors in this case show no intent to be bound ........ 22

V CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................7, 8

*In re Arb. Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.*,
84 F. Supp. 2d 527 (S.D.N.Y. 2000) ....................9, 11, 15, 17

*Asterope Shipping Co. v. CSC Sugar LLC*,
757 F. Supp. 3d 349 (S.D.N.Y. 2024), *appeal withdrawn,* No. 24-3231, 2025 WL 816758 (2d Cir. Feb. 27, 2025)....................8, 10, 18

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)....................7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................7

*Crawford v. Franklin Credit Mgmt. Corp.*,
758 F.3d 473 (2d Cir. 2014)....................7

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998)....................7

*Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*,
No. 14 CIV. 1370 ER, 2015 WL 5439217 (S.D.N.Y. Sept. 14, 2015)....................9

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001)....................7

*In re Great Circle Lines, Ltd.*,
Case No. 80-cv-1575 (CBM), 1981 WL 6769696 (S.D.N.Y. Oct. 16, 1981), *aff'd sub nom. Great Circle Lines, Ltd. v. Matheson & Co*., 681 F.2d 121 (2d Cir. 1982) ....................10, 18

*Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*,
601 U.S. 65 (2024)....................8

*Jarka Corp. v. Hellenic Lines, Ltd.*,
182 F.2d 916 (2d Cir. 1950)....................11, 17

*Krasnyi Oktyabr, Inc. v. Maersk A/S*,
775 F. Supp. 3d 813 (S.D.N.Y. 2025) ....................14

*May Ship Repair Contracting Corp. v. Barge Columbia New York*,
160 F. Supp. 2d 594 (S.D.N.Y. 2001) ....................18

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
121 F.3d 24 (2d Cir. 1997)....................14

*New York v. Mountain Tobacco Co.*,
942 F.3d 536 (2d Cir. 2019)....................7

*Norfolk S. Ry. Co. v. Kirby*,
543 U.S. 14 (2004)....................8

*Oparah v. The New York City Dep't of Educ.*,
No. 12 Civ. 8347(JGK)(SN), 2015 WL 4240733 (S.D.N.Y. July 10, 2015)....................9

*Orient Mid-E. Great Lakes Serv. v. Int'l Exp. Lines, Ltd.*,
315 F.2d 519 (4th Cir. 1963) ....................11, 17

*Phoenix Bulk Carriers Ltd. v. Oldendorff Carriers Gmbh & Co., KG.*,
No. 01-civ-11777 (NRB), 2002 WL 31478198 (S.D.N.Y. Nov. 6, 2002)....................15

*Rojas v. Roman Cath. Diocese of Rochester*,
660 F.3d 98 (2d Cir. 2011)....................8

*Safic Alcan & Cie v. M/T KASCO*,
565 F. Supp. 2d 519 (S.D.N.Y. 2008) ....................10

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998)....................8

*Signet Mar. Corp. v. NFE Transp. Partners LLC*,
No. 4:24-CV-03049, 2025 WL 3491631 (S.D. Tex. July 15, 2025) ....................11, 17

*Smith v. Barnesandnoble.com, LLC*,
839 F.3d 163 (2d Cir. 2016)....................7

*Sunskar Ltd. v. CDII Trading, Inc.*,
828 F. Supp. 2d 604 (S.D.N.Y. 2011) ....................10

*In the Matter of the Arbitration Between Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*,
681 F.2d 121 (2d Cir. 1982).................... *passim*

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
16 F. Supp. 2d 326 (S.D.N.Y.), *opinion withdrawn in part, modified in part*,
182 F.R.D. 97 (S.D.N.Y. 1998), and *aff'd*, 241 F.3d 135 (2d Cir. 2001)....................9

*United States v. Newport News Shipbuilding & Dry Dock Co.*,
571 F.2d 1283 (4th Cir. 1978) ....................15

*Winston v. Mediafare Ent. Corp.*,
777 F.2d 78 (2d Cir. 1985)....................22

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................7

http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm ....................4

Local Rule 56.1 ....................1

# I PRELIMINARY STATEMENT

The Complaint in this matter lacks any foundation in law or fact, as evidenced by the undisputed material facts of this matter as set out in GERE's Statement of Material Facts ("SOF") pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts Of New York (the "Local Rules").

Hornbeck Offshore Operators, LLC ("Hornbeck") alleges that GE Renewables US LLC ("GERE") entered into a binding contract for the charter of the vessel HOS BRIARWOOD (the "BRIARWOOD," or the "Vessel"), by either November 14 or 17, 2025, to begin "upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025." (Complaint, Dkt. 1, at 59-60.) But Hornbeck's own Executive Vice President, Chief Information Officer and Chief Commercial Officer John Cook knew that no charter contract had been reached on November 17, 2025, asking in an internal email late on that day, "*I don't see where it is addressed in the letter what happens if we do not reach a time charter*?" (SOF 44, 47, emphasis added).

That same evening, Hornbeck sent GERE a draft letter agreement acknowledging that "the "Vessel remains subject to availability as determined by Owners *until such time as all details of a Time Charter have been agreed to by Owners*." (SOF 48, 50, emphasis added). Hornbeck further admits that it had not been qualified as a contractor eligible for a contract with GERE, and that it was on constructive notice that no binding contract could be reached without an approved purchase order. (SOF 26-28, 138-139).

