**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 26-cv-04776 |

**DEFENDANT GE RENEWABLES US LLC**
**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts Of New York, Defendant GE Renewables US LLC ("GERE") submits the following statement of undisputed material facts for which there is no genuine issue to be tried. The Exhibits noted below are to the Declaration of Kathryn L. Fitzgerald, submitted herewith.

## I. BACKGROUND

### *A. Persons involved in this matter*

1. The persons involved in this matter include:

(a) GERE Representatives

(1) Tyler Spoffard is the Vineyard Wind – 1 Marine Operations Package Manager. (Exhibit 1- Spofford Deposition, 48:06-49:09).

(2) Pierre Furic is a consultant who assists GE Vernova entities with getting offers to charter offshore support vessels. (Exhibit 2 – Furic Deposition, 17:05-24)

(3) Sebastian Mertens was the Executive Project Director of Vineyard Wind from May 2025 through December of 2025. (Exhibit 3 – Mertens Deposition, 31:12-15)

(b) Hornbeck Representatives

(1) Adam Shrives was Vice President of Business Development in 2025 and he led the commercial department in pursuit of business opportunities. (Exhibit 4 – Dennis Deposition, 40:13-41:14)

(2) Kevin Douglass is the Director of Contracts. (Exhibit 4, 41:21-23)

(3) Jason Dennis was the Senior Director of Business Development from June 2025 through December 2025. (Exhibit 4, 21:23-22:01).

(4) Todd Hornbeck was the Chief Executive Officer ("CEO") of Hornbeck Offshore Operators LLC from June 2025 through December 2025. (Exhibit 4, 32:15-18).

(c) Clarksons, the charter brokers

(1) Jonathan Lints is the Subsea Director. (Exhibit 5 - Bojé Deposition, 57:09-19)

(2) Tyler Bojé is a broker for Clarksons. (Exhibit 4, 133:07-11)

***B. Company Descriptions***

2. GE Renewables US LLC is a subsidiary of GE Vernova that conducts business in the offshore wind sector including the Vineyard Wind 1 project. (Exhibit 3, 21:21–23:24; Hornbeck_001211)

3. Hornbeck Offshore Operators LLC is in the business of operating and owning offshore supply vessels, offshore construction vessels and various other offshore assets. (Exhibit 7 – Shrives Deposition, 10:20-23)

### *C. Common Offshore Industry Practices*

4. The offshore industry refers to the provision of offshore support vessels, referred to as "OSVs" that provide support for work at offshore worksites. (Exhibit 8 - Expert Report of Ian Perrott, p.1-2)

5. A Contract for the lease of a vessel is commonly referred to as a charter or a charter party. (Exhibit 8, p. 2).

6. An agreement to a charter is often called a "fixture." (Exhibit 8, p. 2).

7. A vessel is "fixed" to a charter when Charterers have agreed to be bound to the charter, and the Owners have agreed that the vessel is committed to the charter and no longer available to others for the applicable term of the charter. (Exhibit 8, p. 2).

8. It is common for "Owners [to] make their offers to Charterers subject to vessel availability, meaning that the vessel is not committed to the Charterer, and the Owners remain free to continue to look for better proposals from other customers." (Exhibit 8, p. 4).

9. Lifting a "subject availability" condition can occur in a number of ways including "a verbal or written request to do so from a broker or Charterer" or when an owner is "asked to accept the fixture and confirm the lifting of the subject by signing and returning the confirmation," or "through a letter of intent where the owner is asked to accept and sign the letter of intent stating the subject is lifted." (Exhibit 8, p. 6)

***D. GERE Sourcing Procedures***

10. GERE's procedures for sourcing services and products are set out in a document titled "PMO Sourcing Process" (Rev. 2.0) (GERE 3939, the "Sourcing Process"; Exhibit 9 - GERE_3939 – 3957).

11. Section 4.1 of the Sourcing Process provides a flow chart that illustrates GERE's sourcing check-points and indicates that when a purchase is forecasted to be greater than 25K, the next step is to engage in a "Competitive bidding" phase with the potential suppliers. (Exhibit 9, GERE_3941).

12. Under the Sourcing Process, any purchase estimated to be in excess of $25,000 requires two quotations to be received. (Exhibit 9, GERE 3944).

13. The Sourcing Process require that every purchase must be approved through a Purchase Requisition process. (Exhibit 9, GERE 3948).

14. The Sourcing Process provide that a Purchase Order is the "legal binding document for sourcing between [GERE] and the supplier." (Exhibit 9, GERE 3949).

15. GEVE and its subsidiaries, including GERE, have a "No PO, No Pay" policy. (Exhibit 10, GERE 3959).

16. The No PO No Pay Policy states in its first sentence that "GE Vernova ("GEV") requires that a Purchase Order ("PO") be issued prior to any purchase commitment and supplier payment ("No PO, No Pay")." (Exhibit 10, GERE 3959).

17. The No PO No Pay Policy recognizes certain listed exceptions, but none are applicable to a vessel charter. (Exhibit 10, GERE 3959-63).

***E. Initial Contacts Between GERE and Hornbeck***

18. In 2025, the vessel CADE CANDIES was being chartered by GERE for the Vineyard Wind 1 project. (Exhibit 2, 16:19-17:03).

19. In March 2025, GERE began exploring alternatives for obtaining vessels to support its operations in connection with the Vineyard Wind 1 project; an offshore wind installation located in the Atlantic Ocean, 15 miles south of Martha's Vineyard, Massachusetts. (Exhibit 5, 74:10-76:21; Exhibit 11, GERE 0123-124).

20. On June 19, 2025, Mr. Spofford requested via email that Mr. Bojé and Mr. Lints provide an update to the report they "created in March specifically for available W2W MPSV's starting Nov 25 for 1/3/5 yr charter availability" and to provide an "indicative offer for the Rocinante starting Nov 25 for 3 and 5 years with appropriate options[.]" (Exhibit 12, GERE_121-122).

21. In June 2025, Hornbeck was aware that it was one of possibly multiple vessel owners being considered to provide a "Service Operations Vessel" (or "SOV") to support GERE's operations in connection with the Vineyard Wind 1 project. (Exhibit 13 - Hornbeck's response to GERE's Request for Admission No. 2).

