**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 1:26-CV-04776 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE OF GE RENEWABLES US LLC TO EXCLUDE THE TESTIMONY OF EARL H. BURNS JR. AS AN EXPERT WITNESS**

## PRELIMINARY STATEMENT

Plaintiff Hornbeck Offshore Operators, LLC ("Hornbeck") alleges in its Complaint that Defendant GE Renewables US LLC (GERE) became bound to a contract for the offshore support vessel HOS BRIARWOOD in the middle of negotiations without any expressed intent to be bound. To support that contention, Hornbeck proposes to offer Mr. Earl H. Burns, Jr. to give his opinion that GERE had concluded a binding contract for the vessel and related ancillary opinions. While the issue may be mooted by GERE's pending Motion for Summary Judgment, GERE moves to exclude his testimony for three reasons, each independently sufficient under Fed. R. Evid. 702.

First, Mr. Burns is not qualified to give the opinions he offers. His expertise is in connection with commodities training. His limited experience of vessel chartering consists of sitting next to subordinate staff engaged in arranging charters of international-trading tank vessels transporting crude oil and refined products, many years ago. The alleged charter at issue here is for an offshore vessel serving an offshore wind project, on the BIMCO SUPPLYTIME 2017 form.

At his deposition, Mr. Burns admitted that he has never brokered, negotiated, or approved any offshore vessel charters or had any experience negotiating, using, or working with the BIMCO form at issue. Burns Dep. 136:8-16.

Second, Mr. Burns's opinions have no reliable basis. His Report of Expert Witness Earl H. Burns (the "Report") discloses no methodology of any kind. Instead, it rests entirely on his say-so, which is the definition of *ipse dixit*. The facts upon which he claims to rely come from a chronology written by Hornbeck's counsel ("Counsel's Timeline") the same day that he signed his Report. At his deposition, he conceded that he did not check its entries, and he could not recall which of the curated and referenced documents he may have reviewed. Further, he assumed as true other contentions told to him by Hornbeck's counsel. Burns Dep. 154:19-155:4, 156:16-22, 276:22-277:10. As just one example, he assumes that GERE's representatives never told Hornbeck that a countract would require management approval, even though that contention is refuted by the Counsel's Timeline itself – it details five months of GERE statements discussing the need for management and chief-executive approval, and lists documents that incorporate express terms requiring a purchase order to be bound. Ultimately, upon seeing various documents for the first time in his deposition, Mr. Burns's testimony contradicted several of his own conclusions.

Third, the Report does not provide any useful information to the Court, but instead purports to decide the case as a matter of law – indeed, its ultimate opinion is "Hornbeck and GERE had a binding fixture." Despite offering that and other, equally inadmissible pronouncements of legal conclusions, Mr. Burns admits he had no formal legal education, and no education in maritime law. Burns Dep. 59:13-61:2.

GERE therefore respectfully requests that the Court exclude Mr. Burns's testimony in its entirety and strike his Report.

## CERTIFICATION PURSUANT TO LOCAL RULE 6.4

GERE hereby certifies pursuant to Rule 6.4 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York that it offered to confer with Hornbeck's counsel to request that Hornbeck agree to withdraw its designation of Mr. Burns as an expert witness. Hornbeck responded with no willingness to consider doing so.

## BACKGROUND

### I. Hornbeck's Allegation

Hornbeck alleges that it and GERE concluded a binding "fixture" for the offshore vessel HOS BRIARWOOD (the "Vessel") by November 13, 2025, or, in the alternative, by November 17, 2025. Compl. ¶¶ 34, 59. GERE denies that any contract was formed. Answer ¶¶ 12-14, 19, 34, 42, 59-63.

### II. The Disclosure and Report

On August 28, 2026, Hornbeck served its Rule 26(a)(2) disclosure identifying a single expert, Earl H. Burns, Jr., and describing his area of expertise as "customs, practice, and expectations of the vessel chartering market, including the point at which industry participants understand a fixture to become binding." Black Decl. Exh. 1. Concurrently, Hornbeck provided the eight-page Report, with Mr. Burns's CV (Exhibit A to the Report), and a "Legal Memorandum" from Hornbeck's counsel to Mr. Burns, dated the same day as the Report and titled "Expert Report Reliance Materials Timeline" (the Counsel's Timeline referenced above, Exhibit B to the Report). Black Decl. Exh. 2.

