UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 1:26-cv-04776-JSR<br><br>Related to Civil Action No. 1:26-cv-04014-JSR |

**HORNBECK OFFSHORE OPERATORS, LLC'S OPPOSITION TO GE RENEWABLES US LLC'S MOTION FOR SUMMARY JUDGMENT[1]**

[1] Citations to "SOF" are to GERE's Statement of Uncontested Facts while citations to "SOCF" are to Hornbeck's Statement of Contested Facts.

# TABLE OF CONTENTS


I. BACKGROUND .......... 2

II. LEGAL STANDARD .......... 4

III. ANALYSIS .......... 5

A. The parties reached a binding charter party under established federal maritime law. .......... 5

1. Long-established precedent, *Great Circle* governs charter party formation. .......... 5

2. Hornbeck and GERE agreed to the key terms of the charter party. .......... 5

3. Neither party considered any additional term to be essential. .......... 6

4. GERE's efforts to read additional elements into *Great Circle* fail. .......... 8

a. *Great Circle* does not condition fixtures on a sense of urgency. .......... 8

b. *Great Circle* does not require a fixture recap. .......... 9

B. GERE did not condition its agreement to essential terms on further management approval or a purchase order. .......... 9

1. GERE did not communicate its No PO No Pay policy to Hornbeck. .......... 10

2. Spofford represented to Hornbeck that GERE management had approved a charter for HOS BRIARWOOD. .......... 13

C. The parties agreed on an enforceable delivery term. .......... 14

1. GERE agreed to the delivery term as written and, contrary to GERE's arguments, used it to calculate a canceling date. .......... 15

2. Box 5 is definite because the law requires delivery with reasonable dispatch. .......... 16

3. The canceling date and liquidated damages are details under the charter, not part of the delivery term. .......... 18

D. GERE told Hornbeck the deal was done, and nothing Hornbeck said to GERE withheld its own assent. .......... 18

1. Hornbeck assented when the main terms closed and again when the details closed. .......... 19

2. The October 7 proposal's conditions did not carry into the charter, and Hornbeck lifted them anyway. ........ 19

3. The November 17 letter and email do not withhold Hornbeck's assent after November 18. ........ 22

4. Hornbeck's later records refute GERE's claim that Hornbeck never treated the vessel as committed. ........ 23

E. The *Winston* factors do not apply. ........ 23

IV. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases**

*Gans S.S. Line v. Wilhelmsen*,
275 F. 254 (2d Cir. 1921) .......... 16, 17

*Grammer S.S. Corp. v. James Richardson & Sons*,
47 F.2d 186 (2d Cir. 1931) .......... 16

*Great Circle Lines, Ltd. v. Matheson & Co.*,
681 F.2d 121 (2d Cir. 1982) .......... passim

*Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc.*,
No. 09-CV-2905, 2010 WL 2008971 (E.D. La. May 17, 2010) .......... 8, 22, 25

*Ianniello v. Hartford Life & Acc. Ins. Co.*,
No. 10-CV-370, 2011 WL 7139243 (E.D.N.Y. Aug. 16, 2011) .......... 5

*In re Arb. Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.*,
84 F. Supp. 2d 527 (S.D.N.Y. 2000) .......... 17, 21

*In re Great Circle Lines, Ltd.*,
No. 80-CV-1575, 1981 WL 6769696 (S.D.N.Y. Oct. 16, 1981) .......... 6

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*,
462 F.2d 673 (2d Cir. 1972) .......... 16

*Jarka Corp. v. Hellenic Lines, Ltd.*,
182 F.2d 916 (2d Cir. 1950) .......... 21

*Karran v. Peabody*,
145 F. 166 (2d Cir. 1906) .......... 18

*Krasnyi Oktyabr, Inc. v. Maersk A/S*,
775 F. Supp. 3d 813 (S.D.N.Y. 2025) .......... 12, 13

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
121 F.3d 24 (2d Cir. 1997) .......... 12

*Sanday v. U.S. Shipping Bd. Emergency Fleet Corp.*,
1 F.2d 390 (S.D.N.Y. 1924) .......... 18

*Signet Marine Corp. v. NFE Transportation Partners, LLC*,
No. 24-CV-03049, 2025 WL 3491631 (S.D. Tex. July 15, 2025), *report and recommendation adopted*, No. 24-CV-03049, 2026 WL 1630227 (Mar. 30, 2026) .......... 22

*SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*,
467 F.3d 107 (2d Cir. 2006) .......... 1

*Travellers Int'l A.G. v. Trans World Airlines, Inc.*,
41 F.3d 1570 (2d Cir. 1994) .......... 17

*Turowski v. Triarc Cos.*,
761 F. Supp. 2d 107 (S.D.N.Y. 2011)........................................................................ 4

*U.S. Gypsum Transp. Co. v. Dampskibs Aktieselskabet Karmoy*,
48 F.2d 376 (E.D.N.Y. 1930), *aff'd per curiam*, 54 F.2d 1086 (2d Cir. 1931) ...................... 16

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
241 F.3d 135 (2d Cir. 2001)........................................................................................ 21

*Winston v. Mediafare Entertainment Corp.*,
777 F.2d 78 (2d Cir. 1985).......................................................................................... 23

**Other Authorities**

Complaint, *Hornbeck Offshore Services, LLC v. Fairfield Indus., LLC*, No. 09-CV-02905 (E.D. La. Mar. 2, 2009)........................................................................................ 25

http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm .................................................. 10

Restatement (Second) of Contracts § 204 (1981) .......................................................... 17

Restatement (Second) of Contracts § 33 (1981) ............................................................ 17

**Rules**

FED. R. CIV. P. 56(a) ............................................................................................... 4

FED. R. EVID. 801(d)(2) ........................................................................................... 4

The law of charter party formation is clear: once parties have agreed to essential terms—charterer, vessel owner, vessel, duration, day rate, delivery and redelivery port, time of delivery, and contract form—they are bound, even if they have yet to agree to more ancillary terms or execute a written contract. *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 124–25 (2d Cir. 1982). When Hornbeck and GERE agreed to each of these terms (as well as the details), Pierre Furic, GERE's principal negotiator, announced publicly that "we have a contract," and internally that the "[c]ontract commercial terms [we]re cleared," and Hornbeck understood that the parties had a binding agreement and the charter was fixed. SOCF 27–30.