The very document that Hornbeck identifies as a "fixture recap" allegedly showing GERE's supposed agreement on "essential terms" and an agreement to be bound shows just the opposite – that the parties were unable to reach agreement on various essential issues, including most notably the delivery date, and that the parties did not intend to be bound prior to an executed

contract. (SOF 88-127) Hornbeck's claims against GERE fail as a matter of law, and GE is entitled to summary judgment.

## II FACTUAL BACKGROUND

### *A Background*

GERE is a subsidiary of GE Vernova, Inc. (GEVE) used by GEVE as a contracting vehicle in connection with U.S. offshore wind projects. (SOF 2). GEVE, through GE, is engaged in working on an offshore wind energy development project referred to as Vineyard Wind 1, located approximately 15 miles south of Martha's Vineyard, Massachusetts. (SOF 19). The Marine Operations Package Manager responsible for GE's marine operations on the project is Tyler Spofford. (SOF 1(a)(i)). In the Spring of 2025, GERE was using a chartered Service Operation Vessel ("SOV") named the "CADE CANDIES" equipped with a gangway system to house workers and enable them to "walk to work" on the structures being erected for the project. (SOF 18). A contract for the lease of a vessel is commonly referred to as a "charter," and the document evidencing the charter is commonly referred to as a "charter party." (SOF 5).

### *B GERE's Initial Review of the SOV Market in Early 2025*

In contemplation of the eventual end of the charter of the CADE CANDIES, Spofford contacted the ship broking company Clarksons in March 2025 for a market report on potentially available vessels. (SOF 19). When Spofford sought an update to the market report from Clarksons, that communication led to Hornbeck providing an "indicative offer" regarding potentially available vessels and requesting further details. (SOF 20, 22).

In response, GERE sent Hornbeck, through Clarksons, its contemplated mark-up of a SUPPLYTIME 2017 template charter form (the "GERE BIMCO Form"). (SOF 23, 24).

"SUPPLYTIME 2017" is a standardized template charter form produced by the Baltic and International Maritime Council, commonly known as "BIMCO." (SOF 23).

Spofford initially sought management approval for GERE to charter the Hornbeck vessel ROCINANTE for a period of three to five years. (SOF 29-31). He kept Hornbeck informed of his efforts to obtain the necessary management approval to enter into a charter of the vessel, which was eventually denied. (SOF 32).

***C GERE begins work to develop a proposal for the BRIARWOOD to take to management***

By October, GERE's needs for a vessel to support its operations with Vineyard Wind 1 in 2026 had become clearer, and Spofford, through Clarksons, communicated that information to Hornbeck. (SOF 33-35). On October 7, 2025, Hornbeck sent Spofford a revised commercial proposal for the BRIARWOOD. (SOF 36). The Proposal included various conditions, including the following:

> This offer may be revoked by HOS at any time and is subject to vessel availability, as solely determined by HOS. In no event shall Charterer's acceptance of this offer be binding on HOS until HOS issues to Charterer a written Vessel Order Confirmation that confirms the vessel's availability during the proposed charter term.

(SOF 38).

By mid-October, after having considered other vessel possibilities, Spofford sought to get clarity on Hornbeck's contractual proposal so that he could take it to GERE management. (SOF 35). Pierre Furic, a GEVE contractor, was brought in to assist with negotiations over Hornbeck's proposed contract terms. (SOF 1(a)(2)).

On October 15, 2025, GERE caused an email to be sent to Hornbeck by "GESupplierConnect@ge.com" with the subject heading "EXT: GE Supplier Invite," notifying Hornbeck that it was "identified as a candidate to become a supplier for "GE. Renewable Energy >> Off Shore Wind >> United States". (SOF 139). The email further stated that "Suppliers are

required to comply with our GE Supplier Integrity Guide and watch the training video: http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm." (SOF 139). The email also informed Hornbeck that "GE requires PO issuance prior to work being performed." (SOF 139). The internet address provided by the GE Supplier Invite leads to the GE Vernova Supplier Portal with links to Supplier Policies, including a "No PO No Pay" Policy, under which suppliers are informed that GE Vernova ("GEV") requires that a Purchase Order ("PO") be issued prior to any purchase commitment and supplier payment ("No PO, No Pay")." (SOF 16, 28).

In response to an email from Jonathan Lints of Clarksons on October 20, 2025, recommending against further negotiations with Hornbeck unless GERE was definitely going to charter their vessel, Spofford replied in part as follows:

> Consider this our hard counter to HOS — not our commitment. We do NOT yet have managements final approval, but interest from GEV being discussed internal is 10 mo firm for Briarwood with (2x) 6- month options Starting Dec 15, 2025.
>
> We need to close the gaps on the contract — to Pierre's point, we have never gotten full management approval before starting a neg like this. We now have enough clarity to know what we realistically need for'26, now we need to start closing the gaps and then *once we have a contract package, we get final management approval*.

(SOF 73, emphasis added).

Four days later, Spofford texted Lints and Bojé that he had "got permission last night from management to 'start negotiations' but final Approval upon final contract review." (SOF 76).

Also in October, Hornbeck was informed of the need to complete a contractor pre-qualification process referred to as "ComplyWorks" as a pre-requisite to any contract with GERE. (SOF 138, 139). Section 7.1 of GERE's draft Statement of Work (the "SOW") to be performed under the proposed charter stated: "Contractors shall complete a GEV EHS [environmental, health, and safety] qualification named ComplyWorks process prior to any contract being awarded." (SOF 140). On November 17, 2025, Hornbeck was informed by email that it had not been approved in

the ComplyWorks program and that it could not be an approved GERE vendor until it had received a qualifying score in the ComplyWorks program. (SOF 143).