22. On June 25, 2025, Hornbeck sent GERE a proposal offering the SOV's ROCINANTE, WOODLAND, and RIVERBEND in connection with the Vineyard Wind 1 project with an estimated start date of November 1, 2025, and to continue for a term between 1 and 5 years. (Exhibit 13, No. 4.; Exhibit 14, Hornbeck 0006 – 8).

23. On June 27, 2025, Mark Ransom of Clarksons sent Kevin Douglass, Jason Dennis, and Patrick Gagnet of Hornbeck and copied Tyler Bojé of Clarksons, an email with an attachment identified as "HOS GE_2025 v7.pdf," a draft standard vessel charter form titled "SUPPLYTIME 2017" published by the Baltic and International Maritime Council ("BIMCO"), as revised by GERE for its chartering purposes (referred to in this document as the "GERE BIMCO Form") and stating as follows: "Please find attached and updated BIMCO SUPPLYTIME 2017 draft for the

W2W vessel for Vineyard Wind, in .docx format." (Exhibit 15, Hornbeck 1352; Exhibit 7, 94:16-25).

24. The GERE BIMCO Form attached to the June 27, 2025 email from Mark Ransom contained underscored red text throughout the document indicating changes to the document. (Exhibit 16, Hornbeck 4058 – 4104; Exhibit 7, 95:13-24).

25. The changes to the GERE BIMCO Form attached to the June 27, 2025 email from Mark Ransom were made by GERE before Clarksons sent the document to the Hornbeck recipients. (Exhibit 7, 95:25-96:08; Exhibit 16, Hornbeck 4058 – 4104).

26. Clause 43 (i) subpart (ii) of the GERE BIMCO Form included a term under which Owners acknowledge receipt of the "Guidelines – Third Party Suppliers (the "Guidelines")." (Exhibit 16, Hornbeck 4091; Exhibit 7, 97:01-13).

27. Clause 43 (i) subpart (ii) states that the Guidelines are located at the following Internet address:

> http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm.
>
> And it goes on to state:
>
> Owners agree that they will: (i) comply fully with the Guidelines and the Guide in the performance of the Services, (ii) provide a copy of the Guide to Owners' Employees; (iii) instruct Owners' Employees to comply with such documents; and (iv) be responsible for any failure of Owners' Employees to comply with such documents."
>
> (Exhibit 16, Hornbeck 4091; Exhibit 7, 97:01-98:05).

28. The internet address stated in Clause 43(i)(ii) leads to a page where a person may choose one of two links – one for GE Aerospace and one for GE Vernova. When the user clicks the GE Vernova link, the user is led to the GE Vernova Supplier Portal. That Supplier Portal has a link to "Supplier Policies." The Supplier Policies include links to various policies, including the "No PO No Pay" Policy. (Exhibit 50, Declaration of Tyler Spofford at ¶6).

29. On July 16, 2025, Mr. Tyler Spofford informed Mr. Jason Dennis and Mr. Tyler Bojé by email that GERE has "had 3 additional meetings since last week on the biz case and justification of Rocinante and should have our final review by EOW for Senior Management to make their pitch to CEO beginning of next." (Exhibit 13, No. 5.; Exhibit 17, Hornbeck 1415).

30. On July 24, 2025, Mr. Spofford sent a text message to Mr. Dennis (who testified that he is "Local User <H:\>" in Hornbeck's production) suggesting that the process for approval of the "biz case" would involve the "VP" taking the matter to the "CEO," and the "CEO and CFO" of GE Vernova to make the decision. (Exhibit 13, No. 6.; Exhibit 4, 208:02-25; Exhibit 18, Hornbeck 1436 – 1439).

31. On July 25, 2025, Mr. Dennis informed Adam Shrives by text that GERE personnel would be presenting the proposal for the "biz case" to the CEO of GE Vernova for a decision. (Exhibit 13, No. 7.; Exhibit 19, Hornbeck 1440).

32. Mr. Spofford testified that the "business case" for a "Three-year SOV … was not approved" by management and he "had to go back to the drawing board" for other options including charter "duration, other vessel options" because the decision to charter a vessel is "not just a marine operations consideration. It's a total business and offshore operations, like, efficiency question that has to be looked at." (Exhibit 1, 138:01 – 139:03).

33. By October 2025, GERE's needs for a vessel for 2026 had become clearer, and Spofford communicated that information to Hornbeck. (Exhibit 20, Hornbeck 1677 &1679).

34. By October 17, 2025, Mr. Spofford had communicated to Mr. Dennis that he was still presenting options to management and waiting on management decisions but was anticipating a December start to support work. (Exhibit 20, Hornbeck 1679)

35. On October 17, 2025, at 10:21, Tyler Spofford wrote to Clarksons requesting clarification as to where they were with negotiating the charter offers with Hornbeck and stated "[w]e need to get very clear about where the remaining sticking points are and where each company will not concede." (Exhibit 21, GERE 4198)

## II. HORNBECK STATED A CLEAR INTENTION TO NOT BE BOUND

### *A. Hornbeck made clear it did not intend to be bound without a written Vessel Order Confirmation*

36. On October 7, 2025, Rosemary Ramirez of Hornbeck sent a revised proposal offering the vessel HOS BRIARWOOD for charter by email to Mr. Spofford on behalf of Mr. Dennis and copied Mr. Dennis and Mr. Bojé on the email. (Exhibit 13 No. 102; Exhibit 22, Hornbeck 0331)

37. The revised proposal sent on October 7, 2025, was for the proposed charter by GERE of the HOS BRIARWOOD as an SOV for use on the Vineyard Wind 1 project beginning on December 15, 2025. (Exhibit 13 No. 103; Exhibit 23, Hornbeck 0336)

38. The revised proposal included the following statement:

> Rates assume a mutually agreeable BIMCO Supplytime 2005 with appropriate amendments for the work scope and geography. Rates do NOT consider any COVID-19 impact or restrictions on vessel crew travel / crew changes.
>
> Pricing is valid until close of business on October 31, 2025, unless extended in writing by mutual agreement of Owner and Charterer. This offer may be revoked by HOS at any time and is subject to vessel fixture availability, as solely determined by HOS. In no event shall Charterer's acceptance of this offer be binding on HOS until HOS issues to Charterer a written Vessel Order Confirmation that confirms the vessel's availability during the proposed charter term.