### III. The Opinions Offered

Mr. Burns's ultimate opinion is that "GERE and Hornbeck achieved a fixture no later than November 13, 2025 (and arguably reconfirmed on November 17)," that "[e]very essential term … was agreed without qualification by that date," that "[t]he parties were bound at that time," and

that in declining to proceed, GERE "repudiated its fixture" and "acted contrary to industry practices and expectations." Rep. § I; § VII.1; § VIII.3.

He begins by defining a "fixture" as "a commercial reality, not a legal formality," arising when the parties agree on "key terms," such that "the rights and obligations become binding between the parties, independent of drafting any particular document." Rep. § VII.1. He also opines that market dynamics and "reputational discipline" require that fixtures be treated as binding. Rep. § VII.2. He adds that GERE never used reserving language such as "subject to board approval," that the broker's statements carry special weight in the trade, and that negotiators are presumed to have authority to bind their principals. Rep. § VII.3.c-e.

## LEGAL STANDARD

A proponent of expert testimony must demonstrate "that it is more likely than not" that its witness is "qualified as an expert" and that the testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The trial court serves as a gatekeeper. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). That function applies with full force to experience-based testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). An expert relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. A court "is not required to admit opinion testimony that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

This Court has applied those principles to exclude experts on each of the grounds presented here. In *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023), the Court excluded

one expert because, although he had substantial experience in an adjacent field, neither he nor the party offering him could "explain how such experience would allow [him]" to perform the specific analysis at issue. *Id.* at 469. The Court excluded a second expert whose stated methodology amounted to "the training and experience that [she] got in [her] economics Ph.D.," holding that "the basis for [her] conclusions boils down to her own '*ipse dixit*,' which is plainly insufficient for admission of her testimony under *Daubert* and Rule 702." *Id.* at 470-71; *see Kumho Tire*, 526 U.S. at 157. "Expert testimony that strays outside the expert's area of qualified expertise must be excluded." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 12-md-2542, 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025).

Separately, "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *United States v. Bilzerian,* 926 F.2d 1285, 1295 (2d Cir. 1991) (citing *Marx & Co. v. Diners' Club Inc.,* 550 F.2d 505, 509-10 (2d Cir. 1977)); *see also Marx*, 550 F.2d at 509 n.11. Courts in this District apply that rule specifically to opinions on contract formation, and hold that an expert's opinion on a party's state of mind "cannot be saved by couching his opinion as 'industry custom and practice.'" *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008). "Inferences about the intent or motives of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004). Nor may an expert opine on the credibility of another witness. *Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005).

# ARGUMENT

## I. The Experience Mr. Burns Identifies Does Not Support the Opinions He Offers

Mr. Burns is a commodities trading executive. His career, as his own CV describes it, has been spent buying, selling, and moving crude oil and refined products. His limited marine experience was in connection with hydrocarbon trading: tankers and barges, freight futures, and portfolio optimization for cargo movements. Rep. Exh. A.

This case concerns none of that. The Vessel is an offshore support vessel on an offshore wind installation project, engaged to accommodate offshore construction personnel. Compl. ¶¶ 8, 10. The contemplated form was BIMCO SUPPLYTIME 2017, an offshore support vessel time charter. *Id.* at ¶ 17. The delivery term was contingent on the Vessel's release from an unrelated offshore employment. *Id.* at ¶ 33. These are conventions of the offshore support sector.

Neither Mr. Burns's CV nor his Report states that he ever negotiated, concluded, or administered a charter on the SUPPLYTIME 2017 form. Neither mentions the offshore support vessel market. Neither asserts that fixture practice in the tanker trade is the same as fixture practice in the offshore support trade, and neither cites anything that would establish that. The Report refers instead, throughout, to "this business," "the trade," and "this industry" as though the chartering market were a single undifferentiated whole, and asserts what "an industry participant would call 'essential'" without ever identifying the industry. The industry itself draws the line that the Mr. Burns's Report ignores. Mr. Bojė, the broker on this transaction from the Clarksons Group, a shipbroking entity ("Clarksons") testified that Clarksons separates "shipping" (e.g., "tankers, container ships, bulk carriers") from "offshore," the segment serving "drilling exploration, production, renewables," and that his own remit is offshore. Black Decl. Exh. 8 ("Boje Dep.") at 12:20-24, 55:1-19, 56:23-57:1.