But GERE, unbeknownst to Hornbeck, was apparently negotiating as though its own, unstated set of rules applied: it allegedly intended to be bound only when the parties signed a written long-form charter party. The problem for GERE is that GERE never communicated this to Hornbeck. Instead, GERE agreed to the essential terms of a charter party and expressed that the parties had reached a deal. SOCF 27–29. The law is clear that, regardless of GERE's subjective intention, what matters is what it communicated to Hornbeck. *See SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 125 (2d Cir. 2006). And that reality drives this case.

Faced with a legal framework it does not like, GERE employs a kitchen sink approach in an effort to escape established law. It argues Hornbeck never considered itself bound, GERE expressed an intent to be bound only upon execution of a written charter party, and a year-long charter for an offshore vessel is not the kind of negotiations the law of fixture contemplates. ECF 48 at 21–23, 19–21, 25. But none of these arguments holds water.

*First*, Hornbeck considered itself bound from the moment the parties agreed to the essential terms of the charter party. SOCF 138. GERE cannot twist the record enough to show otherwise.

*Second*, even if GERE intended to be bound only upon execution of a final, long-form

contract, it failed to relay this message to Hornbeck. Tyler Spofford of GERE explicitly told Hornbeck he had management approval to proceed with the deal. SOCF 131. And GERE never circulated its internal "No PO No Pay" policy to Hornbeck, which, once examined, does not even apply. SOCF 135–137; *see infra*.

*Third*, GERE's strained efforts to place this case outside of *Great Circle* fail. No court has ever found that a fixture is contingent upon a certain type of charter. Nor has any court limited fixture analysis to negotiations conducted under severe time constraints. Despite GERE's best efforts, federal maritime law applies to it too.

GERE has not carried its burden to merit summary judgment. It misstates the law. And, applying the law as it stands, genuine disputes of material fact preclude summary judgment. On this record, the Court should deny GERE's motion and allow this case to proceed to trial.

## I. BACKGROUND

This case arises from a maritime breach of contract claim between Hornbeck, a marine transportation service supplier, and GERE, a General Electric contracting entity. SOF 2, 3. In June 2025, GERE contacted Hornbeck through its broker, Clarksons, about chartering a vessel for GERE's operations on Vineyard Wind 1, an offshore wind project. SOCF 1. The parties' negotiations were protracted and fragmented from June to October as GERE refined its vessel needs. SOCF 13, 16. In October, GERE communicated that its vessel needs were becoming clearer, and the parties began negotiating in earnest.[2] SOCF 16. Ultimately, in November, the parties were in constant, daily communication. SOCF 20, 128.

[2] The Hornbeck negotiating team was composed of Kevin Douglass, Jason Dennis, and Adam Shrives; the GERE negotiating team was composed of Pierre Furic and Tyler Spofford; and Clarksons, represented by Jonathan Lints and Tyler Bojé, served as GERE's broker. SOF 1.

As their discussions accelerated, the parties agreed to essential term after essential term. From the start of their conversations, the parties understood that any charter party reached between them would be between Hornbeck, as the vessel owner, and GERE, as the charterer, and would be memorialized on a BIMCO SUPPLYTIME 2017 ("BIMCO"), a pro forma chartering contract. SOCF 51, 42. On October 7, the parties agreed on the vessel and day rate: HOS BRIARWOOD for a rate that fluctuated based on the number of GERE personnel on board during the charter. SOCF 14–15, 66. On October 24, the parties agreed to a charter term of ten months and that the ports of delivery and redelivery would be New Bedford, Massachusetts. SOCF 17–19.

Hornbeck ultimately sought to confirm GERE was serious about chartering HOS BRIARWOOD. SOCF 130. During a phone call with Spofford and Bojé, Shrives inquired whether Spofford needed management approval for the deal. SOCF 131. On the call, Spofford said, "he had approval from upper management to move forward with BRIARWOOD." SOCF 131.

The parties met on November 13 and agreed to the final essential term—that Hornbeck would deliver the vessel "[u]pon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." SOCF 21. GERE then requested to modify two settled essential terms: it requested an extension of the charter duration from ten months to twelve months and a discounted day rate if GERE locked in its number of personnel on board at fifty-two. SOCF 22–23. Hornbeck agreed to an extension of the charter party duration and, four days later, agreed to a discounted rate of $68,333 on November 17. SOCF 22, 101–102.

Hornbeck and GERE met again the next day and agreed on all open details. SOCF 27–28. At the conclusion of the meeting, Furic announced to the group, "we have a contract," and promised to circulate a finalized BIMCO long-form contract. SOCF 27. He never did. SOCF 32.

When Douglass followed up, Furic feigned surprise that Hornbeck had not received it, claimed he had lost the edits, and indicated for the first time since—and in direct contradiction to—Spofford's statement weeks earlier that GERE's management needed to approve the contract. SOCF 33, 131–134.

GERE's crawfishing soon made sense: GERE had received an unsolicited bid for ROSS CANDIES, a vessel owned by a Hornbeck competitor, and Spofford was in Louisiana touring it, while Furic delayed in producing the awaited finalized BIMCO. SOCF 33–34. In the following days, Furic continued his efforts to slow-play the finalization of the BIMCO and distance GERE from the deal, relaying to Douglass, "we have not been able to take clear decision today." SOCF 35. When Hornbeck sought clarity from Clarksons, Bojé, GERE's agent, relayed to Shrives that the parties had a deal.[3] SOCF 37. Internally, Clarksons was advising GERE that it could not back out without a justification. SOCF 36. Rejecting its own broker's advice, GERE repudiated the fixture on November 26 in favor of ROSS CANDIES. SOF 151.

## II. LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In determining whether disputed issues of material fact exist, a court must draw all reasonable inferences in favor of the non-moving party." *Turowski v. Triarc Cos.*, 761 F. Supp. 2d 107, 110 (S.D.N.Y. 2011) (citation modified). "[T]he district court's task on a summary judgment motion-even in a non-jury case-is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." *Ianniello v. Hartford Life & Acc. Ins. Co.*, No. 10-CV-370, 2011 WL

[3] Statements by Clarksons are admissible under Federal Rule of Evidence 801(d)(2) because Clarksons was GERE's agent for purposes of this tender. SOCF 1–3.

7139243, at *14 (E.D.N.Y. Aug. 16, 2011) (citation modified).