To progress the proposed Hornbeck contract, Furic communicated with Lints and Bojé regarding the status of the GERE BIMCO Draft, and on October 21, 2025, emailed Lints stating in part that: "… business cases are never clear 100% while we do not have a strong and clear contract option in hand to display for management decision. It looks necessary to align each other today and to progress on this." (SOF 74). The same day, Lints told Shrives and Dennis of Hornbeck that GERE's "vessel needs are becoming cleaner" but that GERE's management still had to "give the green light" on certain commercial terms. (SOF 75).

***D GERE works to finalize the Hornbeck proposal to take to management***

Furic and Kevin Douglass of Hornbeck exchanged a series of negotiating drafts and comments through November 17, 2025. (SOF 77, 78, 89, 90). On November 13, 2025, however, GERE was contacted directly by the owner of the CADE CANDIES, a company named Otto Candies LLC, that it had another vessel, the ROSS CANDIES, that could be available to replace the CADE CANDIES when that vessel's charter ended. (SOF 144). Because GERE already had worked out terms and conditions of a charter with Otto Candies and had been working with the company throughout the charter of the CADE CANDIES, its contractual requirements were well-known to GERE. (SOF 18, 144, 145, 150).

By November 17, 2025, Furic sought to wrap up discussions with Hornbeck concerning its proposed charter of the BRIARWOOD to GERE. (SOF 90, 91). He planned to present the Hornbeck offer to GERE's management as an alternative proposal with the Otto Candies proposal for the ROSS CANDIES, in accordance with GERE's Sourcing Process. (SOF 11, 82, 146). Furic sent his final markup of the GERE BIMCO Draft to Douglass of Hornbeck with a number of comments on various issues, including the delivery date, early termination provisions, charter hire

escalation, liquidated damages terms, cancellation terms, mobilization work, off-hire terms, insurance terms, force majeure terms, and other matters pending legal review. (SOF 88-127).

In a call on November 18, 2025, Furic sought to close out the various open items to document the final status of the Hornbeck contract proposal. (SOF 80). On November 19, 2025, Douglass followed up with Furic for an updated draft so that he could insert Hornbeck's comments. (SOF 79). Furic did not save the comments from the meeting on the 18th, but informed Douglass that he had a good picture of where things stood, and that he expected a management decision whether to proceed with Hornbeck before the end of the week. (SOF 80).

***E GERE management decides to charter the ROSS CANDIES, not the BRIARWOOD***

The Hornbeck proposal was documented on a set of slides that Furic and Spofford provided to Spofford's supervisor Sebastian Mertens, who forwarded them to his supervisors with a recommendation that GERE charter the ROSS CANDIES rather than the BRIARWOOD. (SOF 148, 149). GERE's management agreed. (SOF 150).

Following the call of November 18, 2025, Hornbeck did not send any confirmation of the BRIARWOOD's availability to GERE and did not record the Vessel as being obligated to GERE for a charter on any computer system. (SOF 153-154). On November 19, 2025, Hornbeck sent out an offer to ENI US Operating Company Inc. for the charter of certain vessels, including the BRIARWOOD, for charter during the first quarter of 2026, overlapping with the same period for which it had been offering the BRIARWOOD to GERE. (SOF 155).

On November 26, 2025, Spofford and Furic informed Hornbeck that GERE would not be chartering the BRIARWOOD. (SOF 151)

## III LEGAL STANDARDS

### *A Standard for Summary Judgment*

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The party moving for summary judgment "bears the burden to demonstrate the absence of any genuine issues of material fact." *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019) (citing *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016)). If the moving party will not bear the burden of proof at trial, as is the case here, it may satisfy its burden by showing the court "an absence of evidence to support an essential element of the nonmoving party's" case or claim. *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014); *Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988). When opposing a motion for summary judgment, the "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also, Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)

If the evidence establishes the absence of an element essential to the nonmoving party's case, and on which that party will bear the burden of proof at trial, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial, and mandates the entry of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When reviewing for what constitutes a 'genuine dispute', the "mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (*emphasis in orig., Anderson*, 477 U.S. at 248. Evidence that is considered "merely colorable," "not significantly probative," a "conclusory allegation," an "unsubstantiated speculation," or merely raises "some metaphysical doubt" as to the material facts, is insufficient to ward off the granting of summary judgment. *Id at* 248–50; *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

"As to materiality... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

***B Standard for a formation of a charter contract***

**1. A maritime contract is reviewed under maritime law, which incorporates common law principles**

A charter is the paradigm of a maritime contract, and as such is subject to federal maritime law. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004). However, a court may apply state law when no maritime rule applies, and may recognize traditional principles of state common law. *See, e.g., Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 7, (2024); *Asterope Shipping Co. v. CSC Sugar LLC*, 757 F. Supp. 3d 349, 356 (S.D.N.Y. 2024), *appeal withdrawn,* No. 24-3231, 2025 WL 816758 (2d Cir. Feb. 27, 2025).