(Exhibit 13 No. 105; Exhibit 23, Hornbeck 0343)

### *B. Hornbeck did not issue the written "Vessel Order Confirmation" that it stated would be required before Hornbeck would be bound to the proposed charter*

39. Hornbeck never issued a written Vessel Order Confirmation to GERE. (Exhibit 13 No. 13; Exhibit 7, 65:11-13)

### *C. Hornbeck's proposed draft "Early Works Letter" confirmed Hornbeck did not intend to be bound until agreement of all terms of a charter party and execution of a contract*

40. On November 10, 2025, Mr. Spofford texted Mr. Dennis, stating in part, "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one which means if we take the boat, we may have to start without the grillage. …" (Exhibit 13, No. 31; Exhibit 24, Hornbeck 2020).

41. On November 10, 2025, in response to Mr. Spofford's text, Mr. Dennis texted Mr. Spofford, stating in part, "Concept is to pre-fabricate grillage and truck to location for installation on vessel. I think we can / should do an early works agreement to start material procurement." (Exhibit 4, 210:14-19; Exhibit 24, Hornbeck 2021).

42. On November 13, 2025, Mr. Douglass circulated within Hornbeck an internal "Draft Authorization for Work" letter (commonly referred to by the parties as an "Early Works Letter") in the form of a draft letter agreement between GERE and Hornbeck, dated November 14, 2025. (Exhibit 13 No. 93, Exhibit 25, Hornbeck 2352).

43. This Draft Authorization for Work letter stated in part:

> "Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD supporting walk-to-work operations at Vineyard Wind (the "Project"), …
>
> ***
>
> The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all

> details of a Time Charter have been agreed to by Owners. Upon execution of the Time Charter, (i) the Letter Agreement shall automatically terminate, …"
>
> (Exhibit 4, 215:12–218:12; Exhibit 25, Hornbeck 10036 – 37).

44. Mr. John Cook was, during the period June through December 2025, Hornbeck's Executive Vice President, Chief Information Officer and Chief Commercial Officer. (Exhibit 4, 34:08-24; Exhibit 26, Hornbeck 1310).

45. On November 17, 2025, Mr. Douglass sent an email to Mr. Cook at 4:26PM (CST) with the subject line "GE – Mob Fees and Modification Costs"; Mr. Douglass's email stated in part:

> I have also drafted an Early Works letter for $200,000 (non-refundable) to be paid up front and get us started. This letter is based on v1 of what we signed with DEME and Jay has reviewed. We will share this with GE and push them to make a decision on how they would prefer costs be invoiced (cost plus, lump sum, etc.)."
>
> (Exhibit 13 No. 95; Exhibit 27, Hornbeck 2389).

46. The Draft Authorization for Work letter attached to Mr. Douglass's email to Mr. Cook of November 17, 2025, did not state that the proposed payment was non-refundable. (Exhibit 4, Dennis Dep. Exhibit No. 19; Exhibit 27, Hornbeck 10040).

47. On November 17, 2025, at 4:42PM (CST), Mr. Cook sent an email to Mr. Douglass with the subject line "GE – Mob Fees and Modification Costs" and that. Mr. Cook stated, "I don't see where it is addressed in the letter what happens if we do not reach a time charter?" (Exhibit 13, No. 96; Exhibit 28, Hornbeck 2390).

48. On November 17, 2025, at 5:43PM (CST), Mr. Douglass sent a Draft Authorization for Work letter, titled "GE-HOS – Authorization for Work DRAFT 2025.11.17.docx" to Mr. Furic, Mr. Spofford, and other members of the Hornbeck and Clarkson's teams. (Exhibit 13, No. 97; Exhibit 29, Hornbeck 9616).

49. This Draft Authorization for Work letter sent by Mr. Douglass to Mr. Furic, Mr. Spofford, and others, revised the first sentence of the fourth paragraph by adding the term "nonrefundable," so that the sentence read as follows: "For Owners' commencement of the Preliminary Work, Charterers agree to pay Owners the nonrefundable lump sum deposit of two hundred thousand United States Dollars ($200,000.00 USD) (the "Preliminary Work Deposit")." (Exhibit 29, Hornbeck 9635)

50. The Draft Authorization for Work letter provided by Mr. Douglass stated in part,

> "Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD supporting walk-to-work operations at Vineyard Wind (the "Project"), …
>
> ***
>
> The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners. Upon execution of the Time Charter, (i) the Letter Agreement shall automatically terminate, …
>
> (Exhibit 13, No. 99-100; Exhibit 29, Hornbeck 9635-36)

51. The Draft Authorization for Work letter also stated that "Charterers agree to pay Owners the non-refundable lump sum deposit of two hundred thousand United States Dollars ($200,000.00 USD) (the 'Preliminary Work Deposit')" to allow Owners to commence performance of 'long lead' tasks." (Exhibit 13, No. 99; Exhibit 29, Hornbeck 9635)

52. Jason Dennis of Hornbeck testified that the Draft Authorization for Work letter was drafted by Hornbeck and sent to Tyler Spofford of GERE in response to the November 10, 2025 text chat between Jason Dennis and Tyler Spofford in which Tyler Spofford had commented that "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one which means if we take the boat, we may have to start without the grillage." (Exhibit 4, 231:22-233:05).

### *D. Hornbeck's Deposition Testimony and exchanged GERE BIMCO Drafts stated that Hornbeck did not intend to be bound until execution of a contract*

53. After the parties began commenting on the GERE BIMCO Draft, up to the last version exchanged between the parties, in Box 12, where the terms for the Mobilisation fee is stated, Hornbeck entered "Deemed earned upon Charter Party execution and payable upon Delivery." (Exhibit 13, Nos. 36, 37, 69, 126; Exhibit 30 – BIMCO Draft ver. 2, Hornbeck_020; BIMCO Draft ver.3, Hornbeck_129; BIMCO Draft ver.4, Hornbeck_431; BIMCO Draft ver. 5, Hornbeck 878; BIMCO Draft ver.6, Hornbeck 1015; BIMCO Draft ver. 7, Hornbeck 1121; BIMCO Draft ver.8, Hornbeck_1212).