Mr. Burns's deposition confirms his lack of relevant experience. Black Decl. Exh. 3 ("Burns Dep."). Mr. Burns described his expertise as "commercial waterborne movements" and "commercial trading." Burns Dep. 68:15-21. He has never worked in the offshore industry, which he understands only as the industry that "deals with waterborne production . . . of hydrocarbons," and he did no work with its offshore vessels. *Id.* at 68:22-24, 69:14-17, 133:12-22. When asked how many charters for offshore vessels he has brokered, personally negotiated, or personally approved, he answered "[n]one" to each. *Id.* at 136:8-16. The charter forms he has used are tanker forms; he has not "worked extensively with BIMCO forms," could not say what BIMCO stands for, and had never personally worked with SUPPLYTIME 2017. *Id.* at 122:19-123:3, 125:15-126:18. Indeed, he did not even know the basic terminology of the offshore vessel industry.[1] Mr. Burns's lack of relevant maritime expertise goes beyond the offshore industry – he could not even correctly identify a charter form with which he claimed to have worked.[2]

## II. Mr. Burns's Opinions Have No Reliable Basis

### *A. The Report discloses no methodology.*

The Report contains no methodology section and describes no analytical process. It identifies no trade treatise, no BIMCO explanatory materials or guidance on the SUPPLYTIME form, no market data, no study of recap practice, no comparable fixtures, no survey of practitioners, and no consultation with anyone active in the offshore support market.

---

[1] He could not state what was an Ampelmann system (a gangway system that was a key piece of equipment for the possible charter), a PSV (a platform supply vessel), an AHTS (an anchor handling tug supply vessel), a CSV (a construction support vessel), a DSV (a diving support vessel), or a CTV (a crew transfer vessel), or even state what "work scope" means in the offshore industry. *Id.* at 135:3-136:7, 174:13-18.

[2] He misreferenced the form "ASBATANKVOY" (the tanker voyage charter party form published by the Association of Ship Brokers and Agents ("ASBA")), as "ASBAVOY." Burns Dep. 122:19-123:3; 136:19-137:1.

Section VII.1 announces what "every broker, chartering manager, and operations director in this business is trained to recognize." No source is given for any of it. At deposition, Mr. Burns acknowledged that he has never been a broker, a formal chartering manager, or an operations director; the basis for his statement about what those professionals are "trained to recognize" is that at one time he worked with and hired them. Burns Dep. 281:11-282:15.

Asked to identify the basis of each opinion, Mr. Burns gave the same answer each time: his experience. The opinion that a fixture is "a commercial reality, not a legal formality" rests on "what I've seen in the market" and "what I've been forced to do in the market for a number of years." *Id.* at 226:25-227:6. The reputational-discipline opinion rests on "what I've seen and experienced," "particularly in the Jones Act market." *Id.* at 235:3-9. At no point did he identify a treatise, BIMCO guidance, market data, a comparable fixture, or any relevant experience in the offshore market.

Indeed, Mr. Burns provides even less of a basis for his central opinion. Mr. Burns defines "fixture" as the moment that parties "agree on key terms and the rights and obligations become binding," states that the parties had reached agreement on his "key terms" by November 13, 2025, and therefore concludes they had a fixture. Rep. § VII.1. He refers to the documents he reviewed, apparently overlooking the ongoing discussions at that time concerning the charter rate, the term, the delivery date, the early termination provisions, and other points. Rep. Exh. B; Black Decl. Exh. 6 (Hornbeck 1211-1280). Explaining the basis of his opinion, he states that once the parties agree upon what he defines as "key terms," they are bound to a contract, regardless of whether they intend to be bound or not. Burns Dep. 269:9-17. Mr. Burns bases that key opinion on his experience as a trading manager, talking to charterers sitting near him, when they would tell him that they would be bound if they agreed to key terms "or we need to caveat." That experience

actually contradicts Mr. Burns's opinion, indicating that parties can indeed "caveat" or decline to be bound notwithstanding agreement to specific terms; a contradiction that Mr. Burns fails to recognize. *Id.* at 268:18-269:7; 270:4-272:13.