## III. ANALYSIS

### A. The parties reached a binding charter party under established federal maritime law.

#### 1. Long-established precedent, *Great Circle* governs charter party formation.

A charter party is governed by federal maritime law. *Great Circle*, 681 F.2d at 124. It is an elementary principle that maritime contracts are valid and binding even if not distilled to writing. Indeed, "[t]he binding effect of oral contracts in maritime law is an ancient concept whose roots are deeply embedded in custom; binding chartering engagements have historically been assumed on nothing more formal than the nod of a head." *Id.* (citation modified).

"Charter parties are formed in two stages." *Id.* First, the parties agree on the "significant, 'main' terms" of the charter. The main terms are only those that "are considered the 'bare-bones' of the contract"—charterer, vessel owner, vessel and its characteristics, time and port of delivery, charter duration, redelivery port, hire rate, form upon which the contract is based, and any other term that a party deems important. *Id.* Agreement to these terms is called a "fixture." *Id.*

Following fixture, parties can continue negotiating the details of the deal. "These minor or side issues 'flesh-out' the original agreement or fixture," which "include a wide variety of matters, for example: fuel used, speed of vessel, condition of ship's holds, exact time of ship's delivery to charterer, brokerage, breakdown, bunkering, option to extend charter, cargo capacity, demurrage and whatever else is deemed by the parties to be of minor importance." *Id.* The law of fixture does not suggest that details are unimportant; only that "[t]he details are not meaningful to the trade in the same way that the main terms of the fixture are." *Id.*

#### 2. Hornbeck and GERE agreed to the key terms of the charter party.

Hornbeck and GERE's negotiations played out exactly as *Great Circle* anticipates. As the parties worked toward a mutually agreeable charter party, they agreed to the bare-bones of the

charter party: the vessel owner (SOCF 39–48); charterer (SOCF 49–58); vessel (SOCF 59–68); duration (SOCF 69–72); day rate (SOCF 101–102); delivery port (SOCF 79–90); redelivery port (SOCF 91–100); delivery date (SOCF 103–112); and contract form (SOCF 73–78).

At the end of their negotiations, Hornbeck and GERE had agreed to every essential term of the charter party, as well as the details. Everyone involved acknowledged this. On November 18, Furic reported to Spofford that all commercial terms were "cleared" and the contract was final and could be presented to management. SOCF 30–31. On November 24, Lints described the parties as having "an 'off the shelf / ready' contract," and Bojé testified that the terms in Part 1 of the BIMCO—the key terms—were "all nailed down." SOCF 36, 113. And Shrives confirmed "[a]ll the essential terms of the charter were agreed between the parties." SOCF 114.

**3. Neither party considered any additional term to be essential.**

Faced with its own agent's testimony that the parties had agreed on the essential terms, its external statement that "we have a contract," and internal confirmation that the "[c]ontract commercial terms are cleared," GERE now claims—after the fact—that every provision of the long-form BIMCO form was essential, relying on dicta from the *Great Circle* district court describing essential terms as "those deemed important enough to the parties to raise during the first stage of negotiations." ECF 48 at 24 (quoting *In re Great Circle Lines, Ltd.*, No. 80-CV-1575, 1981 WL 6769696 (S.D.N.Y. Oct. 16, 1981)).

GERE's reliance on the district court's articulation is misplaced. *Great Circle*—the binding Second Circuit precedent—enumerates a list of main terms that can be expanded by "any other term that a party deems important." 681 F.2d at 125. Everything else is a detail. What separates the two is how important the parties make a term, not when they happen to discuss it. Nothing in *Great Circle* requires parties to settle all main terms before turning to details. Nor does it suggest that a detail morphs into a main term simply because of when it is discussed. The district court in

*Great Circle* was describing one way a party can show that a term is essential; it was not adopting a rule that every provision in an early draft becomes essential whether or not anyone treated it that way. Nor has GERE pointed to any other court that has drawn such a distinction.

Whether a party considers a term important enough to be an essential term depends on its objective manifestations to the other party during negotiations. Notably, GERE fails to point to anything indicating that either party elevated <u>any</u> detail to the level of an essential term. No evidence establishes that any detail was of particular importance or that a deal hinged on agreement to any detail. GERE points only to the BIMCO circulated at the beginning of the negotiations. But sending a contract draft shows only that a party is circulating a contract draft; it does not show that the circulating party considered everything in the contract to be an essential term.[4]

Shrives's testimony that "[a]ll of the open items are important in some way or another" does not change the outcome. ECF 48 at 24–25 (citing SOF 129). Acknowledging that all terms of a charter party are important does not mean they are <u>essential</u>; it merely recognizes that charter parties do not contain meaningless provisions. SOCF 117. As Hornbeck's corporate representative attested, this is precisely what he would have testified to if GERE had asked questions truly designed to probe whether Hornbeck considered any other provision to be an essential term. SOCF 117.

To obtain summary judgment on this issue, GERE would have to show—with no issue of fact—that both sides understood that all terms of the BIMCO were essential. But GERE falls well short because neither party said that during the discussions and Hornbeck rejects the assertion.

---

[4] To be sure, GERE's approach would eradicate the entire fixture framework. Charters are routinely negotiated on printed forms, and the form—as an essential term itself—is often, if not always, proposed at the start. If circulating a form made every clause essential, no fixture could bind until every clause was agreed. Every party who might later want to get out of a binding fixture could simply circulate a draft of the charter party at the start of the parties' discussions.

**4. GERE's efforts to read additional elements into *Great Circle* fail.**

Next, GERE asks the Court to graft two additional requirements onto the *Great Circle* analysis: first, that a fixture binds only when the parties negotiated under severe time constraints, and second, that a party cannot prove a fixture without a fixture recap. But the law does not support GERE's positions. To the contrary, the law directly rejects them.

**a. *Great Circle* does not condition fixtures on a sense of urgency.**

*Great Circle*'s reference to urgency merely explains why the trade fixes deals on main terms before the details are worked out; it does not condition fixture on time pressure. Even though it argues for that reading, GERE cites no case holding that a fixture fails for want of urgency. Indeed, existing authority actually points the other way.[5] *See Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc.*, No. 09-CV-2905, 2010 WL 2008971, at *1 (E.D. La. May 17, 2010) (rejecting argument that a fixture reached three months before charter was not binding).