The United States Court of Appeals for the Second Circuit has noted that "a charter party is merely a contract, subject to all the rules and requirements of contract law," and "[w]hether there was a meeting of the minds resulting in a charter party is a question of fact." *In the Matter of the Arbitration Between Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 125 (2d Cir. 1982). Whether under maritime law or New York State law, a party seeking to enforce a contract

"must show that there was an offer, acceptance, consideration, mutual assent, and intent to be bound by the contract." *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, No. 14 CIV. 1370 ER, 2015 WL 5439217, at *9 n. 11 (S.D.N.Y. Sept. 14, 2015) (*quoting Oparah v. The New York City Dep't of Educ.*, No. 12 Civ. 8347(JGK)(SN), 2015 WL 4240733, at *9 (S.D.N.Y. July 10, 2015).

**2. Industry customs**

*Great Circle Lines* is quoted frequently for its description of the role of industry custom in the formation of charter parties:

> Charter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture." Second, after a "fixture" has been reached, the parties continue to negotiate "details" amending the form contract specified in the "fixture."

*Great Circle Lines*, 681 F.2d at 125.

An agreement between parties to a fixture based on agreement upon main terms is evidenced in the shipping industry through a communication referred to as a "fixture recap." Great Circle Lines noted that "A fixture recap is understood in the industry to be a recapitulation of the main terms that had been agreed upon in the negotiation of a charter party." *Id*. at 123. More precisely, "A 'recap' communication, or 'fixture,' is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co*., 16 F. Supp. 2d 326, 339 (S.D.N.Y.), *opinion withdrawn in part, modified in part*, 182 F.R.D. 97 (S.D.N.Y. 1998), and *aff'd*, 241 F.3d 135 (2d Cir. 2001); *In re Arb. Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.,* 84 F. Supp. 2d 527, 529 (S.D.N.Y. 2000).

Indeed, in *Great Circle Lines* and in every case citing it concerning a question of whether a charter has been reached, a fixture recap, or the lack of a fixture recap, is a critical element in determining whether the parties had agreed to a binding contract. *See, e.g., Great Circle Lines*, 681 F.2d at 125-26; *Asterope* 757 F. Supp. 3d at 355; *Sunskar Ltd. v. CDII Trading, Inc.*, 828 F. Supp. 2d 604, 610 (S.D.N.Y. 2011); *Safic Alcan & Cie v. M/T KASCO*, 565 F. Supp. 2d 519, 521 (S.D.N.Y. 2008).

Notably, *Great Circle Lines* addressed an international voyage charter (a charter for a voyage from one port to another) negotiated under severe time constraints. Neither *Great Circle Lines* nor any of the cases in this Circuit citing the case addressed a long-term charter of a vessel to be used in the offshore industry. The custom in the offshore industry, referring to those vessels that work on the Outer Continental Shelf, is not the same. In the offshore industry, the custom is a generally a more detailed negotiation for longer-term charters, subject to agreement on all details of the proposed charter party, as described more fully in the Report of expert witness Ian Perrot (SOF 4-9).

The Court need not resolve any question of specific industry customs, however: Hornbeck's own reservations, documents, and testimony establish that no charter was formed as a matter of basic common law and maritime law.

**3. "Essential" terms to a charter party include terms important to a party**

The court in *Great Circle Lines* listed a number of terms usually considered to be "main" terms, among which the court listed "any other term that a party deems important." *Great Circle Lines*, 681 F.2d at 125. The District Court below clarified that the essential terms are "those deemed important enough to the parties to raise during the first stage of negotiations." *In re Great Circle Lines, Ltd.*, Case No. 80-cv-1575 (CBM), 1981 WL 6769696 (S.D.N.Y. Oct. 16, 1981), *aff'd sub nom. Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121 (2d Cir. 1982).

**4. Whether a charter party must be signed is determined by the parties**

Whether a charter party must be signed to be effective is determined by the communications and conduct of the parties. The default position is that no signature is required once there is a meeting of the minds, however if "the agreement's text or surrounding circumstances reflect that the parties' signature is a prerequisite to contract formation, then the parties are not bound until that condition is satisfied." *Signet Mar. Corp. v. NFE Transp. Partners LLC*, No. 4:24-CV-03049, 2025 WL 3491631, at *5 (S.D. Tex. July 15, 2025); *see also Orient Mid-E. Great Lakes Serv. v. Int'l Exp. Lines, Ltd.*, 315 F.2d 519, 523–24 (4th Cir. 1963) (finding that the intent of the parties from the very beginning was that the charter party would become binding only upon signature of the final, written charter party, and because that intent was not achieved, ruling that "no charter resulted" since there was no meeting of the minds).

**5. No charter is formed until Owner's conditions are lifted**

Under maritime law, a purported agreement under which one party is bound but the other is not, is not a contract. *Jarka Corp. v. Hellenic Lines, Ltd.*, 182 F.2d 916, 918 (2d Cir. 1950). Such an agreement "lacks mutuality and is not legally enforceable." *Id.* This Court has held likewise, noting that "[W]hen an offer or a counteroffer is accepted subject to a condition or reservation, neither party is bound to an agreement until the condition or reservation has been withdrawn or satisfied." *Andolina Shipping*, 84 F. Supp. 2d at 530 (internal citations and quotes omitted). In chartering practice, the term for a condition precedent to a binding contract is commonly referred to as a "subject," and removing a condition is referred to as "lifting" the "subject." *See, e.g., id.* at 529. Accordingly, if a vessel owner's offer is "subject to vessel availability," then no binding contract exists until the owner lifts the subject and confirms the vessel availability to the proposed charterer. (SOF 8-9)

## IV ARGUMENT

### *A Hornbeck itself recognized that no charter existed as of November 17, 2025.*

On November 10, 2025, Spofford and Dennis texted each other concerning the modifications that would be needed if GERE were to charter the BRIARWOOD. (SOF 40). Spofford informed Dennis that: "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one which means if we take the boat, we may have to start without the [framing]. …" (*Id.*) In response, Dennis stated in part, "I think we can/should do an early works agreement to start material procurement." (SOF 41).