54. In the deposition of Hornbeck's corporate representative, Mr. Shrives testified, that Hornbeck's standard practice is to make offers subject to vessel availability, until the parties either execute a contract and circulate the document between parties; and Hornbeck "[i]s bound when the parties agree on the essential terms of the charter, whether that's in a contract or some work order or some form of confirmation between the parties that they've agreed. So until that point [the vessel is] subject to availability." (Exhibit 7, 54:09-55:07; 59:22-60:07).

55. When asked to explain the meaning behind the sentence contained in Hornbeck's October 7, 2025 offer which states, "[t]his offer may be revoked by HOS at any time and is subject to vessel availability, as solely determined by HOS," Mr. Shrives as Hornbeck's corporate representative testified, that sentence "[m]eans what it says", and that Hornbeck is not bound to a charter until it confirms that its vessel is available for the charter. (Exhibit 7, 58:22-61:05; Exhibit 23, Hornbeck 0325).

56. Mr. Shrives went on to explain that the sentence in the Draft Early Works letter that ends with "subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners" means "that the vessel remains subject to availability as

determined by owners until such time as all details of the time charter have been agreed to by owners." (Exhibit 7, 72:10-73:02).

57. In the deposition of Hornbeck's corporate representative, Mr. Shrives explained that the phrase "Deemed earned upon charter party execution and payable upon delivery" means that "the money is owed to [Hornbeck] upon charter party execution and payable once the vessel is delivered" and that if the Charter Party was not executed, then Hornbeck would not "mobilize the vessel, so, therefore, it would not be due if we never executed the contract with the charter party." (Exhibit 7, 139:03–140:01).

58. When asked whether there can "be a fixture if the vessel is not available for the charter period," Mr. Dennis testified "No, I don't—I don't think so, no." (Exhibit 4, 105:08-13).

59. Mr. Dennis was unable or unwilling to testify as to when and how a charterer is made aware that the "subject to availability" condition placed on the vessel by Hornbeck is lifted. (Exhibit 4, 109:09–110:23.)

60. Hornbeck took no action to perform under the charter it alleges; only speaking with its prior client and contractors to obtain pricing and timelines for equipment that would have been required under the potential charter. (Exhibit 7, 86:01-25.)

## III. HORNBECK WAS ON NOTICE THAT GERE WAS NEGOTIATING A PROPOSAL AND WOULD NOT BE BOUND WITHOUT MANAGEMENT APPROVAL

61. Hornbeck was alerted to GERE Purchaser Guidelines on or about June 27, 2025, when it received the GERE BIMCO Form, which included an express reference to the Purchaser Policies at Clause 43. (Exhibit 16, Hornbeck 4091)

62. Those Purchaser Guidelines included the No PO No Pay Policy. (Exhibit 10, GERE_3959 – 3963).

63. The reference to the GERE Purchaser Guidelines set out in Clause 43 of the GERE BIMCO Form remained in all subsequently exchanged versions of the GERE BIMCO Drafts. (Exhibit 31 - GERE BIMCO Form, Hornbeck 4090-4091; BIMCO Draft ver.2, Hornbeck 54-55; BIMCO Draft ver. 3, Hornbeck 163-164; BIMCO Draft ver. 4, Hornbeck 465-466; BIMCO Draft ver. 5, Hornbeck 918-919; BIMCO Draft ver. 6, Hornbeck 1055-1056; BIMCO Draft ver. 7, Hornbeck 1162-1163; BIMCO Draft ver. 8, Hornbeck 1253-1254).

64. Adam Shrives testified that it was his expectation, as the head of Hornbeck's Commercial Group, that one of his people would have reviewed the GERE Purchaser Guidelines. (Exhibit 7, 187:09-15).

65. Adam Shrives testified that Hornbeck would hope that it was either reviewed or sent to someone to review, but he did not know whether or not anybody did review it. (Exhibit 7, 188:02-09).

66. On July 16, 2025, Mr. Tyler Spofford informed Mr. Jason Dennis and Mr. Tyler Bojé by email that GERE's Senior Management would make their pitch to the CEO on the biz case. (Exhibit 13, No. 5; Exhibit 17, Hornbeck 1415).

67. Mr. Mertens, testifying as GERE's corporate representative, explained that a "biz case" or "business case" is a proposal to senior management of how to fill a previously identified gap (i.e., needing a vessel to support a project). (Exhibit 3, 137:03-138:07).

68. On July 24, 2025, Mr. Spofford sent a message to Mr. Dennis suggesting that the process for approval of the "biz case" would involve the VP" taking the matter to the "CEO," and the "CEO and CFO" of GE Vernova to make the decision. (Exhibit 13, No. 6; Exhibit 18, Hornbeck 1436 – 1439).

69. On July 25, 2025, Mr. Dennis informed Adam Shrives by text that GERE personnel would be presenting the proposal for the "biz case" to the CEO of GE Vernova for a decision. (Exhibit 13 No. 7; Exhibit 19, Hornbeck 1440).

70. On August 14, 2025, Mr. Spofford sent a text to Mr. Dennis stating that "Unfortunately most of my management is OOO now. We should be presenting again early next week to CEO." (Exhibit 13, No. 8.; Exhibit 32, Hornbeck 1494).

71. Mr. Dennis testified that he understood Mr. Spofford's August 14, 2025, text to mean, "I think, again, he's talking about the – the larger business case that – that GE is developing internally on – on what marine assets are going to be required to continue to service their construction and operation and maintenance campaigns." (Exhibit 4, 256:18-257:01).

72. Mr. Spofford testified that the "[t]hree-year SOV decision was not approved. We had to go back to the drawing board" and needed to present "other options, meaning duration, other vessel options, you know, various things. It's –it's not just a marine operations consideration. It's a total business and offshore operations, like, efficiency question that has to be looked at." (Exhibit 1, 138:17-139:03).