***B. The facts and data considered were curated and characterized by Hornbeck's counsel.***

The Report states that Mr. Burns considered the pleadings and the materials listed in the Counsel's Timeline, a document dated the same *day* as the Report. Rep. § IV. The Counsel's Timeline is not a collection of documents; it is a partial chronology of documents selected and described by Hornbeck's counsel. Mr. Burns did not write the Counsel's Timeline and does not know who did. Burns Dep. 46:2-3, 154:19-155:4. Moreover, Mr. Burns admitted that he did not review all of the documents it lists, cannot say which ones he skipped or actually read, and did not check any of counsel's entries against the documents they describe. *Id.* at 46:18-20, 156:6-22. He did not see or ask for any document produced by GERE, and read none of the fact witnesses' deposition transcripts. *Id.* at 16:2-20, 158:4-24. Mr. Burns also claimed to have drawn on unspecified "other facts" from his career, "particularly relative to the Jones Act sector," and on notes he did not give to counsel and does not know where to find. *Id.* at 47:6-20, 149:19-152:21. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii). Hornbeck cannot carry its burden under Fed. R. Evid. 702(b) on a patently incomplete record that its purported expert cannot reconstruct.

***C. The Report's central premise is contradicted by the very materials it considered.***

On that opaque and nebulous foundation, the Report asserts that "[n]othing I reviewed indicates that the parties considered any other terms to be essential," and that there is "no indication that the parties did not intend to be bound." Rep. § VII.3.a. That premise, and the related assumption that GERE used no language reserving a commitment, Rep. § VII.3.c., are refuted by the Counsel's Timeline and the documents it references.

Each of the BIMCO drafts referenced in the Counsel's Timeline included a clause incorporating GERE's Third-Party Supplier Guidelines – including a "No PO No Pay" policy that provides that "GE requires a Purchase Order ('PO') to be issued in advance of a purchase commitment and vendor payment ('No PO, No Pay')." Rep. Exh. B; *see, e.g.,* Black Decl. Exh. 6 (Hornbeck 1211-1280). Further, from the first weeks of the parties' discussions in June 2025 through late October 2025, the Counsel's Timeline documents a continuous pattern of GERE personnel telling Hornbeck and the broker that the transaction depended on internal approval that had not been given. Hornbeck's own commercial notes record that GERE was "[s]till presenting options to management" and "continues to have discussions with internal managem,ent regarding path forward." Rep. Exh. B (entries of June 24 through October 27, 2025). Moreover, the BIMCO drafts exchanged between the parties, up to the last one exchanged on November 17, 2025, include multiple disagreements, including over the delivery and redelivery dates and early termination. *See, e.g.,* Black Dec. Exh. 6 (Hornbeck 1211-1220). Indeed, the broker, Mr. Bojé, testified that Mr. Spofford "always referred to management approval on pretty much every charter that we did with them." Bojé Dep. 242:20-23.

***D. The facts most central to the opinions appear nowhere in the materials considered.***

Mr. Burns's Report notably hinges on statements alleged by Hornbeck in its Complaint to have been made by GERE consultant Pierre Furic and the broker, Tyler Bojé. The statement attributed to Mr. Furic is that he allegedly said at the end of a call on November 18, 2025, "we have a contract." Rep. § VII.3.b. Mr. Burns treats that statement as confirming a fixture. No document containing that statement is identified anywhere in the Counsel's Timeline. That alleged statement comes from the Complaint, and GERE denies it. Compl. ¶ 41; Answer ¶ 41.

The statements attributed to Mr. Bojé are that he "expressed that GERE and Hornbeck had a fixture," "told both GERE and Hornbeck that they had reached a deal," and "repeated this opinion following GERE's repudiation." Rep. § VII.3.d. Those assertions were also from the Complaint and also denied by GERE. Answer ¶¶ 48, 50, 52-53. Nonetheless, Mr. Burns gave them great weight, asserting that when a broker states that a fixture exists, "that statement carries weight in the trade that goes well beyond a layperson's opinion," and that the broker here "has every incentive to get the answer right for both sides." Rep. § VII.3.d.