In any event, there was time pressure to conclude the deal in this case. GERE insists that "the parties negotiated the entirety of the proposed contract over the span of months." ECF 48 at 25. That paints a misleading picture because much of the time involved loose discussions relating to other vessels, as GERE's needs developed. By the time HOS BRIARWOD was selected and GERE's need became clearer, much of the "span of months" had passed. But, to the extent timing matters, the relevant question is not how long the parties negotiated but how much time they had <u>left</u> when they reached a fixture. When the parties agreed to the final essential term in this case, the delivery date was roughly one month away. In that month, Hornbeck had to mobilize the vessel and complete modifications GERE had requested. SOCF 24. GERE felt the pressure just as much

[5] This is undoubtedly, in part, because such a rule would be unworkable. Under GERE's approach, whether a charterer is bound would turn not on what it agreed to, but on an after-the-fact judgment about whether the parties were hurried enough—a standard that would let any charterer with buyer's remorse argue that it had too much time to make the deal it regrets.

as Hornbeck: on November 5, Furic pressed Hornbeck for BIMCO edits because "[w]e need to progress and understand if this is working." SOCF 25. That is precisely the kind of time-sensitive negotiation *Great Circle* describes.

**b. *Great Circle* does not require a fixture recap.**

Contrary to GERE's argument, *Great Circle* does not hold that a fixture is conditional upon the issuance of a fixture recap. As before, GERE cites no case holding that a fixture recap is required before a fixture. And, again, the law instructs the opposite of what GERE says: charters have historically been fixed "on nothing more formal than the nod of a head." *Great Circle*, 681 F.2d at 124. A recap may be evidence of a fixture. But it is not an element of one. Industry practice confirms this point: "Sometimes you see [fixture recaps], sometimes you don't." SOCF 118.

Even if a written proof of terms were required, the BIMCO provided that. Nothing in *Great Circle* or any other authority dictates what a recap must look like. As Shrives testified, a fixture recap "could come in different forms." SOCF 119. The BIMCO did just that. SOCF 119–120. It set out every term of the charter party—including the essential terms—and tracked term by term whether the parties agreed. When Furic declared that the parties "ha[d] a contract," the BIMCO showed agreement on every main term. GERE cannot insist on a fixture recap while ignoring that the parties exchanged a document evidencing all agreed key terms.[6]

**B. GERE did not condition its agreement to essential terms on further management approval or a purchase order.**

GERE argues that it is not bound to the fixture because it informed Hornbeck that a charter party was contingent upon management approval and a purchase order. But the record cannot

[6] Although it is not required, GERE further expressed an intent to be bound in this case when Furic proclaimed at the conclusion of the November 18 meeting, "we have a contract!" SOCF 27. If a charter party can be fixed by the nod of a head, it can certainly be fixed by the charterer's principal negotiator announcing that the parties had a contract after agreeing to terms.

support GERE's argument. The No PO No Pay policy was never communicated to Hornbeck in a way that would put Hornbeck on notice of any variation from federal maritime law. And whatever import GERE assigns to the provision, Spofford explicitly told Hornbeck that he had management approval to proceed with the charter of HOS BRIARWOOD.

**1. GERE did not communicate its No PO No Pay policy to Hornbeck.**

GERE points to a clause in the BIMCO—buried on page forty-four of seventy—as proof that Hornbeck knew GERE would not consider itself bound until it issued a purchase order. In support of its argument, GERE (incorrectly) asserts the following clause incorporates the No PO No Pay policy and, therefore, put Hornbeck on notice:

> (i) Owners acknowledge that they have received a copy of the following documents: (i) Guidelines – Third Party Suppliers (the "Guidelines"), and (ii) the GE Integrity Guide for Suppliers, Contractors and Consultants, which may be updated or modified by General Electric Company from time to time (the "Guide") located at the following Internet address http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm.

SOCF 135.

GERE contends this clause "makes clear reference to [the No PO No Pay policy] and describes it so that its identity may be determined beyond doubt." ECF 48 at 20. But the provision GERE points to does not come even close to meeting this standard. The clause identifies two documents: "Guidelines – Third Party Suppliers" and "the GE Integrity Guide for Suppliers, Contractors and Consultants." The words "No PO No Pay" appear nowhere; neither does the phrase "purchase order." The web address—which ends in "SuppliersIntegrityGuide"—points only to the Integrity Guide. And the provision gives no location for the "Guidelines" at all.

Following the link only confirms the point—and reveals GERE's failure. The link does not open the Integrity Guide, the "Guidelines," or any other document. It opens a generic landing page that asks the visitor to choose between two different companies, GE Aerospace and GE Vernova.

Nothing on the page tells the reader which company's materials the clause means, and the clause itself attributes the Guide to "General Electric Company," not to either one:




A reader who guesses "GE Vernova" reaches a second menu with six more options: (1) Read Supplier Policies, (2) Check your invoices, (3) Access Tools & Portals, (4) Doing business with GE Vernova, (5) Supplier Empowerment Program, and (6) Contact Us:




Selecting "Read Supplier Policies" produces yet another menu, this one with four categories: (1) Supplier Policies, (2) Integrity Guide & Training, (3) Purchase Order Term Documents, and (4) Privacy & Data Protection Documents:




The only listed category that matches either document named in the clause is "Integrity Guide & Training." And selecting it leads to the GE Vernova Integrity Guide for Suppliers, Contractors & Consultants—not to the No PO No Pay policy. No category, and no document, anywhere on the site is called "Guidelines – Third Party Suppliers."

The No PO No Pay policy instead sits inside the separately labeled "Supplier Policies" category. GERE's argument therefore requires reading "Guidelines – Third Party Suppliers" to mean every document in a differently named category, reached only after three layers of menus, on a website belonging to a company the clause never mentions. GE's own website treats "Supplier Policies," the "Integrity Guide," and "Purchase Order Term Documents" as distinct sets of documents.