A few days later, Dennis's colleague at Hornbeck, Kevin Douglass, circulated a "Draft Authorization for Work" (commonly referred to by the parties as an "Early Works Letter") in the form of a draft letter agreement between GERE and Hornbeck to be put onto GERE letterhead. (SOF 42). On November 17, 2025, Douglass emailed the draft Early Works Letter to John Cook, Hornbeck's Executive Vice President, Chief Information Officer and Chief Commercial Officer. (SOF 44-45). While Douglass's email forwarding the draft Early Works Letter noted that it would be for $200,000 to be paid by GERE on a non-refundable basis, the draft Early Works Letter did not include the "non-refundable" language. (SOF 45-46).

Significantly, Hornbeck's Executive Vice President and Chief Commercial Office Cook responded by email later that day on November 17, 2025, at 4:42 PM, asking, "*I don't see where it is addressed in the letter what happens if we do not reach a time charter*?" (SOF 47, emphasis added). Plainly, Hornbeck's own most senior commercial officer did not believe that a binding time charter had been reached or agreed as of the close of business on November 17, 2025.

That evening, Douglass sent an updated draft of the Early Works Letter to Spofford, Furic and others. (SOF 48). The Early Works Letter drafted by Hornbeck and sent to GERE on the evening of November 17, 2025, included the following:

> *Charterers and Owners are engaged in contract negotiations* for the M/V HOS BRIARWOOD supporting walk-to-work operations at Vineyard Wind (the "Project"), …
>
> ***
>
> Charterers agree to pay Owners the non-refundable lump sum deposit of two hundred thousand United States Dollars ($200,000.00 USD) (the 'Preliminary Work Deposit')" to allow Owners to commence performance of "long lead" tasks.
>
> ***
>
> *The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners. Upon execution of the Time Charter, (i) the Letter Agreement shall automatically terminate, …*

(SOF 49-51 emphases added).

Dennis acknowledged at his deposition that the "Draft Authorization for Work" letter was drafted by Hornbeck in response to Spofford's comment of November 10, in which he noted that he did not see GERE authorizing procurement of materials until there was a contract, or close to one, and noting uncertainty whether GERE would "take the boat." (SOF 52).

Accordingly, contrary to what Hornbeck asserts in its Complaint, Hornbeck itself expressly recognized that no contract was formed on November 17, 2025, and therefore that none had been formed on November 13. On that fact alone, GERE is entitled to summary judgment.

### *B GERE made clear that it was preparing a proposal to management*

GERE made clear to Hornbeck that it was preparing a proposal for management review and approval and that any charter would further require a purchase order, and approval of Hornbeck as a contractor. (SOF 72-76; 79-87, 139)

**1. The SUPPLYTIME 2017 drafts incorporated GERE's "NO PO NO PAY" Policy**

In its early communications to Hornbeck on June 27, 2025, GERE provided Hornbeck with its initial markup of the standard SUPPLYTIME 2017 charter form (the "GERE BIMCO Form") (SOF 23). That draft included an express reference and incorporation of GERE's Guidelines – Third Party Suppliers (the "Guidelines"), provided the internet address of those Guidelines, and required Hornbeck to acknowledge receipt and agree to comply fully with the Guidelines. (SOF 26-28). The Guidelines included a "No PO No Pay" policy that stated, in its first line, that "GE Vernova ("GEV") requires that a Purchase Order ("PO") be issued prior to any purchase commitment and supplier payment ("No PO, No Pay")." (SOF 16, 28).

A proposed maritime contract can validly incorporate by reference terms from another document when the proposed contract makes clear reference to it and describes it so that its identity may be determined beyond doubt. *See, e.g., New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997); *Krasnyi Oktyabr, Inc. v. Maersk A/S*, 775 F. Supp. 3d 813, 818 (S.D.N.Y. 2025).

The term requiring the owner to acknowledge receipt of the Guidelines remained in every draft of the GERE BIMCO Draft that the parties exchanged. (SOF 26-28; 63). The reference to the Guidelines included an internet address that leads straight to the Supplier Policies, including the "No PO No Pay" Policy. (SOF 26, 61). Hornbeck's corporate designee, Adam Shrives, testified that he, as head of Hornbeck's Commercial Group, would expect that one of his people would have reviewed the Guidelines. (SOF 64).

**2. Hornbeck was directly informed of the GERE "NO PO NO PAY" Policy by email on October 15, 2025**

Hornbeck was also put on notice of that policy by "Supplier Invite" email sent on behalf of GERE on October 15, 2025. (SOF 139). That email notified Hornbeck that it was "identified as

a candidate to become a supplier for GERE, advised Hornbeck of the link to GERE Supplier policies, including its "No PO No Pay" policy, and expressly informed Hornbeck that "GE requires PO issuance prior to work being performed." (SOF139).

Further, throughout their communications with Hornbeck, Tyler Spofford and Pierre Furic repeatedly communicated the need to have contract approval decisions made by GERE's management, consistent with the "No PO No Pay" Policy. (SOF 68-71, 75, 79-80). The day after the November 18 call with Hornbeck, Furic told Hornbeck that GERE would "finalise contract once we have management confirmation to proceed with your offer." (SOF 80).