73. On October 20, 2025, Mr. Spofford emailed Mr. Lints stating as follows:

> "Consider this our hard counter to HOS – not our commitment. We do NOT yet have managements final approval, but interest from GEV being discussed internal is 10 mo firm for Briarwood with (2x) 6- month options Starting Dec 15, 2025.
>
> We need to close the gaps on the contract – to Pierre's point, we have never gotten full management approval before starting a neg like this. We now have enough clarity to know what we realistically need for '26, now we need to start closing the gaps and then once we have a contract package, we get final management approval."
>
> (Exhibit 13 No. 17; Exhibit 33, GERE 4195)

74. On October 21, 2025, Furic emailed Lints, Bojé, and Spofford stating in part that: "… business cases are never clear 100% while we do not have a strong and clear contract option

in hand to display for management decision. It looks necessary to align each other today and to progress on this." (Exhibit 34, GERE 5475-5476).

75. On October 21, 2025, Mr. Lints stated to Mr. Shrives and Mr. Dennis in an email that GE's "vessel needs are becoming clearer" and that GE's management still had to "give the green light" as to certain commercial terms related to the HOS Briarwood. (Exhibit 13, No. 18; Exhibit 35, Hornbeck 352).

76. On October 24, Tyler Spofford texted Mr. Lints and Mr. Bojé as follows "So got permission last night from management to "start negotiations" but final Approval upon final contract review[.]" (Exhibit 36, GERE_4030).

77. Mr. Douglass emailed a revised version 4 of GERE's Scope of Work ("SOW") for the Vineyard Wind 1 project to Mr. Furic on November 5, 2025. (Exhibit 13, No. 27)

78. This revised SOW (version 4) attached to Mr. Douglass's November 5, 2025 email included proposed edits and marginal notes. (Exhibit 13, No. 28)

79. On November 19, 2025, Mr. Douglass sent a message to Mr. Furic via WhatsApp to follow up on the BIMCO Draft and the annex D financial terms from the call of November 18, 2025, so that he could insert Hornbeck's comments. (Exhibit 37, Hornbeck 2392)

80. Mr. Furic responded on November 19, 2025, to Mr. Douglass via WhatsApp to report that he had not saved the comments from the November 18, 2025 call, but continued on to state as follows:

> "I remember what we have been saying during that call and I have a good picture of things now and I am confident we can be fast finalising contract now.
>
> I also got the opportunity to speak to legal dpt sooner today and they will be available mon tue and wed next week before Thanksgiving to work on this including earlywork afreement.
>
> We understand deadlines.

> Priority is management decision before the end of the week now. I suggest we finalise contract once we have management confirmation to proceed with your offer."
>
> (Exhibit 37, Hornbeck 2393).

81. Mr. Spofford testified that GERE's process to procure a vessel was to "[d]evelop a proposal and put it in front of management." (Exhibit 1, 136:23-137:04).

82. In response to the following question, "did you have any understanding other than GE's plan was to develop a contract with ROSS CANDIES or for the ROSS CANDIES and to develop a contract for the Briarwood and then see which one it liked best," Mr. Spofford replied, that his "job function is to develop these proposals." (Exhibit 1, 166:13-19)

83. Mr. Spofford also testified that "Hornbeck was under the impression that we were developing potential contracts to produce or to show to executive management for our approval. So that is what they knew—to my understanding, what they knew." (Exhibit 1, 169:20-24).

84. Mr. Furic testified in response to questions about Mr. Lints' request to "have authority before engaging in further negotiations with Hornbeck":

> So basically what Jonathan Lints is saying about starting a negotiation is just like that, cold, is completely contrary to the process sourcing protocol of GE. It's absurd to proceed that way. It's the other way around. You can't analyze an offer if you don't have the solid commercial offer in front of you, in this case, the one from Hornbeck. So in this case, Tyler was right in what he was saying, and one could not suggest a proposal from GE without having that in hand.
>
> (Exhibit 2, 97:02-25).

85. Mr. Furic testified that a charter party "can't have authorization from management if you don't have the details in place." (Exhibit 2, 98:09-11).

86. Mr. Furic testified further about GERE's process for obtaining management approval stating:

> The first is that you don't simply go to management with some kind of offer like that. You don't just lay it in front of them. You're not allowed to do that. You have

> to first speak with the supplier or the provider, whoever it is, and gather together all the elements you need, and then present these to management.
>
> (Exhibit 2, 100:02-14).

87. Mr. Furic testified that he saw "subject management approval" mentioned several times in writings to Hornbeck during negotiations, even though he didn't remember a specific instance of telling Hornbeck verbally (Exhibit 2, 156:04-25).

## IV. NO MEETING OF THE MINDS WAS REACHED BETWEEN HORNBECK AND GERE

88. In the response to GERE's Request for Production No. 3, which requested "All documents that Hornbeck alleges constituted a Fixture Recap for the charter of the Vessel by GERE," Hornbeck identified two documents – Hornbeck_001193 to 001210, and Hornbeck_001211 to 001280. (Exhibit 13, Nos. 116 and 117).

89. The "Fixture Recap" identified by Hornbeck as Hornbeck_001193 to 001210 is an email chain that begins with the email Mr. Furic sent to Mr. Douglass and others on November 17, 2025, attaching BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx). (Exhibit 13, No. 118; Exhibit 38, Hornbeck_001193 - 001210).

90. The text of this November 17, 2025, email that Mr. Furic sent to Mr. Douglass and others attaching BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) states in its entirety: "Kevin, For our call tomorrow. Rgds, Pierre". (Exhibit 13, No. 119; Exhibit 38, Hornbeck 1193).

91. The BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) was the other fixture recap identified by Hornbeck and it was attached to the November 17, 2025, email sent by Mr. Furic to Mr. Douglass and others contained comments to the contract terms from Mr. Furic. (Exhibit 13, No. 121; Exhibit 39, Hornbeck_001211 – 001280).

92. The BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) was the last version of the BIMCO Draft exchanged between the parties. (Exhibit 13, No. 122).

93. Box 5, the Date of Delivery, in the BIMCO Draft version 8, was described as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours," stated by Mr. Douglass. (Exhibit 13, No. 123; Exhibit 39, Hornbeck 1211).

94. Mr. Dennis testified that the term "delivery date" means "the date the vessel is delivered to the agreed upon port and would commence charter hire." (Exhibit 4, 173:04-07).