Asked where he heard that Mr. Bojé had confirmed a fixture, Mr. Burns ultimately admitted that he was told of the broker's supposed confirmation by Hornbeck's counsel, testifying "that was in one of the conversations that I believe I had with Daniel – Daniel Charest in prepping." Bojé Dep. 164:4-17, 276:22-277:3. Mr. Burns assumed the statement was true; and that assumption was a basis of his opinion. Burns Dep. 276:22-277:10. Such an opinion seeking to bolster the credibility of another witness is of course inadmissible. *Nimely*, 414 F.3d at 397-98.

More significantly, Mr. Burns was misinformed. In his deposition, Mr. Boje actually testified that "*my best recollection is that I said, you know, we were at a point the parties were working to conclude contracting in good faith*." Boje Dep. 171:7-17 (emphasis added).

### *E. The Report quotes selectively where the complete text is unfavorable.*

Mr. Burns mischaracterizes Mr. Furic's comment that legal review would be the "last step" in the drafting process as confirmation that only boilerplate remained. Rep. § VII.3.b. However, the complete sentence, as recorded in the Counsel's Timeline, is: "We will 'park' the items you cannot conclude on. We also have to review with Legal team our side but that will be the last step, once all the rest has been clarified." Rep. Exh. B. Thus, the Report omits both the deferral of open items and the condition on which legal review was to follow. "Parked," he testified, means "that

you don't have consensus on an item, you've decided to table it," and an item cannot be both parked and closed. Burns Dep. 305:14-19, 307:25-308:2.

***F. Mr. Burns's own testimony refutes the Report's factual premises.***

Mr. Burns's testimony also refutes the Report's claim that every essential term was agreed without qualification by November 13, 2025. He agreed that the base rate is an essential term of a charter and that, as of November 13, it was "not finally agreed." Burns Dep. 222:24-223:6. He agreed that, on the record of that day, the parties had "probably not" agreed on cost escalation. *Id.* at 222:7-13. He understood the red-font letters in Mr. Furic's November 13 email to be "items that are still – that still need to be resolved." *Id.* at 204:11-14; *see* Black Decl. Exh. 5.

The record also contains the kind of express reservations that Mr. Burns says the industry treats as decisive. Hornbeck's October 7, 2025, proposal stated that the offer was "subject to vessel availability, as solely determined by HOS," and that no acceptance would bind Hornbeck until it issued "a written Vessel Order Confirmation." Black Decl. Exh. 4. Mr. Burns agreed that this made the offer "conditional," and that "even if the charterer accepts it, HOS has to issue a confirmation." Burns Dep. 191:14-195:1. He admitted that he did not recall seeing any Vessel Order Confirmation, and saw no evidence that Hornbeck ever lifted the availability condition. *Id.* at 195:2-14, 275:14-276:16.

Hornbeck's own draft letter agreement of November 17, 2025, which Hornbeck's counsel did not provide to Mr. Burns, and that Mr. Burns had never seen, provided that "Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners." Black Decl. Ex. 7; Burns Dep. 288:22-291:1. When asked whether an owner whose vessel remains subject to availability is bound to fulfill the charter, Mr. Burns answered, "I guess technically, no." Burns Dep. 293:22-294:2.

Mr. Burns's view that the delivery date was agreed fares no better. Box 5 of the final draft provides for delivery "[u]pon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Black Decl. Exh. 6, Box 5; Burns Dep. 245:20-246:9. Mr. Burns conceded that under that language the date on which GERE could cancel is "not clear"; that delivery on the day of his deposition, ten months later, would comply; and that Hornbeck could extend its other customer's charter for a year and deliver afterward, leaving GERE without a contractual remedy. Burns Dep. 258:14-264:11, 311:18-312:2, 314:21-315:18. A delivery term that would let Hornbeck defer delivery for a year without contractual consequence, and to which GERE objected in marginal comments on the BIMCO draft, was not "agreed without qualification."

## III. The Report Seeks to Substitute the Witness's Judgment for the Court's on the Ultimate Issue

Whether the parties formed a binding maritime contract is the question this Court must decide. Industry custom has a proper role in that inquiry. But Mr. Burns did not confine himself to custom. Like the expert in *Marx*, he testified "not so much as to common practices as to what was necessary" and then purported to decide the issue for the Court. *Marx*, 550 F.2d at 509. That is the error *Marx* identified, and Mr. Burns's Report commits it repeatedly.