GERE cites cases for the proposition that "[a] proposed maritime contract can validly incorporate by reference terms from another document when the proposed contract makes clear reference to it and describes it so that its identity may be determined beyond doubt." ECF 48 at 20 (citing *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) and *Krasnyi Oktyabr, Inc. v. Maersk A/S*, 775 F. Supp. 3d 813, 818 (S.D.N.Y. 2025)). But a reference that leaves the reader to guess which of them is meant, layers deep in a website's structure, is the opposite of identification "beyond doubt." And, on summary judgment, GERE cannot show that the provision in the draft BIMCO, that led to a website, that led to several layers of menu options, that allowed the user to hunt for a policy about purchase orders, put Hornbeck on notice that the

entire fixture was deferred—and would not be binding—until GERE issued a purchase order.[7] [8]

Nor did GERE advise Hornbeck of the No PO No Pay policy in an October 15 email as GERE claims. That email states that "[s]uppliers are required to comply with our GE Supplier Integrity Guide [i.e., the guide that did not address purchase orders] and watch the training video" at the link discussed above. SOCF 136. The email further provides that "Purchase Orders: GE requires PO issuance prior to work being performed." SOCF 136. Mentioning a different policy and providing a link that, for the reasons explained above, does not lead to the No PO No Pay policy, does not put Hornbeck on notice of anything related to the policy. And the reference to the purchase order merely informs a supplier that GE will issue a purchase order before the supplier begins work. It does not say GERE will not consider itself bound until a purchase order issues or that GERE reserves the right to walk away from an agreement at any point before it issues one.

**2. Spofford represented to Hornbeck that GERE management had approved a charter for HOS BRIARWOOD.**

GERE also argues Hornbeck knew, based on GERE's assertion that Spofford and Furic made many references to the need for management approval, that GERE would not be bound until

[7] It bears observation that both *New Moon Shipping* and *Krasnyi Oktyabr* involved disputes over established contracts—not "proposed maritime contract[s]" as described by GERE. And that is important because, while incorporation by reference in respect of contract interpretation may be adjudged on summary judgment, *see Krasnyi Oktyabr*, 775 F. Supp. 3d at 818, that is not the question here. GERE is asking the Court to conclude that a provision on page forty-four of a seventy-page, unsigned, form agreement put Hornbeck on notice, based on a different company's policy buried layers down in that website, that—contrary to federal maritime law—agreement on essential terms would not result in a fixture and, instead, that no charter would be fixed until after formal execution (or, if GERE's argument is to be credited, until GERE issued a purchase order). The effect, if any, of the provision in respect of notice on Hornbeck is at best a disputed issue of fact and, on summary judgment, cannot be credited to GERE's position.

[8] Spofford swore in a declaration that "[he] believe[s] that the GE No PO No Pay policy is well-known. It is strictly enforced at GE Vernova and GERE." SOF 28 (citing Exhibit 50, Declaration of Tyler Spofford at ¶ 6). Curiously, GERE's own broker had never heard of the policy. SOCF 137.

it received such approval. The problem with that argument is that Spofford expressly told Hornbeck and Clarksons during a phone call that "he had approval from upper management to move forward with the BRIARWOOD." SOCF 131. There is no indication anyone mentioned the need for management approval after this representation. The only document referencing management approval after this call came post-fixture and when GERE was backing away from the deal in favor of ROSS CANDIES. And neither Spofford nor Furic could identify a single time when they told Hornbeck about an alleged limitation on authority. SOCF 133–134.

Hornbeck negotiated in reliance on Spofford's own assurance that GERE's management had approved a fixture of HOS BRIARWOOD and that any internal obstacles had been cleared. SOCF 36. Indeed, when it became clear to Clarksons that GERE intended to repudiate the fixture, Lints wrote to GERE, confirming this exact point: "Clarksons (and Hornbeck) [were] working in good faith belief that GE had management approval to conclude negotiations with Hornbeck using the HOS Briarwood." SOCF 36. After Spofford's representation, no one at GERE referred to management approval until after the parties had reached a fixture and GERE was beginning to back away from the deal in favor of ROSS CANDIES. SOCF 36, 132–134, 33.

**C. The parties agreed on an enforceable delivery term.**

Unable to dispute that the parties agreed to the essential terms of the charter party, GERE takes issue with the final essential term agreed on—date of delivery. Box 5 provides for delivery "[u]pon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." SOCF 109. GERE argues that it never agreed to this term and that the term is too indefinite to enforce. ECF 48 at 26–28. Both arguments fail. GERE agreed to a delivery term that set a floor date and tied the final date to an identified event, the end of the vessel's prior charter. The law supplies the ceiling GERE says is missing by requiring the owner to deliver with reasonable dispatch. And, because the "exact time of ship's

delivery" is a detail the parties never treated as essential, the absence of a calendar date did not leave the parties without a deal. *Great Circle*, 681 F.2d at 125.

**1. GERE agreed to the delivery term as written and, contrary to GERE's arguments, used it to calculate a canceling date.**

Before the November 13 meeting, Furic's list of open items asked that the "final date of delivery shall be clear" by December 10. SOCF 105. After the meeting, he said, "We leave as is." SOCF 106. Box 5's text did not change from Hornbeck's November 10 draft through GERE's November 17 markup. SOCF 103–104, 107, 109. That refutes GERE's arguments.

Hornbeck recorded the agreement on the draft, and GERE let the date stand "as is." Hornbeck's note on Box 5 reads "Agreed and closed in Nov 13 meeting." SOCF 108. Dennis, who attended the meeting, confirmed that the term was agreed there. SOCF 21. Furic returned the draft to Hornbeck without disputing the note. SOCF 110. If GERE's negotiator disagreed with a term marked "agreed and closed," he could have said so. He did not.

Confirming its understanding of (and agreement to) the delivery date, GERE used Box 5 to calculate and confirm the canceling date. Furic's only comment on Box 5 stated that the canceling date and liquidated damages would "be based on clear delivery date." SOF 97. His next comment, on Box 6, calculated that date from Box 5 itself: "15 dec + 7 days = 22 dec." SOF 102. GERE's ability to calculate the cancellation date and liquidated damages belies its post hoc argument that the term was too indefinite. Indeed, GERE's internal planning ran on the same date ("BRIARWOOD start Dec 15"). SOCF 68.

GERE's evidence is Furic's present testimony, which he never expressed during the negotiations. Furic now says the term was "impossible to accept." SOF 98–99. He never told Hornbeck that. And the concern he now asserts (not knowing when the prior charter would end) was not a real issue because Hornbeck and GERE discussed it daily. SOCF 128. Testimony that

conflicts with the parties' contemporaneous writings raises, at most, a question for trial. *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676–77 (2d Cir. 1972).