Hornbeck was thus on notice – or at the very least, constructive notice – that no binding contract could be formed with GERE prior to management approval and the issuance of a purchase order. As Hornbeck well knows, no purchase order was issued to Hornbeck for the charter of the BRIARWOOD. (SOF 152). For that reason as well, GERE is entitled to summary judgment.

***C Hornbeck itself did not commit to a binding charter***

A well-established principle of maritime law provides that where a party to a proposed charter party notes that its acceptance of the charter is subject to a condition or reservation, then "neither party is bound to an agreement until the condition or reservation has been withdrawn or satisfied." *Andolina*, 84 F.Supp.2d at 530 (*quoting United States v. Newport News Shipbuilding & Dry Dock Co*., 571 F.2d 1283, 1286 (4th Cir.1978)); *see also Phoenix Bulk Carriers Ltd. v. Oldendorff Carriers Gmbh & Co., KG*., No. 01-civ-11777 (NRB), 2002 WL 31478198, at *3 (S.D.N.Y. Nov. 6, 2002).

**1. Hornbeck's offer was "subject to vessel availability" and confirmation by a written "Vessel Order Confirmation"**

Hornbeck's offer of the BRIARWOOD was expressly subject to such a condition, by which Hornbeck made clear that it did not intend to be bound to a contract until it confirmed vessel

availability in writing. Hornbeck's offer of the Vessel to GERE, the final version of which was sent on October 7, 2025, expressly stated that:

> This offer may be revoked by HOS at any time and is subject to vessel availability, as solely determined by HOS. In no event shall Charterer's acceptance of this offer be binding on HOS until HOS issues to Charterer a written Vessel Order Confirmation that confirms the vessel's availability during the proposed charter term.

(SOF 36-38). Hornbeck never issued a written Vessel Order Confirmation to GERE. (SOF 39).

**2. Hornbeck confirmed that it would not be bound until "All details of a Time Charter have been agreed"**

Hornbeck reiterated its "subject to vessel availability" condition in its "Draft Authorization for Work" letter that it prepared and proposed to GERE at 5:43PM on the evening of November 17, 2025. (SOF 48, 50). That document stated that "Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners." (SOF 50)

Hornbeck's corporate designee testified that Hornbeck's standard practice is to make its offers subject to vessel availability, until the parties come to agreement on a final contract. (SOF 54). He further testified that Hornbeck does not lift that condition until the parties execute a contract and circulate the signed document among the parties. (SOF 54, 55). He went on to explain that Hornbeck would not mobilize the BRIARWOOD and make it available to GERE until the charter party was actually signed. (SOF 56, 57).

Similarly, even though the proposed charter provided for billing in arrears, thus extending credit to GERE, Hornbeck agreed that it would not require a signed parent company guarantee (PCG) from GERE's parent entity GEVE until contract signature. (SOF 104, 118, 119) Since the whole point of a PCG is to provide security to the entity relying upon it, Hornbeck's agreement

that no PCG was required until contract signature further confirms that Hornbeck did not intend to be bound to provide either the Vessel or services until a charter party was signed.

### 3. Neither party is bound unless both parties are bound

Where a vessel owner has expressly conditioned its agreement to a charter to a condition precedent – the availability of the vessel in its own discretion, and the execution of a charter party – and has not bound itself to perform under the proposed charter, then neither party is bound to a fixture. *Jarka Corp. v. Hellenic Lines, Ltd.*, 182 F.2d 916, 918 (2d Cir. 1950); *In re Arb. Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.*, 84 F. Supp. 2d 527, 530 (S.D.N.Y. 2000); *see also Signet Mar. Corp. v. NFE Transp. Partners LLC*, No. 4:24-CV-03049, 2025 WL 3491631, at *5 (S.D. Tex. July 15, 2025); *see also Orient Mid-E. Great Lakes Serv. v. Int'l Exp. Lines, Ltd.*, 315 F.2d 519, 523–24 (4th Cir. 1963). Such is the case here. Hornbeck expressly made its commitment to the proposed charter contingent upon its issuance of a written "Vessel Order Confirmation," and an executed charter. Neither event occurred, and no binding charter was reached. GERE is therefore entitled to summary judgment.

### *D Hornbeck did not commit the BRIARWOOD to GERE*

In addition to the foregoing, Hornbeck's actions following the call of November 18, 2025 are inconsistent with the formation of a binding charter. Following the call of November 18, 2025, Hornbeck did not send any confirmation of the BRIARWOOD's availability to GERE, and did not record the Vessel as being obligated to GERE for a charter on any computer system. (SOF 153-154). On November 19, 2025, Hornbeck offered the BRIARWOOD to another entity – ENI US Operating Company Inc. ("ENI") – for the first quarter of 2026, overlapping for months with the same period for which it had proposed the Vessel to GERE. (SOF 155). That offer to ENI was *consistent* with Hornbeck's condition in its October 7, 2025 proposal that its offer of the BRIARWOOD to GERE remained "subject to vessel availability," as repeated by Hornbeck in its

"Draft Authorization for Work" letter sent to GERE on November 17, 2025; and *inconsistent* with its claim of having reached a binding fixture with GERE on November 17, 2025.