95. Mr. Dennis next stated that the parties agreed that the delivery date of the Vessel was "following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." (Exhibit 4, 173:08-13).

96. Mr. Dennis was unable to identify a specific date or end date of a date range for delivery of the vessel. (Exhibit 4, 175:10-185:03).

97. Mr. Furic stated in marginal notes to Box 5 of the BIMCO Draft version 8 that "Commented[PF7R7]: Comment was made that Lds and cancelling date shall be based on clear delivery date[.]" (Exhibit 13, No. 124; Exhibit 39, Hornbeck 1211).

98. Mr. Furic testified that the date of delivery was an "open point" because "Hornbeck conditioned the availability of the boat on current chartering status. And that was an issue for us." (Exhibit 2, 121:11 – 122:07).

99. Mr. Furic explained in his testimony that the delivery date was "impossible to accept" because Hornbeck "could simply extend the – they could simply extend the chartering until July of '26, and I wouldn't have any kind of idea or control about that, so I could not accept this as it was written here." (Exhibit 2, 133:10-134:18).

100. Box 6, Cancelling date and time (Cl. 2(a) and (c)), of the BIMCO Draft version 8 states "Delivery date in box 5 +" and "7 days" in red underline type and "8 hours" struck-out. (Exhibit 39, Hornbeck 1211).

101. Box 6 of BIMCO Draft version 8 contains a marginal note that states, "Commented [KD8]: As this was not commented on by GE, HOS assumes this is accepted and closed." (Exhibit 39, Hornbeck 1211).

102. Box 6 of BIMCO Draft version 8 contains a marginal note from Mr. Furic that states "Commented [PF9R9]: Date is understood to be here 15 dec +7 = 22 dec. GE has shown interest to deliver on dec 15th in order to have time to perform mobilization , anticipate about January scope , so having a proper ops handover and potentially perform a scope of coil exchange from dec 15th ." (Exhibit 39, Hornbeck 1211).

103. The parties did not reduce any liquidated-damages or cancelling date to a single fixed calendar date in the BIMCO Draft version 8. (Exhibit 13, No. 174)

104. Mr. Furic stated in a comment to Box 3 of BIMCO Draft version 8 regarding PCG statements that "Commented (PF3R2]: Confirmed no statements available → PCG from GE Vernova to be edited and signed at contract signature[.]" (Exhibit 13, No. 125; Exhibit 39, Hornbeck 1211)

105. Box 12 of BIMCO Draft version 8, Mobilisation fee (cl.2(b)) states in (ii) that the Mobilisation fee is "Deemed earned upon Charter Party execution and payable upon Delivery." (Exhibit 13, No. 126; Exhibit 39, Hornbeck 1212)

106. The term "execution" in Box 12 of BIMCO Draft version 8 refers to the signing of a charter party. (Exhibit 13, No. 170; Exhibit 39, Hornbeck 1212)

107. In Box 13, subsection (ii) of the GERE BIMCO Draft version 8, Hornbeck had drafted language that provided that in the event that the U.S. Federal Government issues a stop work order that prevents Charterer's use of the Vessel for a period of at least 30 days, then Charterers shall have the right to terminate the Charter Party, upon payment of a reduced early termination fee equivalent to 50% of the remaining charter hire, to which GERE had maintained an objection, proposing that in such event, no termination fee should be payable following 30 days' notice. (Exhibit 13, Nos. 41, 128, 129; Exhibit 39, Hornbeck 1212).

108. Box 13 (Early Termination) of BIMCO Draft version 8 has a marginal note by Mr. Douglass stating "[KD19]: GE requested 0% in Nov. 13, See HOS proposal in separate Excel file." (Exhibit 13, No. 128; Exhibit 39, Hornbeck 1212).

109. Box 13 of BIMCO Draft version 8 has a marginal note by Mr. Furic that reads, "Commented [PF20R20]: If Executive order, 30 days notice from Charterers and then free redelivery[.]" (Exhibit 13, No. 129; Exhibit 39, Hornbeck 1212).

110. BIMCO Draft version 8 includes at Box 25 (Interest rate payable) a strike out of the language "two percent (2%) per year" and the added language "1.5% per month, compounded monthly" with a marginal note by Mr. Furic stating: "Commented [PF24R24]: Ge does not accept this after having decreased the payment terms from 60 to 30 days. 1.5% per year accepted." (Exhibit 13, No. 130; Exhibit 39, Hornbeck 1214).

111. BIMCO Draft version 8 includes at Box 31 (Taxes (payable by Owners)) a marginal note by Mr. Furic stating in part: "Commented [PF26R26]: Any local sales and use tax shall be itemized before the contract signature." (Exhibit 13, No. 131; Exhibit 39, Hornbeck 1215).

112. BIMCO Draft version 8, Clause 2(a)(iii) was marked "RESERVED." (Exhibit 13, No. 132; Exhibit 39, Hornbeck 1218).

113. BIMCO Draft version 8, Clause 2(a)(iii) is marked with a marginal note stating "Commented [KD27]: HOS reserves Clause 2(a)(iii) for further review based on final commercial agreement." (Exhibit 13, No. 133; Exhibit 39, Hornbeck 1218).

114. BIMCO Draft version 8, Clause 2(a)(iii) is marked with a marginal note stating "Commented [PF28R28]: GE would like to clean all comments asap. This clause about LDs has already been drastically reviewed and should not be a reason to hold further negotiations." (Exhibit 13, No. 134; Exhibit 39, Hornbeck 1218).

115. BIMCO Draft version 8, Clause 2(b) includes a marginal note by Mr. Furic as follows, "Commented [PF30R30]: GE has requested verbally several times removal of the term "lumpsum" toand [sic] replaced by / refer to a new annex characterizing the sum of items to be upgraded before delivery of the Vessel, their estimated duration, and their estimated price + ref of relevant quote. Amount to be reported in Annex D." (Exhibit 13, No. 135; Exhibit 39, Hornbeck 1218).

116. BIMCO Draft version 8, Clause 5(b) includes a marginal note by Mr. Furic as follows, "Commented [PF38R38]: Noted. GE will need confirmation of mobilization work / upgrade to be performed as per expectations before entering the charter party though." (Exhibit 13, No. 136; Exhibit 39, Hornbeck 1220).