### *A. The Report states legal conclusions on contract formation*

Section VII.3 of the Report is captioned "Hornbeck and GERE had a binding fixture." The text is to the same effect, concluding that "[t]he parties were bound at that time" and that "GERE should have honored the fixture." This Court rejected the same maneuver in *SEC v. GEL Direct Trust*, No. 22-cv-9803, 2024 WL 1374902 (S.D.N.Y. 2024), holding that the expert's conclusion that GEL "should not be considered a broker under the prevailing legal standard" was "a textbook legal conclusion," and that the industry framing was "nothing more than a disingenuous attempt

to couch in factual terms what is plainly 'testimony encompassing an ultimate legal conclusion based upon the facts of the case.'" *Id.* at *10 (quoting *Bilzerian*, 926 F.2d at 1295). "Hornbeck and GERE had a binding fixture" is the same type of conclusion.

Mr. Burns' reference to "from an industry perspective" does not cure the problem. "Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case." *Highland Capital,* 551 F. Supp. 2d at 183; *see Marx*, 550 F.2d at 509 n.11; *Bilzerian*, 926 F.2d at 1294.

Mr. Burns's testimony confirms that, as he uses it, "binding fixture" is a legal conclusion. He testified that Hornbeck's counsel asked for his opinion on whether Hornbeck and GERE had a binding fixture. Burns Dep. 19:16-19. He described the "legalese" as "the second part" of a charter, and testified that once the parties resolve his key terms, they are "bound to complete the contract." *Id.* at 226:16-24, 269:21-270:3. He is not a lawyer and has no formal legal education. *Id.* at 59:6-22. An opinion that the parties are bound to complete a contract is an opinion that a contract was formed.

***B. The Report opines on agency and authority.***

Section VII.3.e of the Report states that "[a]uthority to bind is understood, not individually verified, in this trade." Rep. § VII.3.e. Mr. Burns later clarified that by "this trade" he was referring to the Hornbeck-GERE matter. Burns Dep. 288:1-9. To the extent the issue is pertinent at all, whether GERE's representatives had actual or apparent authority, and whether Hornbeck's assumption of such authority was reasonable, are questions for the Court.

In any event, that opinion, like the others, lacks any coherent basis. As noted above, Mr. Burns overlooked the statements in his own materials that GERE management approval was still required, and he never saw the documents saying the same thing. *See supra* Part II.C. Rather, he

testified that he based that opinion on what he had seen and done, where the authority was simply assumed. Burns Dep. 277:12-278:18. But what Mr. Burns had actually "seen and done" undercuts his opinion. In his trading and chartering roles, he approved or disapproved charters that others had negotiated, and "if I said no, it wasn't taken." *Id.* at 116:7-117:21.

## IV. This is not a case for admitting the testimony and discounting its weight.

Hornbeck may ask this Court to admit the testimony and weigh it. But the principal defects here are not matters of weight. Legal conclusions, opinions on agency, credibility vouching, and testimony about a party's motive are categorically improper. *Marx*, 550 F.2d at 509-10; *Nimely*, 414 F.3d at 397-98. Where an expert's analysis is "inextricably intertwined" with inadmissible opinions, this Court has excluded the report and testimony in their entirety, observing that district courts are "not obligated to prune away all of the problematic elements of an expert's proposed testimony to save the remaining portions, however small." *GEL*, 2024 WL 1374902, at *11 (quoting *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016)).

## CONCLUSION

For the foregoing reasons, GERE respectfully requests that the Court exclude the testimony of Earl H. Burns, Jr. in its entirety and strike his Report.

Dated: November 4, 2026

Respectfully Submitted,

**MILLS BLACK LLP**

By: */s/ H. Allen Black*

H. Allen Black
Peter F. Black
Kathryn L. Fitzgerald
1215 19th Street, NW
Washington, DC 20036
hablack@millsblack.com
pblack@millsblack.com
kfitzgerald@millsblack.com

**WINSTON TAYLOR LLP**

Aldo A. Badini
200 Park Avenue
New York, NY 10166-4193
aldo.badini@winstontaylor.com

*Counsel to GE Renewables US LLC*