**2. Box 5 is definite because the law requires delivery with reasonable dispatch.**

Box 5 tells the parties when delivery occurs. And it is not hard to understand. The delivery date was written around a known fact: HOS BRIARWOOD was finishing a job for another customer that Hornbeck expected to end just before the time when GERE wanted the vessel. SOCF 126. And Hornbeck told GERE this. SOCF 128. If the vessel came free before December 15, it would go on hire at 0001 hours on December 15. SOCF 127. If the job unexpectedly ran late or if the vessel was delayed for some unexpected reason—both common realities of maritime commerce—Hornbeck would deliver "[u]pon availability of the Vessel," which would happen as soon as it was available. SOCF 127. The owner's duty is to deliver "in the agreed delivery window." SOF 135. Pairing a floor date with redelivery from the prior charterer is common in Hornbeck's charters and in the offshore trade, because the date a vessel comes off one charter often cannot be fixed with precision when the next charter is negotiated. SOCF 124–125.

The only thing Box 5 leaves unstated is an outer limit. But the law supplies it. When an owner charters a vessel still under a prior charter, sets a floor date, and promises no fixed calendar date, it must "tender with reasonable dispatch." *U.S. Gypsum Transp. Co. v. Dampskibs Aktieselskabet Karmoy*, 48 F.2d 376, 377–78 (E.D.N.Y. 1930), *aff'd per curiam*, 54 F.2d 1086 (2d Cir. 1931). Owners write the clause this way so that they need not promise delivery "at any specific time" while the vessel is still on another charter. *Id.* at 377. The reference to the prior charterer's redelivery does not make delivery optional. It is "not a condition precedent," and an owner that delivers late is liable. *Gans S.S. Line v. Wilhelmsen*, 275 F. 254, 260 (2d Cir. 1921). Where a contract fixes no time, performance is due "within a reasonable time." *Grammer S.S. Corp. v. James Richardson & Sons*, 47 F.2d 186, 187 (2d Cir. 1931); Restatement (Second) of Contracts

§§ 33 cmt. d, 204 (1981). These are not mysterious or remote concepts; they are everyday realities. SOCF 122, 124–125. The parties understood all of this despite GERE's assertions to the contrary.

Box 5 is enforceable. A term is definite enough if it provides "a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2). Box 5 does both. The owner breaches if it fails to deliver on December 15 after an early redelivery, or fails to deliver promptly after a late one, and the charterer's remedy is damages. *Gans*, 275 F. at 260. GERE cites no authority holding a term like this indefinite. And GERE invokes confusion only by ignoring settled law and the realities of maritime commerce.

The law also forecloses GERE's claim that Hornbeck could have delayed delivery "for a year or more." ECF 48 at 28. Leaving aside the implausibility of GERE's argument, the implied covenant of good faith barred Hornbeck from extending the prior job, or postponing its end, to defeat GERE's charter. SOCF 150; *Travellers Int'l A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994); *In re Arb. Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.*, 84 F. Supp. 2d 527, 530 (S.D.N.Y. 2000). In any event, GERE would never face a year's wait. Box 6 sets the canceling date at the "Delivery date in Box 5 plus 7 days," and GERE read that as December 22. SOCF 111. On GERE's own reading, it could have canceled if the vessel was not delivered within seven days after "redelivery from Owners' other customer."

GERE's evidence of indefiniteness does not show otherwise. Its expert objects only that Box 5 lacks an outer date but concedes that the parties fixed "when the vessel will not deliver," that he has seen delivery tied to redelivery from a prior customer, and that he offers no opinion on whether a charter formed. SOCF 123. And Shrives explained that Hornbeck expected HOS BRIARWOOD to be redelivered in late November or early December. SOCF 126. Only by ignoring the facts and applicable law can GERE assert that the delivery date was indefinite.

### 3. The canceling date and liquidated damages are details under the charter, not part of the delivery term.

GERE's remaining objections concern the remedies for late delivery, not the delivery term. The time of delivery is an essential term. But *Great Circle* lists the "exact time of ship's delivery" among the details, and the remedies for missing that time are details too unless a party makes them essential. 681 F.2d at 125; SOCF 116. A canceling clause does not set a delivery deadline; it gives the charterer an option if the vessel is late. *Karran v. Peabody*, 145 F. 166, 167 (2d Cir. 1906); *Sanday v. U.S. Shipping Bd. Emergency Fleet Corp.*, 1 F.2d 390, 391 (S.D.N.Y. 1924). And GERE accepted the canceling mechanism set by Box 6: the "Delivery date in Box 5 plus 7 days." SOCF 111. GERE did not object; rather, it used the formula to calculate a December 22 canceling date.

The liquidated damages provision is likewise a detail. And the parties here treated it as one. The clause was parked for later discussion. GERE wrote that it "should not be a reason to hold further negotiations." SOF 112–114. GERE identified no open item as an impasse. SOCF 38. A party that sets a term aside and says it should not hold up the deal has not made that term essential. Where the parties did not agree on an amendment to a detail, "the terms of the printed form govern." *Great Circle*, 681 F.2d at 125.

## D. GERE told Hornbeck the deal was done, and nothing Hornbeck said to GERE withheld its own assent.

GERE's negotiator ended the November 18 call by telling Hornbeck, "we are done, we have a contract." SOCF 27. GERE's motion never mentions this statement. And GERE cannot overcome this expression of an intent to be bound. Instead, GERE asserts that Hornbeck never meant to be bound, relying on out-of-context snippets from Hornbeck's produced documents: Hornbeck's October 7 proposal, draft Early Works letter, and internal email about procurement. ECF 48 at 18–24. All three predate the November 18 call at which Hornbeck agreed to the last open items. That timing alone dooms GERE's argument. Under *Great Circle*, parties fix the main

terms first and keep negotiating the details afterward. 681 F.2d at 125. A document written while details were still open therefore says nothing about whether a fixture had formed, and nothing about whether Hornbeck assented once the details closed. The question is whether any of those documents withheld Hornbeck's assent after November 18. None did.

**1. Hornbeck assented when the main terms closed and again when the details closed.**

Hornbeck manifested its assent at both *Great Circle* stages. By November 17, the main terms were agreed. That day, Furic returned the draft BIMCO "[f]or our call tomorrow" with Hornbeck's comments marked "Confirmed" and "agreed." SOCF 12. Hornbeck's designee testified that, as of that draft, "[a]ll the essential terms" were agreed. SOCF 114. On the November 18 call, Hornbeck agreed to each remaining comment and understood Furic's "we are done" statement to mean that "all essential and non-essential details had been agreed." SOCF 27–28.