***E Hornbeck's Complaint misapprehends the applicable law***

Hornbeck's claim is premised upon the legal theory that a party is bound to a maritime contract upon agreement to certain "essential terms" – which it contends are limited to the vessel owner, the charterer, the vessel, a delivery window (no matter how indefinite), duration, redelivery date, port of delivery, port of redelivery, and the rate – even if the party has no intention of being bound to a contract at that point and does not communicate any intention to be bound. (SOF 156). As discussed below, that is not the law.

First, as a well-established matter of contract law, a contract requires an expression of an intent to be bound. *See, e.g., May Ship Repair Contracting Corp. v. Barge Columbia New York,* 160 F. Supp. 2d 594, 597 (S.D.N.Y. 2001). As noted above, in chartering, such expression is given in the form of a "fixture recap" in which the parties recapitulate the main terms that have been agreed and express an agreement to the fixture of the vessel. *Great Circle Lines*, 681 F.2d at 123; *Asterope Shipping Co. v. CSC Sugar LLC*, 757 F. Supp. 3d 349, 355 (S.D.N.Y. 2024). There was no fixture recap here. (SOF 88-128)

Second, Hornbeck overlooks the law as noted by the District Court in *Great Circle Lines*, that the "essential terms" required for a fixture based on agreement to "essential terms" include "those deemed important enough to the parties to raise during the first stage of negotiations." *In re Great Circle Lines, supra*, 1981 WL 6769696.

When Hornbeck's corporate designee Adam Shrives was asked in his deposition whether there were any terms, other than the vessel owner, charterer, vessel, delivery date, duration, redelivery date, ports of delivery and redelivery, and charter rate that were important to Hornbeck,

he testified that "[a]ll of the open items are important in some way or another. They're still discussing them." (SOF 129).

***F This is not a* Great Circle Lines *case***

The *Great Circle Lines* case describes dealings between parties as being "usually conducted with a sense of urgency under severe time constraints." *Great Circle Lines*, 681 F.2d at 125. The *Great Circle Lines* case itself involved hurried negotiations over the span of three days. *Id*. at 123-24. As described more fully in Section III.B.2 above, the two-stage process was described by the court as a "bare-bones" contract on significant "main terms," including an agreed charter form, possibly followed by further negotiations over amending the form contract. *Id*. at 125. This is not that case.

In this case, the parties negotiated the entirety of the proposed contract over the span of months. (SOF 22, 151). All of those terms – negotiated from the first stage of negotiations onward, were important – *i.e.*, essential – terms as defined by *Great Circle Lines*, and as agreed by Hornbeck. Even if the parties had come to agreement on "essential term" – and they did not, as set out below –agree on a standard form. Rather, the contract, while based on the BIMCO SUPPLYTIME 2017 form, was replete with issues still in dispute as of November 17, 2025. (SOF 93-128). In such a case, the parties could not follow the approach contemplated by the court in *Great Circle Lines*, under which if parties don't agree on post-fixture amendments to the standard form details, then the terms of the standard form govern. *Great Circle Lines*, 681 F.2d at 125. Rather, the parties – and the court - would be left in a morass, unable to determine the disputed terms of an alleged contract.

***G The parties never came to agreement on the essential terms***

Hornbeck points to the November 17, 2025 markup of the GERE BIMCO Draft as the supposed "fixture recap" for the charter it alleges. (SOF 88, 91, 92). That document is not a

fixture recap in either form or substance. It is replete with disagreements on essential terms that had been negotiated from the outset, and still not resolved, including the delivery date, redelivery date, charter hire, charter hire escalation, liquidated damages, cancellation, early termination, off-hire, modifications, mobilization, interest rate, allocation of costs for transportation of certain supplies and spares, indemnification terms, force majeure, and protection of proprietary information, among other issues. (SOF 93-127).

***H The so-called "Delivery Date" claimed by Hornbeck is an unenforceable term***

**1. The proposed contract "deal" - for owner to deliver a vessel and charterer to pay for it – requires an actual delivery date**

The "deal" intended by a vessel charter is that the vessel owner agrees to deliver a vessel to the charterer and perform the agreed services, and the charterer agrees to accept delivery of the vessel and pay charter hire. (SOF 134, 135). Specifically with regard to the charter that Hornbeck alleges it reached with GERE, Hornbeck's corporate designee testified that Hornbeck's obligation would have been to: "deliver the vessel … within the time frame we agreed," and GERE's obligation would have been to "accept the vessel on hire and pay for the services." (SOF 136, 137). A clear "delivery date" for the vessel is therefore a critical term for a vessel charter in general, and for the alleged charter in particular. However, the "date" that Hornbeck alleges was agreed was neither a date, agreed, nor enforceable.

Box 5 of the GERE BIMCO Draft of SUPPLYTIME 2017 is intended to state the delivery date – the date on which the vessel owner Hornbeck would be required to deliver the BRIARWOOD to GERE. (SOF 93). Under Clause 2(a)(iii) of the GERE BIMCO Draft, if the owner would fail to deliver the BRIARWOOD by the delivery date, then after three days, charterer would be entitled to liquidated damages (although the liquidated damages clause was "reserved" by Hornbeck). (SOF 113, 114). Similarly, under Clause 2(b), if owner were to fail to deliver the

BRIARWOOD by the date set out in Box 6, which date is based upon the Delivery Date, then charterer would have the right to cancel the charter. (SOF 100).

**2. Hornbeck's proposed "Delivery Date" was an open-ended "no sooner than" term to which GERE did not agree**

Hornbeck's proposed "Delivery Date" in Box 5 stated "Upon availability of the Vessel following redelivery from Owners' other customer, but *no sooner* than December 15, 2025 at 0001 hours." (SOF 93, emphasis added). Hornbeck's proposed "Cancellation Date" in Box 6 stated "Delivery date in box 5 +" and "7 days." (SOF 100).