117. BIMCO Draft version 8, Clause 12(c) includes a marginal note stating "Commented [KD63R63]: Per Nov. 13 meeting, GE requests removal. See HOS counter- proposal in separate Excel file." (Exhibit 13, No. 137; Exhibit 39, Hornbeck 1227).

118. BIMCO Draft version 8, Clause 12(f)(ii) includes a marginal note stating "Commented [KD68]: Pending finalization of PCG from GE parent." (Exhibit 13, No. 138; Exhibit 39, Hornbeck 1228).

119. BIMCO Draft version 8, Clause 12(f)(iii) includes a marginal note stating "Commented [KD68]: Pending finalization of PCG from GE parent." (Exhibit 13, No. 139; Exhibit 39, Hornbeck 1228).

120. BIMCO Draft version 8, Clause 13(a) includes a marginal note stating "Commented [KD75]: HOS maintains edits in 13a. As discussed on Nov. 13 call – HOS is providing rate reductions for gangway, boat landing and crane." (Exhibit 13, No. 140; Exhibit 39, Hornbeck 1228).

121. BIMCO Draft version 8, Clause 13(a) includes a marginal note by Mr. Furic as follows, "Commented [PF76R76]: As already discussed. The Vessel offered is an SOV and these key equipment are not fancy add on from Charterers. This status of partial off hire is accepted but should be capped to max few days before the Vessel can be set full off hire in the case where the repair are not done or if the Vessel needs port call to perform the repairs. To be clarified in writing." (Exhibit 13, No. 141; Exhibit 39, Hornbeck 1228).

122. BIMCO Draft version 8, Clause 13(a) shows a strike-out of the clause "of if the Vessel do not comply with the key performance indicators stated in Section 34.1 of Annex C," which strike-out is marked with a marginal note stating "Commented [KD77]: As per Nov. 13 meeting, GE requests reinsertion. HOS to revert." (Exhibit 13, No. 142; Exhibit 39, Hornbeck 1229).

123. BIMCO Draft version 8, Clause 13(a) includes a marginal note by Mr. Furic as follows, "Commented [PF78R78]: GE just need strong basic off hire principles in the TCP. Nothing more[.]" (Exhibit 13, No. 143; Exhibit 39, Hornbeck 1229).

124. BIMCO Draft version 8, Clause 13(a)(vii) includes a marginal note stating "Commented [KD79]: As per Nov. 13 meeting, GE requests off hire during Vessel breakdown. See HOS proposal via separate Excel file." (Exhibit 13, No. 144; Exhibit 39, Hornbeck 1229).

125. BIMCO Draft version 8, Clause 13(a)(vii) includes a marginal note by Mr. Furic as follows, "Commented[PF80R80]: Noted reduction of 46% if full PAX onboard . GE proposes to reduce this amount prorated part of current pax onboard , reaching 0 USD if no more pax on board ." (Exhibit 13, No. 145; Exhibit 39, Hornbeck 1229).

126. BIMCO Draft version 8, Clause 14 includes a marginal note stating "Commented [KD94R94]: As per Nov. 13 meeting, GE Legal to revert on Cl. 14." (Exhibit 13, No. 146; Exhibit 39, Hornbeck 1230).

127. BIMCO Draft version 8, Clause 14 includes a marginal note by Mr. Furic as follows, "Commented[PF95R94]: Legal team to review." (Exhibit 13, No. 147; Exhibit 39, Hornbeck 1230).

128. Multiple pages of the BIMCO Draft version 8 contain a "Working Copy" watermark. (Exhibit 13, No. 148; Exhibit 39, Hornbeck 1211, 1214 – 1222, 1224, 1226 – 1230, 1232 – 1235, 1237 – 1247, 1249, 1251 – 1256, 1258 – 1261, 1264 – 1268, 1270 – 1272, 1277 – 1279).

129. In the deposition of Hornbeck's corporate representative, Mr. Shrives stated in response to GERE's question as to whether there were any terms, other than the vessel owner, charterer, vessel, delivery date, duration, redelivery date, ports of delivery and redelivery, and charter rate that were important to Hornbeck, that "[a]ll of the open items are important in some way or another. They're still discussing them." (Exhibit 7, 154:15-157:17; 168:07-15).

130. Tyler Bojé's phone number is 713-624-9088. (Exhibit 5, 105:02-06).

131. Mr. Bojé testified that this is the "mobile number that [he] used in connection with [his] work on this case." (Exhibit 5, 105:07-10).

132. On November 20, 2025, Mr. Bojé and Mr. Spofford exchanged a series of text messages related to Mr. Spofford's visit to see the other vessel – the Ross Candies. (Exhibit 40, GERE 4075 – 4076)

133. At 12:02 PM on November 20, 2025, Mr. Bojé texted Mr. Spofford as follows, "I guess that's good and bad also making the choice a bit harder if they continue to get closer together. Sounds like Hornbeck would go back to 10 months of the same price and give you some concessions on the mobilization maybe more if we push hard or a counter…". (Exhibit 40, GERE_00004075).

134. Mr. Shrives testified that the obligations of a charterer under a charter party are to "accept the vessel on the date that they requested it and pay for the vessel at the rate that was agreed between the parties." (Exhibit 7, 76:13-19).

135. Mr. Shrives testified that the obligations of a vessel owner under a charter party are "[t]o provide the agreed vessel in the agreed delivery window to provide the agreed service that was [sic] contracted." (Exhibit 7, 76:20-24.)

136. Mr. Shrives testified that the obligations of GERE as charterer under the charter that Hornbeck alleges it reached with GERE would have been "[t]o accept the vessel on hire and pay for the services that we provided with the vessel." (Exhibit 7, 76:25-77:6.)

137. Mr. Shrives testified that the obligations of Hornbeck as vessel owner under the charter that Hornbeck alleges it reached with GERE would have been to "[d]eliver the vessel that we agreed to deliver within the time frame we agreed to deliver it and provide the services we agreed to provide." (Exhibit 7, 77:07-13.)

## V. HORNBECK DID NOT QUALIFY FOR AN AWARD OF CONTRACT

138. On October 16, 2025, Hornbeck was informed of the requirement to complete a contractor prequalification process referred to as "ComplyWorks." (Exhibit 13, No. 15).