Hornbeck's agreement on that call is the manifestation that counts. And GERE's argument about open items does not undo it. GERE says some items still awaited legal and insurance review. SOF 112–127. If so, those issues were details and the SUPPLYTIME 2017 form governs any detail the parties did not amend. *Great Circle*, 681 F.2d at 125. Beyond that, even crediting GERE's assertion, whether anything that mattered remained open is, at most, a disputed fact.

Hornbeck's conduct matched its words. Before the call, Hornbeck had written the vessel's delivery date into Box 5, marked that term agreed, and told GERE in daily discussions that the vessel was "available to them." SOCF 108, 128. Hornbeck also acted on the commitment with third parties. It told the vessel's prior client that the vessel "would be going to GERE" and alerted its gangway vendor to the coming charter. SOCF 149. Hornbeck told GERE and the market the same thing: HOS BRIARWOOD was committed to this charter.

**2. The October 7 proposal's conditions did not carry into the charter, and Hornbeck lifted them anyway.**

GERE relies on two sentences in Hornbeck's October 7 proposal: that the offer was "subject to vessel availability" and that "[i]n no event shall Charterer's acceptance of this offer be binding on HOS" until HOS issued "a written Vessel Order Confirmation." SOF 38–39. Because no Vessel Order Confirmation issued, GERE says neither party was bound. ECF 48 at 21–23.

The confirmation sentence never applied. It governs "acceptance of this offer," i.e., the October 7 proposal. But the charter did not form by GERE's acceptance of that offer. To the contrary, the parties negotiated a different instrument, the BIMCO SUPPLYTIME 2017 form, through multiple drafts—none of which carries a confirmation requirement or an availability subject. SOCF 5–12. Any conditions on accepting an unaccepted offer do not govern a charter formed by later negotiation. An unaccepted offer is a nullity in respect of the contract terms.

Even if the vessel's availability carried forward as a "subject" of the charter (no writing suggests this), Hornbeck lifted the "subject" and the vessel was, in fact, available. Box 5 told GERE the vessel would be available: it stated when it would be delivered, in terms the law makes definite, and Hornbeck marked it agreed. Hornbeck repeated the point in daily discussions and then agreed to the remaining terms on November 18. SOCF 128, 27–28. Shrives explained that a confirmation is only one form of commitment, that Hornbeck is bound when the parties agree on the essential terms "whether that's in a contract or some work order or some form of confirmation," and that here the parties "documented . . . the fixture . . . in the BIMCO." SOCF 120.

GERE's own witnesses agree that availability is lifted this way. Its expert testified that availability can be lifted by request or by conduct, or falls away without any express lifting when the parties move "straight from receiving an offer to negotiating the charter party details." SOCF 153. GERE's broker defined the subject as whether the vessel is "still being available and not committed to anybody else." SOCF 152. Hornbeck's Dennis agreed that availability as a "subject"

term "is removed when there's a fixture." SOCF 154. The vessel was available. SOCF 129. And Hornbeck committed it to GERE. The law does not require more.

A stated subject does not by itself prevent a charter from forming. In *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, the fixture was subject to the owner's release of the vessel from an existing charter. That subject was still open a month later, yet the Second Circuit held that the parties had "formed an enforceable agreement . . . subject to certain conditions." 241 F.3d 135, 139–41, 150 (2d Cir. 2001). *Andolina* presents the opposite record. There, both sides treated the subject as a condition of the deal: the owner extended the deadline four times, and its own broker telexed that the ship was "NOT REPEAT NOT FIXED." 84 F. Supp. 2d at 528–30. Here, GERE never asked for confirmation, and nothing exchanged after October 7 treated one as a prerequisite.

GERE's mutuality argument falls with the reservation. ECF 48 at 23 (citing *Jarka Corp. v. Hellenic Lines, Ltd.*, 182 F.2d 916, 918 (2d Cir. 1950)). The argument assumes that the reservation in the October 7 offer—which GERE did not accept—left Hornbeck free to walk away after both parties agreed to key terms on November 18. It did not, so both parties were bound.

Terms tied to signature govern payment and security, not formation. The mobilization fee was "[d]eemed earned upon Charter Party execution," and the parent guarantee was to be "signed at contract signature." SOF 53, 57, 104. Those provisions fix when Hornbeck would be paid and secured under the charter; as Shrives testified, the fee "is not part of the essential terms." SOCF 115. GERE says "Hornbeck agreed" to the guarantee's timing, but the comment proposing it was Furic's. SOF 104. Unlike the draft in *Signet Marine Corp. v. NFE Transportation Partners, LLC*, on which GERE relies, nothing in these drafts makes the charter's effectiveness dependent on execution of the entire contract. No. 24-CV-03049, 2025 WL 3491631, at *5 (S.D. Tex. July 15, 2025), *report and recommendation adopted*, No. 24-CV-03049, 2026 WL 1630227 (Mar. 30,

2026). Federal maritime law says exactly the opposite.

**3. The November 17 letter and email do not withhold Hornbeck's assent after November 18.**

The draft Early Works letter reserved nothing about the charter after November 18. It was a separate instrument about procurement money, prepared because GERE asked Hornbeck to start buying long-lead equipment to hold its delivery schedule. SOCF 139. Its availability sentence ran only "until such time as all details of a Time Charter have been agreed to by Owners." SOF 5. To the extent the sentence controls anything (it does not), that endpoint arrived on the November 18 call when the parties agreed to every remaining comment. SOCF 155. The condition turned on Hornbeck's agreement, not on GERE's review.

But the sentence in the draft Early Works letter is not even binding. GERE never responded to the letter, and no one signed it. SOCF 140. Even if read as a statement about the charter, it describes a condition that was satisfied the next day. And the letter itself points toward a deal. Hornbeck does not perform early works for a charterer without an early works agreement to protect its interests, and it does not modify a vessel to one customer's needs out of pocket. SOCF 144–145. Like the other details in the BIMCO, minor modifications to the vessel are not a key term.

Turning to GERE's last scrap of documentary "proof," John Cook's email concerned compensation for early work—not whether a charter had been fixed. Cook asked a colleague what would happen "if we do not reach a time charter." SOF 44, 47. He never sent the question to GERE, and intent is measured by what each party manifested to the other. *Fairfield*, 2010 WL 2008971, at *5 (disregarding internal emails, including Hornbeck's own). Cook was not involved in the negotiations and had read the Early Works letter "as a standalone document." SOCF 141. By "a time charter" he meant the long-form BIMCO SUPPLYTIME 2017. SOCF 142. Hornbeck's practice tracks federal maritime law: the signed long-form agreement follows the charter's fixture.