GERE had repeatedly disagreed with those proposed "delivery dates," repeatedly demanding that Box 5 to the GERE BIMCO Draft set out a "clear delivery date," with Furic commenting on November 17, 2025, that "Comment was made that Lds and cancelling date shall be based on clear delivery date." (SOF 97). Furic further commented to Box 6 of the GERE BIMCO Draft that "Date is understood to be here 15 dec +7 = 22 dec. GE has shown interest to deliver on dec 15th in order to have time to perform mobilization , anticipate about January scope , so having a proper ops handover and potentially perform a scope of coil exchange from dec 15th." (SOF 102). Leaving aside that the proposed "delivery date" was clearly not agreed, the delivery date as proposed by Hornbeck would have been an unenforceable term.

Hornbeck's proposed term does not specify what "other customer" of Owner to which it refers and provides no date by which Hornbeck would be required to deliver the Vessel. Indeed, Hornbeck's Jason Dennis was unable to identify a specific date on which GERE's rights to cancellation or liquidated damages would become enforceable. (SOF 96).

**3. No contract exists where a term is too indefinite to be enforceable**

Under general contract law principles as well as maritime law, no charter exists where a term is too indefinite to be enforceable. *Great Circle Lines*, 681 F.2d. at 124. Even assuming,

*arguendo*, that GERE had agreed to the "delivery date" as proposed by Hornbeck, that critical term – the date on which Hornbeck would be required to deliver the Vessel to GERE – would not have been enforceable. If Hornbeck were to decide to extend the charter to its other customer on which the Vessel was engaged for a year or more, ultimately accepting redelivery on November 4, 2026, or any other date and then "delivering" the Vessel to GERE at that point, GERE would have no contractual remedy. This issue alone merits summary judgment in favor of GERE.

## *I The record plainly shows that the parties did not intend to be bound to a contract*

### 1. The Second Circuit has set out factors to determine the intent to be bound

While oral agreements are generally enforceable in maritime law, they still require proof of agreement. *Great Circle Lines* at 124. The Second Circuit Court of Appeals has articulated several factors a court may consider to determine whether parties intended to be bound to a contract in the absence of an executed agreement. "The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

### 2. Those factors in this case show no intent to be bound

Here, the record plainly shows that the parties did not intend to be bound to a contract in the absence of an executed charter party under the factors set forth in *Winston*.

First, Hornbeck expressly reserved its right not to be bound, as its offer was "subject to vessel availability" and would only bind Hornbeck upon its issuance of a written Vessel Order Confirmation, which it did not issue, and it expressly stated in the Draft Authorization for Work that it drafted and provided to GERE that the vessel would be subject to availability until it had

agreed to all details of a charter party and executed a charter party, and GERE expressly required that a purchase order be issued prior to any purchase commitment. (SOF 38, 39, 50, 139).

Second, there was no partial performance, as GERE paid nothing, and Hornbeck did not commit or mobilize the Vessel. (SOF 152-154).

Third, the parties had not agreed on all terms, as the last-exchanged markup was replete with open items, including essential items. (SOF 93-127).

Fourth and finally, a multi-month offshore charter with extension options, a PCG, and a negotiated SUPPLYTIME 2017 form is exactly the type of agreement that is committed to writing. (SOF 9). Hornbeck's own drafting of the proposed charter party deemed its mobilization fee earned only "upon Charter Party execution"; Hornbeck agreed to the required PCG being signed only "at contract signature"; and Hornbeck's corporate designee stated clearly that Hornbeck would not perform unless and until a charter party was signed. (SOF 56, 57, 104). The record is clear that neither party intended to be bound without an executed charter party. GERE is therefore entitled to summary judgment.

## V CONCLUSION

As demonstrated above, this matter presents no genuine dispute of material fact. On the documents and Hornbeck's own admissions, the facts are plain that neither party agreed to be bound without an executed charter party, and that Hornbeck never lifted its condition of "subject to vessel availability." Hornbeck's own Executive Vice President acknowledged that no charter had been reached by November 17, 2025. Hornbeck's "Draft Authorization for Work" stated Hornbeck's position that no contract would be reached until agreement on all details of a charter party. Hornbeck's corporate representative further testified under oath that Hornbeck would not consider itself bound until an executed charter party had been circulated between the parties. For

the foregoing reasons, GERE respectfully requests this Court to grant summary judgment to GERE.

Dated: November 4, 2026

Respectfully Submitted,

**MILLS BLACK LLP**

By: *<u>/s/ H. Allen Black</u>*

H. Allen Black
Peter F. Black
Kathryn L. Fitzgerald
1215 19th Street, NW
Washington, DC 20036
hablack@millsblack.com
pblack@millsblack.com
kfitzgerald@millsblack.com

**WINSTON TAYLOR LLP**

By: *<u>/s/ Aldo A. Badini</u>*

Aldo A. Badini
200 Park Avenue
New York, NY 10166-4193
aldo.badini@winstontaylor.com

*Counsel to GE Renewables US LLC*

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c), I hereby certify that the foregoing memorandum of law is twenty-five pages and contains 7,541 words, exclusive of the caption, table of authorities, and signature block, as counted by the Microsoft Word software used to prepare this document.

*/s/ H. Allen Black*
H. Allen Black