139. On October 15, 2025, Hornbeck received an email from GESupplierConnect@ge.com, copied to Pierre Furic, with the subject heading "EXT: GE Supplier Invite." The email notified Hornbeck that it was "identified as a candidate to become a supplier for "GE. Renewable Energy >> Off Shore Wind >> United States". The email further stated that "Suppliers are required to comply with our GE Supplier Integrity Guide and watch the training video: http://www.gesupplier.com/html/SupplierslnteqrityGuide.htm." The email also informed Hornbeck that "GE requires PO issuance prior to work being performed." (Exhibit 41, GERE_2056-2058).

140. Annex C to the proposed GERE BIMCO Form was a draft Statement of Work to be performed by the Vessel under the possible charter and included a Section 7.1 that stated "Contractors shall complete a GEV EHS qualification named ComplyWorks process prior to any contract being awarded." (Exhibit 13, No. 11, Exhibit 42, Hornbeck 412).

141. As of November 13, 2025, Hornbeck had not completed the ComplyWorks process as required prior to any contract being awarded. (Exhibit 13, No. 84, Exhibit 43, GERE 1322-1323).

142. As of November 17, 2025, Hornbeck had not completed the ComplyWorks process as required prior to any contract being awarded. (Exhibit 13, No. 115; Exhibit 44, GERE 1741-1742).

143. Hornbeck was informed by email on November 17, 2025 that it had not been approved in the ComplyWorks program and that it could not be an approved GERE vendor until

it received a qualifying score in the program. (Exhibit 13, Nos. 113, 114; Exhibit 44, GERE_1741-1742).

## VI. GERE NEGOTIATIONS WITH OTTO CANDIES AND PRESENTATION OF BOTH VESSELS TO GE MANAGEMENT

144. On November 13, 2025 at 2:23 PM, Spofford sent a Teams message to Sebastian Mertens and Steffen Zander of GE Vernoa stating "good news – there has been some changes in vessel market and OC has reoffered the ROSS CANDIES – sister to CADE." (Exhibit 45 - GERE 3760).

145. Towards the end of the same message on November 13, 2025 at 2:23 PM, Spofford states that "staying with OC significantly simplifies the contract and transition from CADE to replacement." (Exhibit 45)

146. Furic and Spofford exchanged Teams messages on November 20, 2025, in which Furic asked at 2:23 PM "What do we need to set a call to get Sebastian approving the choice ross / briarwood?" (Exhibit 46, GERE 3603).

147. Spofford responded to Furic's Teams message on November 20, 2025 at 2:24 PM as follows "I think we need ot put togehter couple of slides . . .can you made exec summary out of quick and dirty table you sent other day in email?" (Exhibit 46, GERE 3604).

148. On November 21, 2025, Spofford sent an email with the subject "ROSS v. BRIARWOOD" to Sebastian Mertens with Pierre Furic, Samuel Butts, and Luis Castro-Loza in copy stating "[i]t is Marine Ops opinion, that the Ross is the better platform." (Exhibit 47, GERE 5662).

149. On November 21, 2025, Sebastian Mertens forwarded the email from Spofford with the subject line "FW: ROSS vs BRIARWOOD" that attached a PowerPoint titled "2026 SOV comparison.pptx" to Paolo Marone and Daniel Laskowski with Stephen Swift copied informing

them that this "is the down selection for SOV for 2026 – send an invite for Monday to discuss/decide." (Exhibit 47, GERE 5661).

150. On November 21, 2025 at 1:38PM, Sebastian Mertens emailed Stephen Swift with Tyler Spofford copied stating "Team has strong preference for Ross Candies ... In all other categories (performance, contract, price, deck space/storage) the Ross is the better choice." (Exhibit 47, GERE 5661).

151. On November 26, 2025, Spofford and Furic informed representatives from Hornbeck that GERE would not be chartering the BRIARWOOD. (Exhibit 48, GERE 4080-81).

152. Neither GERE nor any GERE parent or affiliate entity issued any purchase order to Hornbeck Offshore Operators, LLC for any charter of the motor vessel BRIARWOOD (Exhibit 50, ¶8).

## VII. HORNBECK DID NOT COMMIT THE BRIARWOOD TO GERE

153. Following the call between Furic and Hornbeck on November 18, 2025, Hornbeck did not send any confirmation of the BRIARWOOD's availability to GERE. (Exhibit 7, 194:13-17)

154. Following the call between Furic and Hornbeck on November 18, 2025, Hornbeck did not enter the BRIARWOOD into any computer system of Hornbeck's as being obligated for the 12-month term set out in the proposed charter that Hornbeck alleges. (Exhibit 7, 194:18-24)

155. On November 19, 2025, Hornbeck sent out an offer to ENI US Operating Co. Inc. for the charter of certain vessels, including the BRIARWOOD, for charter during the first quarter of 2026, overlapping with the same period for which it had been offering the BRIARWOOD to GERE. (Exhibit 7, 194:25-195:14; Exhibit 49, Hornbeck 2395-2397).

## VIII. HORNBECK'S CLAIM IS PREMISED ON ENSNARING "ESSENTIAL TERMS"

156. Hornbeck's position in this matter is that once a party has agreed to certain "essential terms" – specifically: the vessel owner, the charterer, the vessel, a delivery window (no matter how indefinite), duration, redelivery date, port of delivery, port of redelivery, and the charter hire rate – then the party is fixed to a binding charter contract, even if the party has no intention to be bound to a contract at that point, and does not communicate any intention to be bound. (Exhibit 7, 152:14-24; 154:15-158:08).

Dated: November 4, 2026

Respectfully submitted,

**MILLS BLACK LLP**

/s/ H. Allen Black

H. Allen Black
Peter F. Black
Kathryn L. Fitzgerald
1215 19th Street, NW
Washington, DC 20036
hablack@millsblack.com
pblack@millsblack.com
kfitzgerald@millsblack.com

**WINSTON TAYLOR LLP**

By: */s/ Aldo A. Badini*

Aldo A. Badini
200 Park Avenue
New York, NY 10166-4193
aldo.badini@winstontaylor.com

*Counsel to GE Renewables US LLC*