SOCF 121. Cook was ensuring that Hornbeck would be paid for its early work if the vessel could not be delivered, as had once happened after a catastrophic breakdown. SOCF 143. Hornbeck addressed that concern within the hour by making the advance "non-refundable." SOF 48–49. In no way did Cook's internal email express (and certainly not to GERE) any intent to not be bound.

**4. Hornbeck's later records refute GERE's claim that Hornbeck never treated the vessel as committed.**

GERE cites selected records as proof that Hornbeck treated the vessel as uncommitted. SOF 153–155. But the charter did not yet appear in Hornbeck's operating system because that system records a charter when the vessel goes on hire, not when it is fixed. SOCF 148. Nor does the ENI document—a multi-vessel indicative offer—show that the vessel was uncommitted to GERE. SOCF 146–147. As its name suggests, an indicative offer "does not incorporate a fixture" and, rather, indicates the sort of vessels Hornbeck could offer.[9] SOCF 146–147. Hornbeck tests the market with indicatives, but it does not "fix a vessel for a period where that vessel was . . . not available." SOCF 146–147.

**E. The *Winston* factors do not apply.**

As a last resort, GERE asks the Court to decide this case under the four-factor test from *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). But the *Winston* factors have no role in this case. *Winston* did not concern the formation of a maritime charter party; it employed New York state law to determine whether the parties had a binding settlement agreement. *Id.* Its factors rest on the premise that parties generally are not bound by a contract unless they agree in writing. But maritime law recognizes the exact opposite: "[t]he binding effect of oral contracts in maritime law is an ancient concept," and charters have historically been fixed

---

[9] HOS BRIARWOOD is one vessel within a class that is capable of carrying out similar roles. Its inclusion in the ENI indicative offer was an exemplar of that size/class of vessel. SOCF 146–147.

"on nothing more formal than the nod of a head." *Great Circle*, 681 F.2d at 124.

A cursory review of the factors shows that they have no place in a fixture analysis. *Winston*'s third factor asks whether the parties agreed on all the terms of the contract. But the entire fixture framework assumes that all terms have not been agreed. The fourth factor, whether this kind of agreement is usually put in writing, likewise ignores the long practice of fixing charters orally. This is why, despite regularly deciding issues of charter party formation, neither the Second Circuit nor any court in the Southern District of New York has employed *Winston* when deciding issues of charter party formation. This Court should not be the first to do so.

Even if *Winston* applied, its factors would point to both parties intending to be bound by a fixture. First, the parties did not reserve their right not to be bound. GERE never actually provided Hornbeck with the No PO No Pay policy or directed Hornbeck to review it, and Spofford explicitly told Hornbeck that management had approved a charter for HOS BRIARWOOD. Nor did Hornbeck reserve such a right through language in the October 7 proposal or the Early Works Agreement because neither applied to the parties' negotiations and, regardless, Hornbeck satisfied the subject.[10] Second, Hornbeck partially performed by initiating the Early Works agreement process—a process indicative of a binding agreement to charter a vessel. SOCF 144–145. Third, the parties had agreed to all essential terms, all details, and had an "off the shelf/ready" contract. SOCF 36. Finally, it is a fundamental truth of federal maritime law that charter parties are routinely fixed before a formal charter is signed.[11] *Great Circle*, 681 F.2d at 124. Each of the *Winston*

---

[10] In any event, the vessel availability subject is a condition to perform, not a barrier to formation.

[11] GERE attempts to dodge this well-settled law by arguing without citation that "a multi-month offshore charter with extension options, a parent company guarantee, and a negotiated SUPPLYTIME 2017 is exactly the type of agreement that is committed to writing." ECF 48 at 29. But at least one court has held that the fixture analysis applies in cases involving almost identical charters. *See Hornbeck*, 2010 WL 2008971, at *1, *5 (holding that the parties manifested an intent to be bound to a one-year charter party for an offshore vessel pursuant to a BIMCO SUPPLYTIME

factors—even if they were to apply—establishes that the parties intended to be bound by a fixture.

## IV. CONCLUSION

After the parties had agreed on all key terms—and more—GERE's principal negotiator told Hornbeck, "we have a contract." And the record supports him. By November 18, Hornbeck and GERE had agreed on every essential term of the charter party, including an enforceable delivery term, and on every detail. GERE never told Hornbeck that GERE would be bound only by a signed contract, a purchase order, or further management approval. Instead, GERE's Spofford told Hornbeck that management had approved the charter. Hornbeck, for its part, assented to the terms, committed HOS BRIARWOOD to GERE, and withheld nothing. On the law, *Great Circle*, not *Winston*, governs. And applying *Great Circle*, the parties reached a binding fixture. At a minimum, genuine disputes of material fact preclude summary judgment. The Court should deny GERE's motion.

---

2005); *see also* Complaint, *Hornbeck Offshore Services, LLC v. Fairfield Indus., LLC*, No. 09-CV-02905 (E.D. La. Mar. 2, 2009) (alleging a fixture for a one-year charter party).

Respectfully submitted,

*/s/ Daniel H. Charest*

Daniel H. Charest (*pro hac vice* applicant)
BURNS CHAREST LLP
901 Main Street, Suite 5800
Dallas, Texas 75202
Tel.: (469) 904-4550
Fax: (469) 444-5002
dcharest@burnscharest.com

Claire B. Curwick (admitted *pro hac vice*)
Natalie R. Earles (*pro hac vice* applicant)
Lauren M. Perry (admitted *pro hac vice*)
BURNS CHAREST LLP
201 St. Charles Avenue, Suite 2900
New Orleans, Louisiana 70170
Tel.: (504) 799-2845
Fax: (504) 881-1765
ccurwick@burnscharest.com
nearles@burnscharest.com
lperry@burnscharest.com

Matthew Tripolitsiotis (MT9413)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, New York 10017
Tel.: (469) 895-5269
Fax: (469) 444-5002
mtripolitsiotis@burnscharest.com

Counsel for Hornbeck Offshore Operators, LLC

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT-LIMITATIONS**

I, Daniel H. Charest, pursuant to Local Rule 7.1(c), hereby certify that this document contains 8,450 words. This word count does not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes or endnotes. I relied on the word count of the word-processing program used to prepare the document.

Dated: November 18, 2026

*/s/ Daniel H. Charest*

Daniel H. Charest (*pro hac vice* applicant)