UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORNBECK OFFSHORE OPERATORS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GE RENEWABLES US LLC,<br><br>Defendant. | Civil Action No. 1:26-cv-04776-JSR<br><br>Related to Civil Action No. 1:26-cv-04014-JSR |

**HORNBECK OFFSHORE OPERATORS, LLC'S RESPONSE TO GE RENEWABLES US LLC'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Hornbeck Offshore Operators, LLC ("Hornbeck") submits the following responses to the Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (ECF 49) (the "Statement") submitted by Defendant GE Renewables US LLC ("GERE"). Hornbeck reproduces each numbered paragraph of the Statement verbatim, using GERE's own numbering and outline structure, and responds directly below it. Hornbeck reproduces GERE's headings for reference only; Hornbeck does not admit them. Hornbeck contends that genuine issues of material fact exist for trial as to each paragraph identified below as disputed, or undisputed only in part, for the reasons stated in the corresponding response and more fully set forth in Hornbeck's accompanying Memorandum of Law in Opposition to GERE's Motion for Summary Judgment. Hornbeck likewise submits additional paragraphs containing a separate, short, and concise statement of additional material facts as to which there exists a genuine issue to be tried. Citations to numbered exhibits ("Exhibit 1" through "Exhibit 50") are to the exhibits to the Declaration of Kathryn L. Fitzgerald (ECF 50);

citations to lettered exhibits ("Exhibit A" through "Exhibit MM") are to the exhibits to the Declaration of Daniel H. Charest, submitted herewith; citations to "SOF ¶ __" are to the Statement; and citations to "SOCF ¶ __" are to Hornbeck's statement of additional material facts below.

# I. BACKGROUND

## *A. Persons involved in this matter*

1. The persons involved in this matter include:

**RESPONSE:** Undisputed that the individuals identified in the following subparagraphs were involved in the matters at issue in this litigation, without conceding that the list which follows is exhaustive of all persons with relevant knowledge. Hornbeck reserves the right to identify additional witnesses in the ordinary course of this litigation.

(a) GERE Representatives

(1) Tyler Spoffard is the Vineyard Wind – 1 Marine Operations Package Manager. (Exhibit 1- Spofford Deposition, 48:06-49:09).

**RESPONSE:** Undisputed.

(2) Pierre Furic is a consultant who assists GE Vernova entities with getting offers to charter offshore support vessels. (Exhibit 2 – Furic Deposition, 17:05-24)

**RESPONSE:** Undisputed.

(3) Sebastian Mertens was the Executive Project Director of Vineyard Wind from May 2025 through December of 2025. (Exhibit 3 – Mertens Deposition, 31:12-15)

**RESPONSE:** Undisputed.

(b) Hornbeck Representatives

(1) Adam Shrives was Vice President of Business Development in 2025 and he led the commercial department in pursuit of business opportunities. (Exhibit 4 – Dennis Deposition, 40:13-41:14)

**RESPONSE:** Undisputed.

(2) Kevin Douglass is the Director of Contracts. (Exhibit 4, 41:21-23)

**RESPONSE:** Undisputed.

(3) Jason Dennis was the Senior Director of Business Development from June 2025 through December 2025. (Exhibit 4, 21:23-22:01).

**RESPONSE:** Undisputed.

(4) Todd Hornbeck was the Chief Executive Officer ("CEO") of Hornbeck Offshore Operators LLC from June 2025 through December 2025. (Exhibit 4, 32:15-18).

**RESPONSE:** Undisputed.

(c) Clarksons, the charter brokers

(1) Jonathan Lints is the Subsea Director. (Exhibit 5 - Bojé Deposition, 57:09-19)

**RESPONSE:** Undisputed.

(2) Tyler Bojé is a broker for Clarksons. (Exhibit 4, 133:07-11)

**RESPONSE:** Undisputed.

***B. Company Descriptions***

2. GE Renewables US LLC is a subsidiary of GE Vernova that conducts business in the offshore wind sector including the Vineyard Wind 1 project. (Exhibit 3, 21:21–23:24; Hornbeck_001211)

**RESPONSE:** Undisputed.

3. Hornbeck Offshore Operators LLC is in the business of operating and owning offshore supply vessels, offshore construction vessels and various other offshore assets. (Exhibit 7 – Shrives Deposition, 10:20-23)

**RESPONSE:** Undisputed.

***C. Common Offshore Industry Practices***

4. The offshore industry refers to the provision of offshore support vessels, referred to as "OSVs" that provide support for work at offshore worksites. (Exhibit 8 - Expert Report of Ian Perrott, p.1-2)

**RESPONSE:** Undisputed.

5. A Contract for the lease of a vessel is commonly referred to as a charter or a charter party. (Exhibit 8, p. 2).

**RESPONSE:** Disputed. "The term 'charter party' actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out." *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 124 (2d Cir. 1982) (citation modified). Hornbeck's expert explains that "[a] formal long-form charter party is typically a lengthy document full of terms and particulars" that does "not affect whether a binding charter party is reached or not." Exhibit CC at 3 (Burns Expert Report).

6. An agreement to a charter is often called a "fixture." (Exhibit 8, p. 2).

**RESPONSE:** Undisputed.

7. A vessel is "fixed" to a charter when Charterers have agreed to be bound to the charter, and the Owners have agreed that the vessel is committed to the charter and no longer available to others for the applicable term of the charter. (Exhibit 8, p. 2).

**RESPONSE:** Disputed. A fixture occurs when the parties demonstrate their intention to be bound by agreeing to the essential terms of a charter party. *Great Circle*, 681 F.2d at 125. Hornbeck's expert explains that "[w]hat makes a deal . . . is agreement on the key terms that define the core transaction: who the parties are, which vessel, at what rate, for how long, delivering when and where, redelivering where, the printed contract form the parties will use, and any other term that the parties agree is essential." Exhibit CC at 3 (Burns Expert Report). A fixture "describes the event when the parties agree on key terms and the rights and obligations become binding between the parties, independent of drafting any particular document." Exhibit CC at 3 (Burns Expert Report).

8. It is common for "Owners [to] make their offers to Charterers subject to vessel availability, meaning that the vessel is not committed to the Charterer, and the Owners remain free to continue to look for better proposals from other customers." (Exhibit 8, p. 4).

**RESPONSE:** Undisputed that this describes the general purpose of a "subject to availability" qualification on an initial offer. Disputed to the extent this paragraph suggests a vessel remains "subject to availability" after the owner and charterer have reached agreement on the essential terms of the charter. Exhibit CC at 1, 5–6 (Burns Expert Report).

9. Lifting a "subject availability" condition can occur in a number of ways including "a verbal or written request to do so from a broker or Charterer" or when an owner is "asked to accept the fixture and confirm the lifting of the subject by signing and returning the confirmation," or "through a letter of intent where the owner is asked to accept and sign the letter of intent stating the subject is lifted." (Exhibit 8, p. 6)

**RESPONSE:** Undisputed.

***D. GERE Sourcing Procedures***

10. GERE's procedures for sourcing services and products are set out in a document titled "PMO Sourcing Process" (Rev. 2.0) (GERE 3939, the "Sourcing Process"; Exhibit 9 - GERE_3939 – 3957).

**RESPONSE:** Undisputed.

11. Section 4.1 of the Sourcing Process provides a flow chart that illustrates GERE's sourcing check-points and indicates that when a purchase is forecasted to be greater than 25K, the next step is to engage in a "Competitive bidding" phase with the potential suppliers. (Exhibit 9, GERE_3941).

**RESPONSE:** Undisputed.

12. Under the Sourcing Process, any purchase estimated to be in excess of $25,000 requires two quotations to be received. (Exhibit 9, GERE 3944).

**RESPONSE:** Undisputed.

13. The Sourcing Process require that every purchase must be approved through a Purchase Requisition process. (Exhibit 9, GERE 3948).

**RESPONSE:** Undisputed.

14. The Sourcing Process provide that a Purchase Order is the "legal binding document for sourcing between [GERE] and the supplier." (Exhibit 9, GERE 3949).

**RESPONSE:** Undisputed.

15. GEVE and its subsidiaries, including GERE, have a "No PO, No Pay" policy. (Exhibit 10, GERE 3959).

**RESPONSE:** Undisputed that GEVE has a "No PO No Pay" policy. Disputed that this policy states or otherwise suggests it is applicable to its subsidiaries or GERE. The policy merely states, "This policy applies to internal transactions between GE Vernova entities and to external transactions with third party suppliers." It is clear that the policy would apply to a transaction between two GE Vernova entities and that it would apply to a transaction between GE Vernova and a third-party supplier. But it is not clear that the policy would apply to a transaction between a GE Vernova entity and a third-party supplier. The policy also bears the legend "Last Updated: October 2025 | Supersedes: February 2024." Exhibit 10 at GERE 3959.

16. The No PO No Pay Policy states in its first sentence that "GE Vernova ("GEV") requires that a Purchase Order ("PO") be issued prior to any purchase commitment and supplier payment ("No PO, No Pay")." (Exhibit 10, GERE 3959).

**RESPONSE:** Undisputed.

17. The No PO No Pay Policy recognizes certain listed exceptions, but none are applicable to a vessel charter. (Exhibit 10, GERE 3959-63).

**RESPONSE:** Disputed. The policy lists exceptions including "Contract Payment[:] Payments made in connection with legal agreements properly vetted through legal,

compliance and other channels as appropriate" and "Agreement (Third Party)," and directs questions on "the interpretation of exceptions" to "the policy leader or their delegate." Exhibit 10 at GERE 3959–63. Hornbeck objects to Exhibit 50 at ¶ 7 to the extent offered for this paragraph because whether an exception applies is a legal conclusion, not a fact within the declarant's personal knowledge.

### *E. Initial Contacts Between GERE and Hornbeck*

18. In 2025, the vessel CADE CANDIES was being chartered by GERE for the Vineyard Wind 1 project. (Exhibit 2, 16:19-17:03).

**RESPONSE:** Undisputed.

19. In March 2025, GERE began exploring alternatives for obtaining vessels to support its operations in connection with the Vineyard Wind 1 project; an offshore wind installation located in the Atlantic Ocean, 15 miles south of Martha's Vineyard, Massachusetts. (Exhibit 5, 74:10-76:21; Exhibit 11, GERE 0123-124).

**RESPONSE:** Undisputed.

20. On June 19, 2025, Mr. Spofford requested via email that Mr. Bojé and Mr. Lints provide an update to the report they "created in March specifically for available W2W MPSV's starting Nov 25 for 1/3/5 yr charter availability" and to provide an "indicative offer for the Rocinante starting Nov 25 for 3 and 5 years with appropriate options[.]" (Exhibit 12, GERE_121-122).

**RESPONSE:** Undisputed.

21. In June 2025, Hornbeck was aware that it was one of possibly multiple vessel owners being considered to provide a "Service Operations Vessel" (or "SOV") to support GERE's

operations in connection with the Vineyard Wind 1 project. (Exhibit 13 - Hornbeck's response to GERE's Request for Admission No. 2).

**RESPONSE:** Undisputed.

22. On June 25, 2025, Hornbeck sent GERE a proposal offering the SOV's ROCINANTE, WOODLAND, and RIVERBEND in connection with the Vineyard Wind 1 project with an estimated start date of November 1, 2025, and to continue for a term between 1 and 5 years. (Exhibit 13, No. 4.; Exhibit 14, Hornbeck 0006 – 8).

**RESPONSE:** Undisputed.

23. On June 27, 2025, Mark Ransom of Clarksons sent Kevin Douglass, Jason Dennis, and Patrick Gagnet of Hornbeck and copied Tyler Bojé of Clarksons, an email with an attachment identified as "HOS GE_2025 v7.pdf," a draft standard vessel charter form titled "SUPPLYTIME 2017" published by the Baltic and International Maritime Council ("BIMCO"), as revised by GERE for its chartering purposes (referred to in this document as the "GERE BIMCO Form") and stating as follows: "Please find attached and updated BIMCO SUPPLYTIME 2017 draft for the W2W vessel for Vineyard Wind, in .docx format." (Exhibit 15, Hornbeck 1352; Exhibit 7, 94:16-25).

**RESPONSE:** Undisputed.

24. The GERE BIMCO Form attached to the June 27, 2025 email from Mark Ransom contained underscored red text throughout the document indicating changes to the document. (Exhibit 16, Hornbeck 4058 – 4104; Exhibit 7, 95:13-24).

**RESPONSE:** Undisputed.

25. The changes to the GERE BIMCO Form attached to the June 27, 2025 email from Mark Ransom were made by GERE before Clarksons sent the document to the Hornbeck recipients. (Exhibit 7, 95:25-96:08; Exhibit 16, Hornbeck 4058 – 4104).

**RESPONSE:** Undisputed.

26. Clause 43 (i) subpart (ii) of the GERE BIMCO Form included a term under which Owners acknowledge receipt of the "Guidelines – Third Party Suppliers (the "Guidelines")." (Exhibit 16, Hornbeck 4091; Exhibit 7, 97:01-13).

**RESPONSE:** Undisputed.

27. Clause 43 (i) subpart (ii) states that the Guidelines are located at the following Internet address:

http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm.

And it goes on to state:

> Owners agree that they will: (i) comply fully with the Guidelines and the Guide in the performance of the Services, (ii) provide a copy of the Guide to Owners' Employees; (iii) instruct Owners' Employees to comply with such documents; and (iv) be responsible for any failure of Owners' Employees to comply with such documents."

(Exhibit 16, Hornbeck 4091; Exhibit 7, 97:01-98:05).

**RESPONSE:** Undisputed that Clause 43 contains the quoted language. Disputed that Clause 43 states that the Guidelines are located at that internet address. The clause reads "the GE Integrity Guide for Suppliers, Contractors and Consultants, which may be updated or modified by General Electric Company from time to time (the 'Guide') located at the following Internet address." Exhibit 16, Hornbeck 4091. The clause defines "the Guidelines" and "the Guide" as two separate documents, and the address, which ends in "SuppliersIntegrityGuide.htm," refers only to the Guide.

28. The internet address stated in Clause 43(i)(ii) leads to a page where a person may choose one of two links – one for GE Aerospace and one for GE Vernova. When the user clicks the GE Vernova link, the user is led to the GE Vernova Supplier Portal. That Supplier Portal has a link to "Supplier Policies." The Supplier Policies include links to various policies, including the "No PO No Pay" Policy. (Exhibit 50, Declaration of Tyler Spofford at ¶6).

**RESPONSE:** Disputed as written. Undisputed as follows: the internet address stated in Clause 43(i)(ii) leads to a page where a person may choose one of two links—one for GE Aerospace and one for GE Vernova; when the user clicks the GE Vernova link, the user is led to the GE Vernova Supplier Portal; that Supplier Portal provides four options: Supplier Policies, Integrity Guide & Training, Purchase Order Term Documents, and Privacy & Data Protection Documents; selecting Supplier Policies brings users to a webpage with nine policies, one of which is the No PO No Pay policy. Disputed that Hornbeck had actual knowledge of, or agreed to be bound by, the No PO No Pay Policy merely because a hyperlink to it exists several pages removed from the URL referenced in Clause 43, and disputed that the mere availability of that hyperlink made GERE's unilateral internal policy a term of the parties' charter. Exhibit 7 at 98:8–12 (Shrives, shown the policy: "Q. . . . Mr. Shrives, have you seen this document before? A. No."); Exhibit D at ¶ 6 (Shrives MSJ Decl.). Hornbeck objects to Exhibit 50 at ¶ 6 because it does not state when the declarant viewed the website and so lacks foundation as to its content during June–November 2025.

29. On July 16, 2025, Mr. Tyler Spofford informed Mr. Jason Dennis and Mr. Tyler Bojé by email that GERE has "had 3 additional meetings since last week on the biz case and justification of Rocinante and should have our final review by EOW for Senior Management to make their pitch to CEO beginning of next." (Exhibit 13, No. 5.; Exhibit 17, Hornbeck 1415).

**RESPONSE:** Undisputed.

30. On July 24, 2025, Mr. Spofford sent a text message to Mr. Dennis (who testified that he is "Local User <H:\>" in Hornbeck's production) suggesting that the process for approval of the "biz case" would involve the "VP" taking the matter to the "CEO," and the "CEO and CFO" of GE Vernova to make the decision. (Exhibit 13, No. 6.; Exhibit 4, 208:02-25; Exhibit 18, Hornbeck 1436 – 1439).

**RESPONSE:** Undisputed.

31. On July 25, 2025, Mr. Dennis informed Adam Shrives by text that GERE personnel would be presenting the proposal for the "biz case" to the CEO of GE Vernova for a decision. (Exhibit 13, No. 7.; Exhibit 19, Hornbeck 1440).

**RESPONSE:** Undisputed.

32. Mr. Spofford testified that the "business case" for a "Three-year SOV … was not approved" by management and he "had to go back to the drawing board" for other options including charter "duration, other vessel options" because the decision to charter a vessel is "not just a marine operations consideration. It's a total business and offshore operations, like, efficiency question that has to be looked at." (Exhibit 1, 138:01 – 139:03).

**RESPONSE:** Undisputed.

33. By October 2025, GERE's needs for a vessel for 2026 had become clearer, and Spofford communicated that information to Hornbeck. (Exhibit 20, Hornbeck 1677 &1679).

**RESPONSE:** Undisputed.

34. By October 17, 2025, Mr. Spofford had communicated to Mr. Dennis that he was still presenting options to management and waiting on management decisions but was anticipating a December start to support work. (Exhibit 20, Hornbeck 1679)

**RESPONSE:** Undisputed.

35. On October 17, 2025, at 10:21, Tyler Spofford wrote to Clarksons requesting clarification as to where they were with negotiating the charter offers with Hornbeck and stated "[w]e need to get very clear about where the remaining sticking points are and where each company will not concede." (Exhibit 21, GERE 4198)

**RESPONSE:** Undisputed.

## II. HORNBECK STATED A CLEAR INTENTION TO NOT BE BOUND

### *A. Hornbeck made clear it did not intend to be bound without a written Vessel Order Confirmation*

36. On October 7, 2025, Rosemary Ramirez of Hornbeck sent a revised proposal offering the vessel HOS BRIARWOOD for charter by email to Mr. Spofford on behalf of Mr. Dennis and copied Mr. Dennis and Mr. Bojé on the email. (Exhibit 13 No. 102; Exhibit 22, Hornbeck 0331)

**RESPONSE:** Undisputed.

37. The revised proposal sent on October 7, 2025, was for the proposed charter by GERE of the HOS BRIARWOOD as an SOV for use on the Vineyard Wind 1 project beginning on December 15, 2025. (Exhibit 13 No. 103; Exhibit 23, Hornbeck 0336)

**RESPONSE:** Undisputed.

38. The revised proposal included the following statement:

> Rates assume a mutually agreeable BIMCO Supplytime 2005 with appropriate amendments for the work scope and geography. Rates do NOT consider any COVID-19 impact or restrictions on vessel crew travel / crew changes.
>
> Pricing is valid until close of business on October 31, 2025, unless extended in writing by mutual agreement of Owner and Charterer. This offer may be revoked by HOS at any time and is subject to vessel fixture availability, as solely determined by HOS. In no event shall Charterer's acceptance of this offer be binding on HOS until HOS issues to Charterer a written Vessel Order Confirmation that confirms the vessel's availability during the proposed charter term.

(Exhibit 13 No. 105; Exhibit 23, Hornbeck 0343)

**RESPONSE:** Disputed as written. Undisputed that the revised proposal states: "Pricing is valid until close of business on October 31, 2025, unless extended in writing by the mutual agreement of Owner and Charterer. This offer may be revoked by HOS at any time and is subject to vessel availability, as solely determined by HOS. In no event shall Charterer's acceptance of this offer be binding on HOS until HOS issues to Charterer a written Vessel Order Confirmation that confirms the vessel's availability during the proposed charter term." Exhibit 23 at Hornbeck 343; Exhibit 13 at No. 105. Disputed that this language governed or negated the fixture the parties later reached. Exhibit 7 at 60:2–7, 61:16–24.

### *B. Hornbeck did not issue the written "Vessel Order Confirmation" that it stated would be required before Hornbeck would be bound to the proposed charter*

39. Hornbeck never issued a written Vessel Order Confirmation to GERE. (Exhibit 13 No. 13; Exhibit 7, 65:11-13)

**RESPONSE:** Undisputed.

### *C. Hornbeck's proposed draft "Early Works Letter" confirmed Hornbeck did not intend to be bound until agreement of all terms of a charter party and execution of a contract*

40. On November 10, 2025, Mr. Spofford texted Mr. Dennis, stating in part, "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see

that happening till we have a contract or close to one which means if we take the boat, we may have to start without the grillage. …" (Exhibit 13, No. 31; Exhibit 24, Hornbeck 2020).

**RESPONSE:** Undisputed.

41. On November 10, 2025, in response to Mr. Spofford's text, Mr. Dennis texted Mr. Spofford, stating in part, "Concept is to pre-fabricate grillage and truck to location for installation on vessel. I think we can / should do an early works agreement to start material procurement." (Exhibit 4, 210:14-19; Exhibit 24, Hornbeck 2021).

**RESPONSE:** Undisputed.

42. On November 13, 2025, Mr. Douglass circulated within Hornbeck an internal "Draft Authorization for Work" letter (commonly referred to by the parties as an "Early Works Letter") in the form of a draft letter agreement between GERE and Hornbeck, dated November 14, 2025. (Exhibit 13 No. 93, Exhibit 25, Hornbeck 2352).

**RESPONSE:** Undisputed.

43. This Draft Authorization for Work letter stated in part:

> "Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD supporting walk-to-work operations at Vineyard Wind (the "Project"), …
>
> ***
>
> The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners. Upon execution of the Time Charter, (i) the Letter Agreement shall automatically terminate, …"
>
> (Exhibit 4, 215:12–218:12; Exhibit 25, Hornbeck 10036 – 37).

**RESPONSE:** Undisputed.

44. Mr. John Cook was, during the period June through December 2025, Hornbeck's Executive Vice President, Chief Information Officer and Chief Commercial Officer. (Exhibit 4, 34:08-24; Exhibit 26, Hornbeck 1310).

**RESPONSE:** Undisputed.

45. On November 17, 2025, Mr. Douglass sent an email to Mr. Cook at 4:26PM (CST) with the subject line "GE – Mob Fees and Modification Costs"; Mr. Douglass's email stated in part:

> I have also drafted an Early Works letter for $200,000 (non-refundable) to be paid up front and get us started. This letter is based on v1 of what we signed with DEME and Jay has reviewed. We will share this with GE and push them to make a decision on how they would prefer costs be invoiced (cost plus, lump sum, etc.)."

(Exhibit 13 No. 95; Exhibit 27, Hornbeck 2389).

**RESPONSE:** Undisputed.

46. The Draft Authorization for Work letter attached to Mr. Douglass's email to Mr. Cook of November 17, 2025, did not state that the proposed payment was non-refundable. (Exhibit 4, Dennis Dep. Exhibit No. 19; Exhibit 27, Hornbeck 10040).

**RESPONSE:** Undisputed.

47. On November 17, 2025, at 4:42PM (CST), Mr. Cook sent an email to Mr. Douglass with the subject line "GE – Mob Fees and Modification Costs" and that. Mr. Cook stated, "I don't see where it is addressed in the letter what happens if we do not reach a time charter?" (Exhibit 13, No. 96; Exhibit 28, Hornbeck 2390).

**RESPONSE:** Undisputed.

48. On November 17, 2025, at 5:43PM (CST), Mr. Douglass sent a Draft Authorization for Work letter, titled "GE-HOS – Authorization for Work DRAFT 2025.11.17.docx" to Mr. Furic, Mr. Spofford, and other members of the Hornbeck and Clarkson's teams. (Exhibit 13, No. 97; Exhibit 29, Hornbeck 9616).

**RESPONSE:** Undisputed.

49. This Draft Authorization for Work letter sent by Mr. Douglass to Mr. Furic, Mr. Spofford, and others, revised the first sentence of the fourth paragraph by adding the term "nonrefundable," so that the sentence read as follows: "For Owners' commencement of the Preliminary Work, Charterers agree to pay Owners the nonrefundable lump sum deposit of two hundred thousand United States Dollars ($200,000.00 USD) (the "Preliminary Work Deposit")." (Exhibit 29, Hornbeck 9635)

**RESPONSE:** Undisputed.

50. The Draft Authorization for Work letter provided by Mr. Douglass stated in part,

> "Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD supporting walk-to-work operations at Vineyard Wind (the "Project"), …
>
> ***
>
> The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners. Upon execution of the Time Charter, (i) the Letter Agreement shall automatically terminate, …
>
> (Exhibit 13, No. 99-100; Exhibit 29, Hornbeck 9635-36)

**RESPONSE:** Undisputed.

51. The Draft Authorization for Work letter also stated that "Charterers agree to pay Owners the non-refundable lump sum deposit of two hundred thousand United States Dollars ($200,000.00 USD) (the 'Preliminary Work Deposit')" to allow Owners to commence performance of 'long lead' tasks." (Exhibit 13, No. 99; Exhibit 29, Hornbeck 9635)

**RESPONSE:** Undisputed.

52. Jason Dennis of Hornbeck testified that the Draft Authorization for Work letter was drafted by Hornbeck and sent to Tyler Spofford of GERE in response to the November 10, 2025 text chat between Jason Dennis and Tyler Spofford in which Tyler Spofford had commented that "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one which means if we take the boat, we may have to start without the grillage." (Exhibit 4, 231:22-233:05).

**RESPONSE:** Undisputed.

***D. Hornbeck's Deposition Testimony and exchanged GERE BIMCO Drafts stated that Hornbeck did not intend to be bound until execution of a contract***

53. After the parties began commenting on the GERE BIMCO Draft, up to the last version exchanged between the parties, in Box 12, where the terms for the Mobilisation fee is stated, Hornbeck entered "Deemed earned upon Charter Party execution and payable upon Delivery." (Exhibit 13, Nos. 36, 37, 69, 126; Exhibit 30 – BIMCO Draft ver. 2, Hornbeck_020; BIMCO Draft ver.3, Hornbeck_129; BIMCO Draft ver.4, Hornbeck_431; BIMCO Draft ver. 5, Hornbeck 878; BIMCO Draft ver.6, Hornbeck 1015; BIMCO Draft ver. 7, Hornbeck 1121; BIMCO Draft ver.8, Hornbeck_1212).

**RESPONSE:** Undisputed.

54. In the deposition of Hornbeck's corporate representative, Mr. Shrives testified, that Hornbeck's standard practice is to make offers subject to vessel availability, until the parties either execute a contract and circulate the document between parties; and Hornbeck "[i]s bound when the parties agree on the essential terms of the charter, whether that's in a contract or some work order or some form of confirmation between the parties that they've agreed. So until that point [the vessel is] subject to availability." (Exhibit 7, 54:09-55:07; 59:22-60:07).

> **RESPONSE:** Undisputed that Mr. Shrives gave the quoted testimony. Disputed that Hornbeck's practice requires execution of a contract; Mr. Shrives testified that there are "different methods to fix the vessel between us and our clients," including "a Vessel Confirmation Form, . . . a BIMCO, . . . a work order, a call-off document." Exhibit 7 at 61:16–24.

55. When asked to explain the meaning behind the sentence contained in Hornbeck's October 7, 2025 offer which states, "[t]his offer may be revoked by HOS at any time and is subject to vessel availability, as solely determined by HOS," Mr. Shrives as Hornbeck's corporate representative testified, that sentence "[m]eans what it says", and that Hornbeck is not bound to a charter until it confirms that its vessel is available for the charter. (Exhibit 7, 58:22–61:05; Exhibit 23, Hornbeck 0325).

> **RESPONSE:** Undisputed that Mr. Shrives gave the quoted testimony. Hornbeck further states that he testified that Hornbeck "is bound when the parties agree on the essential terms of the charter, whether that's in a contract or some work order or some form of confirmation between the parties that they've agreed." Exhibit 7 at 60:2–7.

56. Mr. Shrives went on to explain that the sentence in the Draft Early Works letter that ends with "subject to availability as determined by Owners until such time as all details of a Time

Charter have been agreed to by Owners" means "that the vessel remains subject to availability as determined by owners until such time as all details of the time charter have been agreed to by owners." (Exhibit 7, 72:10-73:02).

**RESPONSE:** Undisputed.

57. In the deposition of Hornbeck's corporate representative, Mr. Shrives explained that the phrase "Deemed earned upon charter party execution and payable upon delivery" means that "the money is owed to [Hornbeck] upon charter party execution and payable once the vessel is delivered" and that if the Charter Party was not executed, then Hornbeck would not "mobilize the vessel, so, therefore, it would not be due if we never executed the contract with the charter party." (Exhibit 7, 139:03–140:01).

**RESPONSE:** Undisputed that Mr. Shrives so testified regarding the contractual mechanics of when the Mobilisation Fee specifically would become payable. Disputed to the extent this paragraph is offered to suggest that "execution" of a long-form, signed charter party document was a condition precedent to the formation of the parties' binding fixture generally, as opposed to a payment-timing mechanism applicable to one particular, non-essential ancillary term. Hornbeck further states that Mr. Shrives testified that the mobilization fee "is not part of the essential terms of a charter." Exhibit 7 at 139:5–7. Hornbeck further notes that Mr. Shrives's testimony did not relate to the facts of this case. Exhibit C at 184:14–20 (Shrives Deposition).

58. When asked whether there can "be a fixture if the vessel is not available for the charter period," Mr. Dennis testified "No, I don't—I don't think so, no." (Exhibit 4, 105:08-13).

**RESPONSE:** Undisputed that Mr. Dennis gave the quoted testimony. Hornbeck adds that immediately before, Mr. Dennis testified, "There could be a fixture while that vessel is working for someone else." Exhibit 4 at 105:5–6.

59. Mr. Dennis was unable or unwilling to testify as to when and how a charterer is made aware that the "subject to availability" condition placed on the vessel by Hornbeck is lifted. (Exhibit 4, 109:09–110:23.)

**RESPONSE:** Disputed. The statement that "Mr. Dennis was unable or unwilling" to testify to a certain topic is a characterization, not a fact. Mr. Dennis testified that a charterer knows there is a fixture "[w]hen we've agreed to the required fixture terms," and that Hornbeck communicates availability by "a phone call, it could be a email, it could be a text, it could be a personal meeting." Exhibit 4 at 109:23–24, 110:19–23.

60. Hornbeck took no action to perform under the charter it alleges; only speaking with its prior client and contractors to obtain pricing and timelines for equipment that would have been required under the potential charter. (Exhibit 7, 86:01-25.)

**RESPONSE:** Undisputed that Hornbeck spoke with its prior client and contractors to obtain pricing and timelines for equipment. Disputed that this constitutes "no action to perform" and that Hornbeck took no other action; Mr. Shrives testified, "We spoke with the vendor of the gangway system to let them know of the impending charter," and "the vessel was already in the region." Exhibit 7 at 86:5–13.

## III. HORNBECK WAS ON NOTICE THAT GERE WAS NEGOTIATING A PROPOSAL AND WOULD NOT BE BOUND WITHOUT MANAGEMENT APPROVAL

61. Hornbeck was alerted to GERE Purchaser Guidelines on or about June 27, 2025, when it received the GERE BIMCO Form, which included an express reference to the Purchaser Policies at Clause 43. (Exhibit 16, Hornbeck 4091)

**RESPONSE:** Disputed that Clause 43 references—much less expressly so—"GERE Purchaser Guidelines." Clause 43 refers to "Guidelines – Third Party Suppliers ('the Guidelines')" and "the GE Integrity Guide for Suppliers, Contractors and Consultants." Nowhere does Clause 43 describe, reference, or incorporate "GERE Purchaser Guidelines." Exhibit 16 at Hornbeck 4091.

62. Those Purchaser Guidelines included the No PO No Pay Policy. (Exhibit 10, GERE_3959 – 3963).

**RESPONSE:** Disputed that Clause 43 references "GERE Purchaser Guidelines." Clause 43 refers to "Guidelines – Third Party Suppliers ('the Guidelines')" and "the GE Integrity Guide for Suppliers, Contractors and Consultants." Nowhere does Clause 43 describe, reference, or incorporate "GERE Purchaser Guidelines." Hornbeck likewise denies that any version of the Bimco describes, references, or incorporates the No PO No Pay policy. Exhibit 16 at Hornbeck 4091; Exhibit 31. Mr. Shrives had not seen the policy before his deposition. Exhibit 7 at 98:8–12.

63. The reference to the GERE Purchaser Guidelines set out in Clause 43 of the GERE BIMCO Form remained in all subsequently exchanged versions of the GERE BIMCO Drafts. (Exhibit 31 - GERE BIMCO Form, Hornbeck 4090-4091; BIMCO Draft ver.2, Hornbeck 54-55; BIMCO Draft ver. 3, Hornbeck 163-164; BIMCO Draft ver. 4, Hornbeck 465-466; BIMCO Draft

ver. 5, Hornbeck 918-919; BIMCO Draft ver. 6, Hornbeck 1055-1056; BIMCO Draft ver. 7, Hornbeck 1162-1163; BIMCO Draft ver. 8, Hornbeck 1253-1254).

**RESPONSE:** Undisputed that Clause 43 appears in each version. Disputed that any version names "GERE Purchaser Guidelines" or the No PO No Pay Policy. Clause 43 does not reference the No PO No Pay policy and therefore, no version of the Bimco did either. Exhibit 31.

64. Adam Shrives testified that it was his expectation, as the head of Hornbeck's Commercial Group, that one of his people would have reviewed the GERE Purchaser Guidelines. (Exhibit 7, 187:09-15).

**RESPONSE:** Disputed. Mr. Shrives testified that he would expect someone would have reviewed the GE Integrity Guide for Suppliers, Contractors and Consultants, not the GERE Purchaser Guidelines. Exhibit C at 186:16–187:15 (Shrives Deposition).

65. Adam Shrives testified that Hornbeck would hope that it was either reviewed or sent to someone to review, but he did not know whether or not anybody did review it. (Exhibit 7, 188:02-09).

**RESPONSE:** Disputed. This purported fact does not specify what "it" is that Mr. Shrives purportedly testified Hornbeck would hope that someone reviewed. To the extent "it" refers to the GE Integrity Guide for Suppliers, Contractors and Consultants, undisputed. To the extent "it" refers to any other policy, including the No PO No Pay policy, GERE Purchaser Guidelines, or Guidelines – Third Party Suppliers, disputed. Exhibit C at 186:16–187:15 (Shrives Deposition).

66. On July 16, 2025, Mr. Tyler Spofford informed Mr. Jason Dennis and Mr. Tyler Bojé by email that GERE's Senior Management would make their pitch to the CEO on the biz case. (Exhibit 13, No. 5; Exhibit 17, Hornbeck 1415).

**RESPONSE:** Undisputed.

67. Mr. Mertens, testifying as GERE's corporate representative, explained that a "biz case" or "business case" is a proposal to senior management of how to fill a previously identified gap (i.e., needing a vessel to support a project). (Exhibit 3, 137:03-138:07).

**RESPONSE:** Undisputed.

68. On July 24, 2025, Mr. Spofford sent a message to Mr. Dennis suggesting that the process for approval of the "biz case" would involve the VP" taking the matter to the "CEO," and the "CEO and CFO" of GE Vernova to make the decision. (Exhibit 13, No. 6; Exhibit 18, Hornbeck 1436 – 1439).

**RESPONSE:** Undisputed.

69. On July 25, 2025, Mr. Dennis informed Adam Shrives by text that GERE personnel would be presenting the proposal for the "biz case" to the CEO of GE Vernova for a decision. (Exhibit 13 No. 7; Exhibit 19, Hornbeck 1440).

**RESPONSE:** Undisputed.

70. On August 14, 2025, Mr. Spofford sent a text to Mr. Dennis stating that "Unfortunately most of my management is OOO now. We should be presenting again early next week to CEO." (Exhibit 13, No. 8.; Exhibit 32, Hornbeck 1494).

**RESPONSE:** Undisputed.

71. Mr. Dennis testified that he understood Mr. Spofford's August 14, 2025, text to mean, "I think, again, he's talking about the – the larger business case that – that GE is developing internally on – on what marine assets are going to be required to continue to service their construction and operation and maintenance campaigns." (Exhibit 4, 256:18-257:01).

**RESPONSE:** Undisputed.

72. Mr. Spofford testified that the "[t]hree-year SOV decision was not approved. We had to go back to the drawing board" and needed to present "other options, meaning duration, other vessel options, you know, various things. It's –it's not just a marine operations consideration. It's a total business and offshore operations, like, efficiency question that has to be looked at." (Exhibit 1, 138:17-139:03).

**RESPONSE:** Undisputed.

73. On October 20, 2025, Mr. Spofford emailed Mr. Lints stating as follows:

> "Consider this our hard counter to HOS – not our commitment. We do NOT yet have managements final approval, but interest from GEV being discussed internal is 10 mo firm for Briarwood with (2x) 6- month options Starting Dec 15, 2025.
>
> We need to close the gaps on the contract – to Pierre's point, we have never gotten full management approval before starting a neg like this. We now have enough clarity to know what we realistically need for '26, now we need to start closing the gaps and then once we have a contract package, we get final management approval."
>
> (Exhibit 13 No. 17; Exhibit 33, GERE 4195)

**RESPONSE:** Undisputed.

74. On October 21, 2025, Furic emailed Lints, Bojé, and Spofford stating in part that: "… business cases are never clear 100% while we do not have a strong and clear contract option

in hand to display for management decision. It looks necessary to align each other today and to progress on this." (Exhibit 34, GERE 5475-5476).

**RESPONSE:** Undisputed.

75. On October 21, 2025, Mr. Lints stated to Mr. Shrives and Mr. Dennis in an email that GE's "vessel needs are becoming clearer" and that GE's management still had to "give the green light" as to certain commercial terms related to the HOS Briarwood. (Exhibit 13, No. 18; Exhibit 35, Hornbeck 352).

**RESPONSE:** Undisputed.

76. On October 24, Tyler Spofford texted Mr. Lints and Mr. Bojé as follows "So got permission last night from management to "start negotiations" but final Approval upon final contract review[.]" (Exhibit 36, GERE_4030).

**RESPONSE:** Undisputed.

77. Mr. Douglass emailed a revised version 4 of GERE's Scope of Work ("SOW") for the Vineyard Wind 1 project to Mr. Furic on November 5, 2025. (Exhibit 13, No. 27)

**RESPONSE:** Undisputed.

78. This revised SOW (version 4) attached to Mr. Douglass's November 5, 2025 email included proposed edits and marginal notes. (Exhibit 13, No. 28)

**RESPONSE:** Undisputed.

79. On November 19, 2025, Mr. Douglass sent a message to Mr. Furic via WhatsApp to follow up on the BIMCO Draft and the annex D financial terms from the call of November 18, 2025, so that he could insert Hornbeck's comments. (Exhibit 37, Hornbeck 2392)

**RESPONSE:** Undisputed that Mr. Douglass sent a WhatsApp message to Mr. Furic on November 19, 2025, to follow up on the Bimco and Annex D following the November 18, 2025 call. Disputed that it was "so that he could insert Hornbeck's comments." Exhibit A at 1 (Hornbeck 2392–2393 at 2392).

80. Mr. Furic responded on November 19, 2025, to Mr. Douglass via WhatsApp to report that he had not saved the comments from the November 18, 2025 call, but continued on to state as follows:

> "I remember what we have been saying during that call and I have a good picture of things now and I am confident we can be fast finalising contract now.
>
> I also got the opportunity to speak to legal dpt sooner today and they will be available mon tue and wed next week before Thanksgiving to work on this including earlywork afreement.
>
> We understand deadlines.
>
> Priority is management decision before the end of the week now. I suggest we finalise contract once we have management confirmation to proceed with your offer."
>
> (Exhibit 37, Hornbeck 2393).

**RESPONSE:** Undisputed.

81. Mr. Spofford testified that GERE's process to procure a vessel was to "[d]evelop a proposal and put it in front of management." (Exhibit 1, 136:23-137:04).

**RESPONSE:** Undisputed.

82. In response to the following question, "did you have any understanding other than GE's plan was to develop a contract with ROSS CANDIES or for the ROSS CANDIES and to develop a contract for the Briarwood and then see which one it liked best," Mr. Spofford replied, that his "job function is to develop these proposals." (Exhibit 1, 166:13-19)

**RESPONSE:** Undisputed.

83. Mr. Spofford also testified that "Hornbeck was under the impression that we were developing potential contracts to produce or to show to executive management for our approval. So that is what they knew—to my understanding, what they knew." (Exhibit 1, 169:20-24).

**RESPONSE:** Disputed. Hornbeck objects to Mr. Spofford's characterization of Hornbeck's understanding, because it calls for speculation as to Hornbeck's state of mind, Mr. Spofford lacks personal knowledge of it, and it is not a proper subject of a Rule 56.1 statement of fact because it would not be admissible at trial. Mr. Shrives testified that Mr. Spofford said, "I have the authority to negotiate this contract," Exhibit 7 at 194:7–12, and that at the end of the November 18, 2025 call Mr. Furic "declared we are done, we have a contract." Exhibit C at 192:9–19 (Shrives Deposition). When asked whether anyone told Hornbeck of GERE's plan to develop two contracts in parallel, Mr. Spofford answered, "I don't recall." Exhibit 1 at 169:7–13.

84. Mr. Furic testified in response to questions about Mr. Lints' request to "have authority before engaging in further negotiations with Hornbeck":

> So basically what Jonathan Lints is saying about starting a negotiation is just like that, cold, is completely contrary to the process sourcing protocol of GE. It's absurd to proceed that way. It's the other way around. You can't analyze an offer if you don't have the solid commercial offer in front of you, in this case, the one from Hornbeck. So in this case, Tyler was right in what he was saying, and one could not suggest a proposal from GE without having that in hand.

(Exhibit 2, 97:02-25).

**RESPONSE:** Undisputed.

85. Mr. Furic testified that a charter party "can't have authorization from management if you don't have the details in place." (Exhibit 2, 98:09-11).

**RESPONSE:** Undisputed.

86. Mr. Furic testified further about GERE's process for obtaining management approval stating:

> The first is that you don't simply go to management with some kind of offer like that. You don't just lay it in front of them. You're not allowed to do that. You have to first speak with the supplier or the provider, whoever it is, and gather together all the elements you need, and then present these to management.

(Exhibit 2, 100:02-14).

**RESPONSE:** Undisputed.

87. Mr. Furic testified that he saw "subject management approval" mentioned several times in writings to Hornbeck during negotiations, even though he didn't remember a specific instance of telling Hornbeck verbally (Exhibit 2, 156:04-25).

**RESPONSE:** Undisputed that Mr. Furic testified that he saw "subject management approval, mentioned several times in writing." Disputed that Mr. Furic testified the writings were sent to Hornbeck; asked whether they were internal communications not including Hornbeck, he answered, "I don't remember exactly." Exhibit 2 at 156:4–19.

## IV. NO MEETING OF THE MINDS WAS REACHED BETWEEN HORNBECK AND GERE

88. In the response to GERE's Request for Production No. 3, which requested "All documents that Hornbeck alleges constituted a Fixture Recap for the charter of the Vessel by GERE," Hornbeck identified two documents – Hornbeck_001193 to 001210, and Hornbeck_001211 to 001280. (Exhibit 13, Nos. 116 and 117).

**RESPONSE:** Undisputed.

89. The “Fixture Recap” identified by Hornbeck as Hornbeck_001193 to 001210 is an email chain that begins with the email Mr. Furic sent to Mr. Douglass and others on November 17, 2025, attaching BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx). (Exhibit 13, No. 118; Exhibit 38, Hornbeck_001193 - 001210).

**RESPONSE:** Undisputed.

90. The text of this November 17, 2025, email that Mr. Furic sent to Mr. Douglass and others attaching BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) states in its entirety: “Kevin, For our call tomorrow. Rgds, Pierre”. (Exhibit 13, No. 119; Exhibit 38, Hornbeck 1193).

**RESPONSE:** Undisputed.

91. The BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) was the other fixture recap identified by Hornbeck and it was attached to the November 17, 2025, email sent by Mr. Furic to Mr. Douglass and others contained comments to the contract terms from Mr. Furic. (Exhibit 13, No. 121; Exhibit 39, Hornbeck_001211 – 001280).

**RESPONSE:** Disputed to the extent the statement suggests that Hornbeck considers the documents to separately constitute fixture recaps. Hornbeck produced proof of the parties’ agreement as to the essential terms of the charter party and produced with it the parent email for completeness. Otherwise undisputed. Exhibit 13 at No. 121.

92. The BIMCO Draft version 8 (HOS SOV BIMCO V8 – Nov 17.docx) was the last version of the BIMCO Draft exchanged between the parties. (Exhibit 13, No. 122).

**RESPONSE:** Undisputed.

93. Box 5, the Date of Delivery, in the BIMCO Draft version 8, was described as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours," stated by Mr. Douglass. (Exhibit 13, No. 123; Exhibit 39, Hornbeck 1211).

**RESPONSE:** Disputed as written. Undisputed that Box 5 was described as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours" in BIMCO version 8 as stated by Mr. Douglass. Hornbeck avers that this delivery window was agreed by the parties as the essential delivery term of the charter. Exhibit 13 at No. 123. Mr. Dennis testified that the parties agreed to that delivery term. Exhibit 4 at 173:8–13.

94. Mr. Dennis testified that the term "delivery date" means "the date the vessel is delivered to the agreed upon port and would commence charter hire." (Exhibit 4, 173:04-07).

**RESPONSE:** Undisputed.

95. Mr. Dennis next stated that the parties agreed that the delivery date of the Vessel was "following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." (Exhibit 4, 173:08-13).

**RESPONSE:** Undisputed.

96. Mr. Dennis was unable to identify a specific date or end date of a date range for delivery of the vessel. (Exhibit 4, 175:10-185:03).

**RESPONSE:** Disputed. The cited testimony concerns the date upon which liquidated damages would begin to accrue and the date on which a charterer could exercise its option to cancel the charter party when the delivery date is framed as a delivery window. The

testimony does not concern Mr. Dennis's ability "to identify a specific date or end date of a date range for delivery of the vessel." And even if it did, this is an improper characterization, not a fact. Asked whether "no sooner than December 15" is a specific date, Mr. Dennis answered, "In this instance, yes," and testified the earliest date "would be December 15." Exhibit 4 at 178:25–179:1; 179:15–17; 185:1–3.

97. Mr. Furic stated in marginal notes to Box 5 of the BIMCO Draft version 8 that "Commented[PF7R7]: Comment was made that Lds and cancelling date shall be based on clear delivery date[.]" (Exhibit 13, No. 124; Exhibit 39, Hornbeck 1211).

**RESPONSE:** Undisputed.

98. Mr. Furic testified that the date of delivery was an "open point" because "Hornbeck conditioned the availability of the boat on current chartering status. And that was an issue for us." (Exhibit 2, 121:11 – 122:07).

**RESPONSE:** Undisputed that Mr. Furic so testified. Disputed that the delivery term was open. Exhibit 2 at 122:2–7; 133:12–15; 134:19–23; Exhibit I at 129:1–4, 129:20–23 (Furic Deposition); Exhibit 39 at Hornbeck 1211 (KD6).

99. Mr. Furic explained in his testimony that the delivery date was "impossible to accept" because Hornbeck "could simply extend the – they could simply extend the chartering until July of '26, and I wouldn't have any kind of idea or control about that, so I could not accept this as it was written here." (Exhibit 2, 133:10-134:18).

**RESPONSE:** Undisputed that Mr. Furic gave this testimony. The correctness of the statement is disputed. Exhibit 2 at 134:19–23; SOF ¶ 102. Hornbeck understood that, having committed the Vessel to GERE beginning December 15, 2025, it could not extend

the Vessel's prior charter without breaching its obligations to GERE. Exhibit D at ¶ 12 (Shrives MSJ Decl.).

100. Box 6, Cancelling date and time (Cl. 2(a) and (c)), of the BIMCO Draft version 8 states "Delivery date in box 5 +" and "7 days" in red underline type and "8 hours" struck-out. (Exhibit 39, Hornbeck 1211).

**RESPONSE:** Undisputed.

101. Box 6 of BIMCO Draft version 8 contains a marginal note that states, "Commented [KD8]: As this was not commented on by GE, HOS assumes this is accepted and closed." (Exhibit 39, Hornbeck 1211).

**RESPONSE:** Undisputed.

102. Box 6 of BIMCO Draft version 8 contains a marginal note from Mr. Furic that states "Commented [PF9R9]: Date is understood to be here 15 dec +7 = 22 dec. GE has shown interest to deliver on dec 15th in order to have time to perform mobilization , anticipate about January scope , so having a proper ops handover and potentially perform a scope of coil exchange from dec 15th ." (Exhibit 39, Hornbeck 1211).

**RESPONSE:** Undisputed.

103. The parties did not reduce any liquidated-damages or cancelling date to a single fixed calendar date in the BIMCO Draft version 8. (Exhibit 13, No. 174)

**RESPONSE:** Undisputed that the parties had not reduced any liquidated-damages or cancelling date to a single fixed calendar date in the long-form charter party. Disputed to the extent this paragraph implies that any such date was an essential term whose agreement was necessary to the formation of a binding fixture and disputed to the extent it implies the

parties failed to agree on the delivery term. Except as expressly undisputed, disputed. Exhibit 13 at No. 174; Exhibit 4 at 173:8–13.

104. Mr. Furic stated in a comment to Box 3 of BIMCO Draft version 8 regarding PCG statements that "Commented (PF3R2]: Confirmed no statements available → PCG from GE Vernova to be edited and signed at contract signature[.]" (Exhibit 13, No. 125; Exhibit 39, Hornbeck 1211)

**RESPONSE:** Undisputed.

105. Box 12 of BIMCO Draft version 8, Mobilisation fee (cl.2(b)) states in (ii) that the Mobilisation fee is "Deemed earned upon Charter Party execution and payable upon Delivery." (Exhibit 13, No. 126; Exhibit 39, Hornbeck 1212)

**RESPONSE:** Undisputed.

106. The term "execution" in Box 12 of BIMCO Draft version 8 refers to the signing of a charter party. (Exhibit 13, No. 170; Exhibit 39, Hornbeck 1212)

**RESPONSE:** Undisputed.

107. In Box 13, subsection (ii) of the GERE BIMCO Draft version 8, Hornbeck had drafted language that provided that in the event that the U.S. Federal Government issues a stop work order that prevents Charterer's use of the Vessel for a period of at least 30 days, then Charterers shall have the right to terminate the Charter Party, upon payment of a reduced early termination fee equivalent to 50% of the remaining charter hire, to which GERE had maintained an objection, proposing that in such event, no termination fee should be payable following 30 days' notice. (Exhibit 13, Nos. 41, 128, 129; Exhibit 39, Hornbeck 1212).

**RESPONSE:** Undisputed.

108. Box 13 (Early Termination) of BIMCO Draft version 8 has a marginal note by Mr. Douglass stating "[KD19]: GE requested 0% in Nov. 13, See HOS proposal in separate Excel file." (Exhibit 13, No. 128; Exhibit 39, Hornbeck 1212).

**RESPONSE:** Undisputed.

109. Box 13 of BIMCO Draft version 8 has a marginal note by Mr. Furic that reads, "Commented [PF20R20]: If Executive order, 30 days notice from Charterers and then free redelivery[.]" (Exhibit 13, No. 129; Exhibit 39, Hornbeck 1212).

**RESPONSE:** Undisputed.

110. BIMCO Draft version 8 includes at Box 25 (Interest rate payable) a strike out of the language "two percent (2%) per year" and the added language "1.5% per month, compounded monthly" with a marginal note by Mr. Furic stating: "Commented [PF24R24]: Ge does not accept this after having decreased the payment terms from 60 to 30 days. 1.5% per year accepted." (Exhibit 13, No. 130; Exhibit 39, Hornbeck 1214).

**RESPONSE:** Undisputed.

111. BIMCO Draft version 8 includes at Box 31 (Taxes (payable by Owners)) a marginal note by Mr. Furic stating in part: "Commented [PF26R26]: Any local sales and use tax shall be itemized before the contract signature." (Exhibit 13, No. 131; Exhibit 39, Hornbeck 1215).

**RESPONSE:** Undisputed.

112. BIMCO Draft version 8, Clause 2(a)(iii) was marked "RESERVED." (Exhibit 13, No. 132; Exhibit 39, Hornbeck 1218).

**RESPONSE:** Undisputed.

113. BIMCO Draft version 8, Clause 2(a)(iii) is marked with a marginal note stating "Commented [KD27]: HOS reserves Clause 2(a)(iii) for further review based on final commercial agreement." (Exhibit 13, No. 133; Exhibit 39, Hornbeck 1218).

**RESPONSE:** Undisputed.

114. BIMCO Draft version 8, Clause 2(a)(iii) is marked with a marginal note stating "Commented [PF28R28]: GE would like to clean all comments asap. This clause about LDs has already been drastically reviewed and should not be a reason to hold further negotiations." (Exhibit 13, No. 134; Exhibit 39, Hornbeck 1218).

**RESPONSE:** Undisputed.

115. BIMCO Draft version 8, Clause 2(b) includes a marginal note by Mr. Furic as follows, "Commented [PF30R30]: GE has requested verbally several times removal of the term "lumpsum" toand [sic] replaced by / refer to a new annex characterizing the sum of items to be upgraded before delivery of the Vessel, their estimated duration, and their estimated price + ref of relevant quote. Amount to be reported in Annex D." (Exhibit 13, No. 135; Exhibit 39, Hornbeck 1218).

**RESPONSE:** Undisputed.

116. BIMCO Draft version 8, Clause 5(b) includes a marginal note by Mr. Furic as follows, "Commented [PF38R38]: Noted. GE will need confirmation of mobilization work / upgrade to be performed as per expectations before entering the charter party though." (Exhibit 13, No. 136; Exhibit 39, Hornbeck 1220).

**RESPONSE:** Undisputed.

117. BIMCO Draft version 8, Clause 12(c) includes a marginal note stating "Commented [KD63R63]: Per Nov. 13 meeting, GE requests removal. See HOS counter- proposal in separate Excel file." (Exhibit 13, No. 137; Exhibit 39, Hornbeck 1227).

**RESPONSE:** Undisputed.

118. BIMCO Draft version 8, Clause 12(f)(ii) includes a marginal note stating "Commented [KD68]: Pending finalization of PCG from GE parent." (Exhibit 13, No. 138; Exhibit 39, Hornbeck 1228).

**RESPONSE:** Undisputed.

119. BIMCO Draft version 8, Clause 12(f)(iii) includes a marginal note stating "Commented [KD68]: Pending finalization of PCG from GE parent." (Exhibit 13, No. 139; Exhibit 39, Hornbeck 1228).

**RESPONSE:** Disputed. The marginal note to Clause 12(f)(iii) is numbered "Commented [KD73]:" — the "[KD68]" numbering GERE quotes here in fact appears in the marginal note to Clause 12(f)(ii), addressed in the preceding paragraph. Subject to this correction, undisputed. Exhibit 39 at Hornbeck 1228.

120. BIMCO Draft version 8, Clause 13(a) includes a marginal note stating "Commented [KD75]: HOS maintains edits in 13a. As discussed on Nov. 13 call – HOS is providing rate reductions for gangway, boat landing and crane." (Exhibit 13, No. 140; Exhibit 39, Hornbeck 1228).

**RESPONSE:** Undisputed.

121. BIMCO Draft version 8, Clause 13(a) includes a marginal note by Mr. Furic as follows, "Commented [PF76R76]: As already discussed. The Vessel offered is an SOV and these

key equipment are not fancy add on from Charterers. This status of partial off hire is accepted but should be capped to max few days before the Vessel can be set full off hire in the case where the repair are not done or if the Vessel needs port call to perform the repairs. To be clarified in writing." (Exhibit 13, No. 141; Exhibit 39, Hornbeck 1228).

**RESPONSE:** Undisputed.

122. BIMCO Draft version 8, Clause 13(a) shows a strike-out of the clause "of if the Vessel do not comply with the key performance indicators stated in Section 34.1 of Annex C," which strike-out is marked with a marginal note stating "Commented [KD77]: As per Nov. 13 meeting, GE requests reinsertion. HOS to revert." (Exhibit 13, No. 142; Exhibit 39, Hornbeck 1229).

**RESPONSE:** Undisputed.

123. BIMCO Draft version 8, Clause 13(a) includes a marginal note by Mr. Furic as follows, "Commented [PF78R78]: GE just need strong basic off hire principles in the TCP. Nothing more[.]" (Exhibit 13, No. 143; Exhibit 39, Hornbeck 1229).

**RESPONSE:** Undisputed.

124. BIMCO Draft version 8, Clause 13(a)(vii) includes a marginal note stating "Commented [KD79]: As per Nov. 13 meeting, GE requests off hire during Vessel breakdown. See HOS proposal via separate Excel file." (Exhibit 13, No. 144; Exhibit 39, Hornbeck 1229).

**RESPONSE:** Undisputed.

125. BIMCO Draft version 8, Clause 13(a)(vii) includes a marginal note by Mr. Furic as follows, "Commented[PF80R80]: Noted reduction of 46% if full PAX onboard . GE proposes to

reduce this amount prorated part of current pax onboard , reaching 0 USD if no more pax on board .” (Exhibit 13, No. 145; Exhibit 39, Hornbeck 1229).

**RESPONSE:** Undisputed.

126. BIMCO Draft version 8, Clause 14 includes a marginal note stating “Commented [KD94R94]: As per Nov. 13 meeting, GE Legal to revert on Cl. 14.” (Exhibit 13, No. 146; Exhibit 39, Hornbeck 1230).

**RESPONSE:** Undisputed.

127. BIMCO Draft version 8, Clause 14 includes a marginal note by Mr. Furic as follows, “Commented[PF95R94]: Legal team to review.” (Exhibit 13, No. 147; Exhibit 39, Hornbeck 1230).

**RESPONSE:** Undisputed.

128. Multiple pages of the BIMCO Draft version 8 contain a “Working Copy” watermark. (Exhibit 13, No. 148; Exhibit 39, Hornbeck 1211, 1214 – 1222, 1224, 1226 – 1230, 1232 – 1235, 1237 – 1247, 1249, 1251 – 1256, 1258 – 1261, 1264 – 1268, 1270 – 1272, 1277 – 1279).

**RESPONSE:** Undisputed.

129. In the deposition of Hornbeck’s corporate representative, Mr. Shrives stated in response to GERE’s question as to whether there were any terms, other than the vessel owner, charterer, vessel, delivery date, duration, redelivery date, ports of delivery and redelivery, and charter rate that were important to Hornbeck, that “[a]ll of the open items are important in some way or another. They’re still discussing them.” (Exhibit 7, 154:15-157:17; 168:07-15).

**RESPONSE:** Undisputed.

130. Tyler Bojé's phone number is 713-624-9088. (Exhibit 5, 105:02-06).

**RESPONSE:** Undisputed.

131. Mr. Bojé testified that this is the "mobile number that [he] used in connection with [his] work on this case." (Exhibit 5, 105:07-10).

**RESPONSE:** Undisputed.

132. On November 20, 2025, Mr. Bojé and Mr. Spofford exchanged a series of text messages related to Mr. Spofford's visit to see the other vessel – the Ross Candies. (Exhibit 40, GERE 4075 – 4076)

**RESPONSE:** Undisputed.

133. At 12:02 PM on November 20, 2025, Mr. Bojé texted Mr. Spofford as follows, "I guess that's good and bad also making the choice a bit harder if they continue to get closer together. Sounds like Hornbeck would go back to 10 months of the same price and give you some concessions on the mobilization maybe more if we push hard or a counter…". (Exhibit 40, GERE_00004075).

**RESPONSE:** Undisputed.

134. Mr. Shrives testified that the obligations of a charterer under a charter party are to "accept the vessel on the date that they requested it and pay for the vessel at the rate that was agreed between the parties." (Exhibit 7, 76:13-19).

**RESPONSE:** Undisputed.

135. Mr. Shrives testified that the obligations of a vessel owner under a charter party are "[t]o provide the agreed vessel in the agreed delivery window to provide the agreed service that was [sic] contracted." (Exhibit 7, 76:20-24.)

**RESPONSE:** Undisputed.

136. Mr. Shrives testified that the obligations of GERE as charterer under the charter that Hornbeck alleges it reached with GERE would have been "[t]o accept the vessel on hire and pay for the services that we provided with the vessel." (Exhibit 7, 76:25-77:6.)

**RESPONSE:** Undisputed.

137. Mr. Shrives testified that the obligations of Hornbeck as vessel owner under the charter that Hornbeck alleges it reached with GERE would have been to "[d]eliver the vessel that we agreed to deliver within the time frame we agreed to deliver it and provide the services we agreed to provide." (Exhibit 7, 77:07-13.)

**RESPONSE:** Undisputed.

## V. HORNBECK DID NOT QUALIFY FOR AN AWARD OF CONTRACT

138. On October 16, 2025, Hornbeck was informed of the requirement to complete a contractor prequalification process referred to as "ComplyWorks." (Exhibit 13, No. 15).

**RESPONSE:** Undisputed that on October 16, 2025, Rodrigo Betto sent an email to Joseph Trosclair of Hornbeck, with a copy to Mr. Furic, providing guidance on the GE Vernova Contractor EHS Prequalification Process referred to as "Comply Works," consistent with Exhibit 13 at No. 15. Disputed that the parties agreed to ComplyWorks completion as a requirement. Exhibit 13 at Nos. 11, 15; Exhibit E at 285:16–19; 287:13–15 (Dennis Deposition).

139. On October 15, 2025, Hornbeck received an email from GESupplierConnect@ge.com, copied to Pierre Furic, with the subject heading "EXT: GE Supplier Invite." The email notified Hornbeck that it was "identified as a candidate to become a supplier for "GE. Renewable Energy >> Off Shore Wind >> United States". The email further stated that "Suppliers are required to comply with our GE Supplier Integrity Guide and watch the training video: http://www.gesupplier.com/html/Supplierslnteqrity Guide.htm." The email also informed Hornbeck that "GE requires PO issuance prior to work being performed." (Exhibit 41, GERE_2056-2058).

**RESPONSE:** Undisputed.

140. Annex C to the proposed GERE BIMCO Form was a draft Statement of Work to be performed by the Vessel under the possible charter and included a Section 7.1 that stated "Contractors shall complete a GEV EHS qualification named ComplyWorks process prior to any contract being awarded." (Exhibit 13, No. 11, Exhibit 42, Hornbeck 412).

**RESPONSE:** Undisputed.

141. As of November 13, 2025, Hornbeck had not completed the ComplyWorks process as required prior to any contract being awarded. (Exhibit 13, No. 84, Exhibit 43, GERE 1322-1323).

**RESPONSE:** Hornbeck notes that GERE's citation to "Exhibit 13, No. 84" appears to be in error, as Hornbeck's Response to GERE's RFA No. 94, not No. 84, addresses the subject matter of this paragraph. Undisputed only that, as of November 13, 2025, Hornbeck had submitted a questionnaire to ComplyWorks and certain administrative steps in the ComplyWorks process remained outstanding. Disputed that completion was a requirement the parties agreed to, Exhibit E at 287:13–15 (Dennis Deposition), and disputed that

Hornbeck had not complied with the substantive requirements of ComplyWorks. Exhibit 13 at No. 94; Exhibit 43 at GERE 1322–23.

142. As of November 17, 2025, Hornbeck had not completed the ComplyWorks process as required prior to any contract being awarded. (Exhibit 13, No. 115; Exhibit 44, GERE 1741-1742).

**RESPONSE:** Undisputed only that, as of November 17, 2025, Hornbeck had submitted materials to ComplyWorks and certain administrative steps in the ComplyWorks process remained outstanding. Disputed that completion was a requirement the parties agreed to, Exhibit E at 287:13–15, and disputed that Hornbeck had not complied with the substantive requirements of ComplyWorks. Exhibit 13 at No. 115; Exhibit 44 at GERE 1741–42.

143. Hornbeck was informed by email on November 17, 2025 that it had not been approved in the ComplyWorks program and that it could not be an approved GERE vendor until it received a qualifying score in the program. (Exhibit 13, Nos. 113, 114; Exhibit 44, GERE_1741-1742).

**RESPONSE:** Undisputed that the November 17, 2025 email stated that Hornbeck had achieved a ComplyWorks score of 94 and could not be an approved GERE vendor until it received a score of 95, and listed what was missing, consistent with Exhibit 13 at Nos. 113, 114. Disputed that ComplyWorks approval was a condition of the parties' fixture. Exhibit 13 at Nos. 113–114; Exhibit E at 285:16–19; 287:13–15 (Dennis Deposition).

## VI. GERE NEGOTIATIONS WITH OTTO CANDIES AND PRESENTATION OF BOTH VESSELS TO GE MANAGEMENT

144. On November 13, 2025 at 2:23 PM, Spofford sent a Teams message to Sebastian Mertens and Steffen Zander of GE Vernoa stating "good news – there has been some changes in

vessel market and OC has reoffered the ROSS CANDIES – sister to CADE." (Exhibit 45 - GERE 3760).

**RESPONSE:** Undisputed.

145. Towards the end of the same message on November 13, 2025 at 2:23 PM, Spofford states that "staying with OC significantly simplifies the contract and transition from CADE to replacement." (Exhibit 45)

**RESPONSE:** Undisputed.

146. Furic and Spofford exchanged Teams messages on November 20, 2025, in which Furic asked at 2:23 PM "What do we need to set a call to get Sebastian approving the choice ross / briarwood?" (Exhibit 46, GERE 3603).

**RESPONSE:** Undisputed.

147. Spofford responded to Furic's Teams message on November 20, 2025 at 2:24 PM as follows "I think we need ot put togehter couple of slides . . .can you made exec summary out of quick and dirty table you sent other day in email?" (Exhibit 46, GERE 3604).

**RESPONSE:** Undisputed.

148. On November 21, 2025, Spofford sent an email with the subject "ROSS v. BRIARWOOD" to Sebastian Mertens with Pierre Furic, Samuel Butts, and Luis Castro-Loza in copy stating "[i]t is Marine Ops opinion, that the Ross is the better platform." (Exhibit 47, GERE 5662).

**RESPONSE:** Undisputed.

149. On November 21, 2025, Sebastian Mertens forwarded the email from Spofford with the subject line "FW: ROSS vs BRIARWOOD" that attached a PowerPoint titled "2026 SOV comparison.pptx" to Paolo Marone and Daniel Laskowski with Stephen Swift copied informing them that this "is the down selection for SOV for 2026 – send an invite for Monday to discuss/decide." (Exhibit 47, GERE 5661).

**RESPONSE:** Undisputed.

150. On November 21, 2025 at 1:38PM, Sebastian Mertens emailed Stephen Swift with Tyler Spofford copied stating "Team has strong preference for Ross Candies ... In all other categories (performance, contract, price, deck space/storage) the Ross is the better choice." (Exhibit 47, GERE 5661).

**RESPONSE:** Undisputed.

151. On November 26, 2025, Spofford and Furic informed representatives from Hornbeck that GERE would not be chartering the BRIARWOOD. (Exhibit 48, GERE 4080-81).

**RESPONSE:** Undisputed.

152. Neither GERE nor any GERE parent or affiliate entity issued any purchase order to Hornbeck Offshore Operators, LLC for any charter of the motor vessel BRIARWOOD (Exhibit 50, ¶8).

**RESPONSE:** Undisputed.

## VII. HORNBECK DID NOT COMMIT THE BRIARWOOD TO GERE

153. Following the call between Furic and Hornbeck on November 18, 2025, Hornbeck did not send any confirmation of the BRIARWOOD's availability to GERE. (Exhibit 7, 194:13-17)

**RESPONSE:** Disputed. Mr. Shrives testified there were "daily discussions about the vessel, the availability of the vessel, the timeline of the vessel." Exhibit 7 at 86:17–25. Following GERE's breach of the charter party, Hornbeck urged GERE to comply with its obligations under the charter party and, in doing so, informed GERE that "Hornbeck has held the Briarwood off the market so that we can perform." Exhibit F at 2 (Hornbeck 2489, Hornbeck 9718–9797 at 9718).

154. Following the call between Furic and Hornbeck on November 18, 2025, Hornbeck did not enter the BRIARWOOD into any computer system of Hornbeck's as being obligated for the 12-month term set out in the proposed charter that Hornbeck alleges. (Exhibit 7, 194:18-24)

**RESPONSE:** Undisputed. Hornbeck's operating system records a charter when the vessel goes on hire, not when it is fixed. SOCF ¶ 148.

155. On November 19, 2025, Hornbeck sent out an offer to ENI US Operating Co. Inc. for the charter of certain vessels, including the BRIARWOOD, for charter during the first quarter of 2026, overlapping with the same period for which it had been offering the BRIARWOOD to GERE. (Exhibit 7, 194:25-195:14; Exhibit 49, Hornbeck 2395-2397).

**RESPONSE:** Disputed. On November 19, 2025, Hornbeck included HOS BRIARWOOD in an indicative proposal to ENI US Operating Co. Inc. for the first quarter of 2026. This inclusion does not suggest that Hornbeck was offering the vessel to ENI for a charter during that period. The inclusion of a vessel in an indicative proposal is often done to introduce a vessel class to a customer for budgetary purposes. Exhibit C at 80:16–24 (Shrives Deposition).

## VIII. HORNBECK'S CLAIM IS PREMISED ON ENSNARING "ESSENTIAL TERMS"

156. Hornbeck's position in this matter is that once a party has agreed to certain "essential terms" – specifically: the vessel owner, the charterer, the vessel, a delivery window (no matter how indefinite), duration, redelivery date, port of delivery, port of redelivery, and the charter hire rate – then the party is fixed to a binding charter contract, even if the party has no intention to be bound to a contract at that point, and does not communicate any intention to be bound. (Exhibit 7, 152:14-24; 154:15-158:08).

**RESPONSE:** Disputed. None of the cited testimony suggests that Hornbeck believes no delivery window is too indefinite. The cited testimony addressed a hypothetical in which the parties agreed on "a specific delivery date" and "a specific redelivery date," not "a delivery window (no matter how indefinite)." Exhibit 7 at 155:4–9; 156:18–20. Mr. Shrives testified that the outcome turned on authority: "if I understood you to have the authority to bind your company, then you bound your company." Exhibit 7 at 158:15–18. Hornbeck's position is that parties are bound when they objectively manifest an intent to be bound by expressing agreement to the charterer, vessel owner, vessel, duration, delivery date, port of delivery, port of redelivery, day rate, and contract form. Exhibit C at 123:4–9; 150:17–25 (Shrives Deposition). Hornbeck's position in this case is that the parties objectively manifested an intention to be bound by agreeing to these terms and by Mr. Furic's declaration that "we are done, we have a contract." Exhibit C at 192:9–193:4.

## HORNBECK'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Civil Rule 56.1(b), Hornbeck submits the following statement of additional material facts as to which Hornbeck contends there exists a genuine issue to be tried.

### A. Hornbeck and GERE negotiated for a time charter between June 2025 and November 2025.

1. In June 2025, GERE contacted Hornbeck through its broker, Clarksons, about chartering a Hornbeck-owned vessel for GERE's operations on Vineyard Wind 1. Exhibit V at 1 (Hornbeck 6–14 at 6).

2. GERE had retained Clarksons to help it find a vessel to fill GERE's needs for Vineyard Wind 1. Exhibit M at 135:11–14; 74:4–25; 78:19–79:25; 100:9–19; 131:16–18 (Bojé Deposition).

3. GERE exercised control over Clarksons, its broker for the tender. Exhibit M at 37:12–23; 38:4–13; 39:11–14; 39:21–40:19; 43:14–16; 45:1–5; 45:19–46:3; 99:8–100:2; 104:7–13; 106:2–25.

4. Hornbeck and GERE used a BIMCO SUPPLYTIME 2017 ("Bimco") as a template for negotiations. Exhibit I at 121:9–10 (Furic Deposition).

5. On June 27, 2025, Clarksons sent the first draft of the Bimco ("Bimco v1") to Hornbeck on behalf of GERE. Exhibit Z (Hornbeck 1352, Hornbeck 4058–4104).

6. On June 27, 2025, Hornbeck sent the second version of the Bimco ("Bimco v2") to Clarksons. Exhibit DD (Hornbeck 17–68).

7. On July 8, 2025, Hornbeck sent the third version of the Bimco ("Bimco v3") to Clarksons. Exhibit EE (Hornbeck 123–177).

8. On October 27, 2025, GERE sent the fourth version of the Bimco ("Bimco v4") to Hornbeck. Exhibit FF (Hornbeck 354–360, Hornbeck 430–487).

9. On November 10, 2025, Hornbeck sent the fifth version of the Bimco ("Bimco v5") to GERE. Exhibit R (Hornbeck 863–945).

10. On November 12, 2025, GERE sent the sixth version of the Bimco ("Bimco v6") to Hornbeck. Exhibit S (Hornbeck 946–961, Hornbeck 1014–1082).

11. On November 16, 2025, Hornbeck sent the seventh version of the Bimco ("Bimco v7") to GERE. Exhibit T (Hornbeck 1101–1189).

12. On November 17, 2025, GERE sent the eighth version of the Bimco ("Bimco v8") to Hornbeck. Exhibit U (Hornbeck 1193–1280).

13. Between June 2025 and October 2025, the negotiations between Hornbeck and GERE were "very fragmented and protracted." Exhibit HH at 3 (GERE 3676–3688 at 3678).

14. On October 7, 2025, Hornbeck sent GERE a final revised proposal for the vessel HOS BRIARWOOD. Exhibit GG (Hornbeck 313–330).

15. The October 7, 2025 proposal offered HOS BRIARWOOD at a day rate that fluctuated depending on the number of GERE personnel on board ("POB") during the charter. The day rate was $60,000 for up to thirty-six POB. For every additional eight POB, the price increased by $5,000 per day. Under this calculation, the day rate would be $70,000 for fifty-two POB. Exhibit GG at 6 (Hornbeck 313–330 at 318).

16. In mid-October 2025, GERE's offshore needs began crystallizing. Exhibit II at 1 (Hornbeck 352–353 at 352).

17. On October 24, 2025, the parties agreed to a charter term of ten months firm. Exhibit FF at 1 (Hornbeck 354–360, Hornbeck 430–487 at 354).

18. On October 24, 2025, the parties agreed that the port of delivery would be New Bedford, Massachusetts. Exhibit FF at 1, 8 (Hornbeck 354–360, Hornbeck 430–487 at 354, 430).

19. On October 24, 2025, the parties agreed that the port of redelivery would be New Bedford, Massachusetts. Exhibit FF at 1, 8 (Hornbeck 354–360, Hornbeck 430–487 at 354, 430).

20. In November 2025, the parties were in constant, daily communication. Exhibit C at 86:18–25 (Shrives Deposition).

21. Hornbeck and GERE had a meeting on November 13, 2025, during which they agreed that Hornbeck would deliver the vessel "[u]pon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Exhibit JJ at ¶ 5 (Dennis TRO Decl.). Dennis testified that the parties agreed to the delivery date during the November 13 meeting. Exhibit E at 172:19–173:18 (Dennis Deposition).

22. During the November 13, 2025 meeting, GERE asked for a discounted rate if GERE locked in its number of GERE personnel on board at fifty-two. Exhibit JJ at ¶ 5 (Dennis TRO Decl.).

23. At some point between November 12, 2025, and November 16, 2025, GERE asked to extend the charter duration from ten months to twelve months, and Hornbeck agreed. Exhibit MM at ¶ 12 (Shrives TRO Decl.).

24. As of mid-November 2025, Hornbeck felt a sense of urgency to conclude the deal because Hornbeck had to mobilize HOS BRIARWOOD and complete modifications that GERE had requested. Exhibit D at ¶¶ 4, 5 (Shrives MSJ Decl.).

25. GERE shared in this sense of urgency. Exhibit Q at 1 (Hornbeck 1938–1944 at 1938).

**B. Furic affirmatively stated that the parties had a binding contract.**

26. Hornbeck and GERE had their final meeting on November 18, 2025. Exhibit C at 192:9–14 (Shrives Deposition).

27. In testifying about the November 18, 2025 call, Shrives testified: "When we finished that call all items had been closed and Pierre Furic declared we are done, we have a contract. And he followed that up with that he was going to send the final version with all of those agreed items to the group for finalization." Exhibit C at 192:9–193:4 (Shrives Deposition).

28. Shrives understood Furic's statement to mean "[t]hat all essential and non-essential details had been agreed between the parties." Exhibit C at 192:20–23 (Shrives Deposition).

29. Shrives understood Furic's statement to be an independent confirmation that GERE had agreed to a contract, including the essential terms and all details. Exhibit C at 192:20–193:4 (Shrives Deposition).

30. Following the November 18, 2025 call between Hornbeck and GERE, Furic reported to Spofford that "[c]ontract commercial terms are cleared." Exhibit H (GERE 15).

31. Furic testified that his November 18, 2025 comment to Spofford meant that the contract was ready to be presented to management. Exhibit I at 143:20–25 (Furic Deposition).

**C. GERE began walking back its agreement.**

32. Furic never sent the finalized Bimco as promised at the conclusion of the parties' November 18, 2025 meeting. Exhibit C at 136:15–18 (Shrives Deposition).

33. On November 19, 2025, after Furic failed to circulate the finalized Bimco as promised, Douglass contacted Furic to discuss the status of the finalized Bimco. Furic responded by saying:

> You didn't receive my file…? Let me check . . . .
>
> Ok… file not sent out indeed + all comments from the call have not been grabbed as I have saved older version with same name over the one we have been discussing in the call…( my fault ).
>
> I remember what we have been saying during that call and I have a good picture of things now and I am confident we can be fast finalising contract now. . . .

> We understand deadlines.
>
> Priority is management decision before the end of the week now. I suggest we finalise contract once we have management confirmation to proceed with your offer.

Exhibit A at 1–2 (Hornbeck 2392–2393).

34. Hornbeck learned on or around November 20, 2025, that GERE had received an unsolicited bid and that Spofford was in Port Fourchon, Louisiana, visiting the vessel for which GERE had received an unsolicited bid. Exhibit MM at ¶¶ 15, 16 (Shrives TRO Decl.).

35. On November 21, 2025, Furic advised Hornbeck that "we have not been able to take clear decision today." Exhibit LL at 1 (Hornbeck 2402–2420 at 2402).

**D. GERE's own agent confirmed that the parties had a binding agreement.**

36. On November 24, 2025, Lints emailed Spofford and Furic:

> GE have been in very advanced discussions with Hornbeck for several weeks about the HOS Briarwood – Charter Party negotiations conducted to the point that there is an "off the shelf/ready" contract.
>
> . . . Clarksons (and Hornbeck) working in good faith belief that GE had management approval to conclude negotiations with Hornbeck using the HOS Briarwood. In fact, there may be potential repercussions from Hornbeck should GE decide to go down another route given such advanced discussions and intent to date.

Exhibit J at 1 (GERE 3848–3849 at 3848).

37. On November 25, 2025, Bojé relayed to Shrives his belief that the parties had a deal. Exhibit KK (Hornbeck 1283–1284).

38. When GERE informed Hornbeck it would not take possession of HOS Briarwood, it did not identify an open item as an impasse. Exhibit M at 190:14–20 (Bojé Deposition).

**E. Hornbeck and GERE had agreed to every essential term of the charter party, as well as all other details.**

**a. Hornbeck and GERE agreed that Hornbeck would be the vessel owner.**

39. The parties' negotiations were based on a proposal from Hornbeck for a Hornbeck-owned vessel. Exhibit GG (Hornbeck 313–330).

40. GERE's corporate representative testified that the parties had agreed that Hornbeck would be the vessel owner in any charter reached between the parties. Exhibit Y at 172:1–11 (Mertens Deposition).

41. GERE's principal negotiator testified that Hornbeck as the vessel owner was a closed item. Exhibit I at 118:4–15 (Furic Deposition).

42. Bimco v2 identified Hornbeck as the vessel owner. Exhibit DD at 3 (Hornbeck 17–68 at 19).

43. Bimco v3 identified Hornbeck as the vessel owner. Exhibit EE at 6 (Hornbeck 123–177 at 128).

44. Bimco v4 identified Hornbeck as the vessel owner. Exhibit FF at 8 (Hornbeck 354–360, Hornbeck 430–487 at 430).

45. Bimco v5 identified Hornbeck as the vessel owner. Exhibit R at 14 (Hornbeck 863–945 at 877).

46. Bimco v6 identified Hornbeck as the vessel owner. Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

47. Bimco v7 identified Hornbeck as the vessel owner. Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

48. Bimco v8 identified Hornbeck as the vessel owner. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

**b. Hornbeck and GERE agreed that GERE would be the charterer.**

49. GERE's corporate representative testified that the parties had agreed that GERE would be the charterer in any charter reached between the parties. Exhibit Y at 172:7–10 (Mertens Deposition).

50. GERE's principal negotiator testified that GERE as the charterer was a closed item. Exhibit I at 115:16–116:3 (Furic Deposition).

51. Bimco v1 identified GERE as the charterer. Exhibit Z at 2 (Hornbeck 1352, Hornbeck 4058–4104 at 4058).

52. Bimco v2 identified GERE as the charterer. Exhibit DD at 3 (Hornbeck 17–68 at 19).

53. Bimco v3 identified GERE as the charterer. Exhibit EE at 6 (Hornbeck 123–177 at 128).

54. Bimco v4 identified GERE as the charterer. Exhibit FF at 8 (Hornbeck 354–360, Hornbeck 430–487 at 430).

55. Bimco v5 identified GERE as the charterer. Exhibit R at 14 (Hornbeck 863–945 at 877).

56. Bimco v6 identified GERE as the charterer. Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

57. Bimco v7 identified GERE as the charterer. Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

58. Bimco v8 identified GERE as the charterer. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

**c. Hornbeck and GERE agreed that the vessel would be HOS Briarwood.**

59. GERE's corporate representative testified that the parties had agreed that the vessel would be HOS Briarwood. Exhibit Y at 172:12–21 (Mertens Deposition).

60. GERE's principal negotiator testified that HOS Briarwood as the vessel was a closed item. Exhibit I at 118:10–15 (Furic Deposition).

61. Bimco v4 identified HOS Briarwood as the vessel. Exhibit FF at 8 (Hornbeck 354–360, Hornbeck 430–487 at 430).

62. Bimco v5 identified HOS Briarwood as the vessel. Exhibit R at 14 (Hornbeck 863–945 at 877).

63. Bimco v6 identified HOS Briarwood as the vessel. Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

64. Bimco v7 identified HOS Briarwood as the vessel. Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

65. Bimco v8 identified HOS Briarwood as the vessel. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

66. After October 7, 2025, the parties did not discuss a different vessel in respect of a charter party between them. Exhibit Y at 172:12–17 (Mertens Deposition).

67. The November 17, 2025 Annex D is captioned "HOS BRIARWOOD charter." Exhibit X (Hornbeck 1281).

68. On November 13, 2025, Spofford said, "directive from Seb is BRIARWOOD start Dec 15." Exhibit W (GERE 3743).

**d. Hornbeck and GERE agreed to a twelve-month charter.**

69. GERE's corporate representative testified that the parties had agreed to a twelve-

month charter term. Exhibit Y at 178:15–20 (Mertens Deposition).

70. GERE's principal negotiator testified that the twelve-month duration was a closed item. Exhibit I at 118:16–119:2 (Furic Deposition).

71. Bimco v7 identified the period of hire as twelve months firm. Exhibit T at 20 (Hornbeck 1101–1189 at 1121).

72. Bimco v8 identified the period of hire as twelve months firm. Exhibit U at 20 (Hornbeck 1193–1280 at 1212).

**e. Hornbeck and GERE agreed that the contract form would be a BIMCO SUPPLYTIME 2017.**

73. GERE's corporate representative testified that the parties would use a BIMCO SUPPLYTIME 2017 as the contract template. Exhibit Y at 171:18–25 (Mertens Deposition).

74. GERE's principal negotiator testified that the contract form was a closed term. Exhibit I at 120:11–13, 121:9–10 (Furic Deposition).

75. Hornbeck's corporate representative testified that the parties used a BIMCO SUPPLYTIME 2017 as a form for negotiating a charter party. Exhibit C at 94:17–20 (Shrives Deposition).

76. Hornbeck and GERE circulated eight draft BIMCO SUPPLYTIME 2017 forms memorializing their agreement to charter party terms. Exhibit Z (Hornbeck 1352, Hornbeck 4058–4104); Exhibit DD (Hornbeck 17–68); Exhibit EE (Hornbeck 123–177); Exhibit FF (Hornbeck 354–360, Hornbeck 430–487); Exhibit R (Hornbeck 863–945); Exhibit S (Hornbeck 946–961, Hornbeck 1014–1082); Exhibit T (Hornbeck 1101–1189); Exhibit U (Hornbeck 1193–1280).

77. On November 13, 2025, Furic emailed Hornbeck and Clarksons, stating, "HOS needs to keep Bimco Word format for deviation or similar. We have agreed that @Douglass, Kevin include HOS positions directly in the Bimco word format before next call , with the intention to

close items." Exhibit BB at 1 (Hornbeck 1083–1099).

78. On November 16, 2025, Douglass offered to "create the file this week in BIMCO Smartcon if this helps relieve the burden on GE." Exhibit T at 1 (Hornbeck 1101–1189).

**f. Hornbeck and GERE agreed that the port of delivery would be New Bedford, Massachusetts.**

79. GERE's principal negotiator testified that the port of delivery as New Bedford, Massachusetts was a closed term. Exhibit I at 118:24–119:3 (Furic Deposition).

80. Bimco v1 identified the port of delivery as New Bedford, Massachusetts. Exhibit Z at 2 (Hornbeck 1352, Hornbeck 4058–4104 at 4058).

81. Bimco v2 identified the port of delivery as New Bedford, Massachusetts. Exhibit DD at 3 (Hornbeck 17–68 at 19).

82. Bimco v3 identified the port of delivery as New Bedford, Massachusetts. Exhibit EE at 6 (Hornbeck 123–177 at 128).

83. Bimco v4 identified the port of delivery as New Bedford, Massachusetts. Exhibit FF at 8 (Hornbeck 354–360, Hornbeck 430–487 at 430).

84. Bimco v5 identified the port of delivery as New Bedford, Massachusetts. Exhibit R at 14 (Hornbeck 863–945 at 877).

85. Bimco v6 identified the port of delivery as New Bedford, Massachusetts. Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

86. Bimco v7 identified the port of delivery as New Bedford, Massachusetts. Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

87. Bimco v8 identified the port of delivery as New Bedford, Massachusetts. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

88. On November 10, 2025, in the Bimco v5, Douglass commented on the port of

delivery: "Parties to confirm delivery / redelivery. Annex D states 'Provport[.]'" Exhibit R at 14 (Hornbeck 863–945 at 877).

89. The comment referenced in SOCF ¶ 88 did not appear in the November 16 Bimco v7 or the November 17 Bimco v8. Exhibit T at 19 (Hornbeck 1101–1189 at 1120); Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

90. The November 17, 2025 Annex D identified the port of delivery as New Bedford, Massachusetts. Exhibit X (Hornbeck 1281).

**g. Hornbeck and GERE agreed that the port of redelivery would be New Bedford, Massachusetts.**

91. GERE's principal negotiator testified that the port of redelivery as New Bedford, Massachusetts was a closed term. Exhibit I at 119:4–120:4 (Furic Deposition).

92. Bimco v1 identified the port of redelivery as New Bedford, Massachusetts. Exhibit Z at 2 (Hornbeck 1352, Hornbeck 4058–4104 at 4058).

93. Bimco v2 identified the port of redelivery as New Bedford, Massachusetts. Exhibit DD at 3 (Hornbeck 17–68 at 19).

94. Bimco v3 identified the port of redelivery as New Bedford, Massachusetts. Exhibit EE at 6 (Hornbeck 123–177 at 128).

95. Bimco v4 identified the port of redelivery as New Bedford, Massachusetts. Exhibit FF at 8 (Hornbeck 354–360, Hornbeck 430–487 at 430).

96. Bimco v5 identified the port of redelivery as New Bedford, Massachusetts. Exhibit R at 14 (Hornbeck 863–945 at 877).

97. Bimco v6 identified the port of redelivery as New Bedford, Massachusetts. Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

98. Bimco v7 identified the port of redelivery as New Bedford, Massachusetts. Exhibit

T at 19 (Hornbeck 1101–1189 at 1120).

99. Bimco v8 identified the port of redelivery as New Bedford, Massachusetts. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

100. The November 17, 2025 Annex D identified the port of redelivery as New Bedford, Massachusetts. Exhibit X (Hornbeck 1281).

**h. Hornbeck and GERE agreed to a day rate of $68,333.**

101. GERE's corporate representative testified that the parties agreed to a day rate of $68,333. Exhibit Y at 177:18–178:13 (Mertens Deposition).

102. The November 17, 2025 Annex D circulated by GERE includes a day rate of $68,333. Exhibit X (Hornbeck 1281).

**i. Hornbeck and GERE agreed that Hornbeck would deliver the vessel "[u]pon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours."**

103. Bimco v5 identified the delivery date as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Exhibit R at 14 (Hornbeck 863–945 at 877).

104. Bimco v6 identified the delivery date as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Exhibit S at 17 (Hornbeck 946–961, Hornbeck 1014–1082 at 1014).

105. On November 12, 2025, Furic stated, "Just set a delivery from dec 15th and include the fact that Mobilization items upgrade shall be considered done before delivery." "On dec 10th final date of delivery shall be clear[.]" Exhibit S at 1 (Hornbeck 946–961, Hornbeck 1014–1082 at 946).

106. On November 13, 2025, following the parties' meeting, Furic commented on the statement in SOCF ¶ 105, "[w]e leave as is." Exhibit BB at 1 (Hornbeck 1083–1099 at 1083).

107. Bimco v7 identified the delivery date as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

108. Bimco v7 includes a comment by Douglass on the delivery date stating, "Agreed and closed in Nov 13 meeting." Exhibit T at 19 (Hornbeck 1101–1189 at 1120).

109. Bimco v8 identified the delivery date as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

110. In Bimco v8, Furic did not disagree with Douglass's comment on the delivery date that the term was "[a]greed and closed in Nov 13 meeting." Furic responded only that the liquidated damages and canceling clause "shall be based on clear delivery date[.]" Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

111. In Bimco v8, Box 6, pertaining to the canceling date and time, calculates the delivery date as December 15. Exhibit U at 19 (Hornbeck 1193–1280 at 1211).

112. Dennis agreed "that the parties agreed that the delivery date would be 'following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours.'" Exhibit E at 173:8–13 (Dennis Deposition).

**j. Hornbeck and Clarksons testified that the parties agreed on the essential terms of the charter party.**

113. Bojé testified that the key terms of the charter party were "all nailed down." Exhibit M at 167:11–14 (Bojé Deposition).

114. Hornbeck's corporate representative testified that "[a]ll the essential terms of the charter were agreed between the parties." Exhibit C at 127:19–20 (Shrives Deposition).

115. A mobilization fee is not an essential term under the charter. Exhibit C at 139:3–7

(Shrives Deposition).

116. Neither a canceling provision nor a liquidated-damages provision is typically considered an essential term of a charter party. Exhibit B at 301:3–5, 301:20–23 (Burns Deposition).

117. All charter party terms are important, but that does not mean they are essential. Had GERE's counsel asked Shrives whether the parties considered any provisions typically deemed details to be essential in this case, he would have said no. Exhibit D at ¶ 13 (Shrives MSJ Decl.).

**F. The Bimco evidences the parties' agreement to the essential terms of the charter party.**

118. Fixture recaps are not required. Sometimes they are issued, and sometimes they are not. Exhibit B at 297:9–19 (Burns Deposition); Exhibit C at 122:17–18 (Shrives Deposition).

119. Fixture recaps come in different forms. Exhibit C at 123:2–5 (Shrives Deposition) ("Typically could be an email – could come in different forms[.]").

120. In this case, the parties "documented . . . the fixture . . . in the BIMCO." Exhibit C at 88:14–16 (Shrives Deposition).

121. In Hornbeck's practice, a long-form charter party follows the fixture. Exhibit E at 107:21–25 (Dennis Deposition).

**G. The delivery term is valid, specific, and enforceable.**

122. The delivery date is simple to apply in practice. Exhibit B at 299:13–24 (Burns Deposition).

123. GERE's expert concedes that the parties agreed "when the vessel will not deliver," that he has seen delivery tied to redelivery from a prior customer, and that he is not offering an opinion on whether the parties formed a charter party. Exhibit P at 185:7–9, 188:8–9, 152:18–25 (Perrott Deposition).

124. A delivery term providing for delivery upon redelivery from the owner's other

charterer, but no sooner than a specified date, is a common mechanism that Hornbeck uses in its charters and that is used throughout the industry. Exhibit D at ¶¶ 7–8 (Shrives MSJ Decl.).

125. Such a mechanism assures the charterer that the vessel will not be delivered before the date the charterer needs it, while accounting for the vessel's completion of its prior charter. Exhibit D at ¶¶ 7–8 (Shrives MSJ Decl.).

126. HOS BRIARWOOD's prior charter was set to terminate "earlier in December, potentially end of November, which was sooner than GE wanted the vessel." Exhibit C at 87:11–23 (Shrives Deposition).

127. The parties understood that if the vessel became available before December 15, Hornbeck would deliver on December 15, and if the vessel became available after December 15, Hornbeck would deliver as soon as it was available. Exhibit C at 87:13–21 (Shrives Deposition).

128. GERE knew when HOS Briarwood would be returned to Hornbeck, because the parties were in daily discussions about it. Exhibit C at 87:1–4 (Shrives Deposition).

129. HOS Briarwood remained available to GERE even after GERE repudiated the parties' agreement. Exhibit F at 2 (Hornbeck 2489, Hornbeck 9718–9797 at 9718).

**H. GERE did not condition its agreement to the essential terms of the charter party on management approval or a purchase order.**

130. As discussions progressed, Hornbeck sought to confirm GERE was serious about chartering HOS BRIARWOOD. Exhibit M at 155:15–156:6 (Bojé Deposition) (A: "So Adam gets called in to kind of close the door, put the nail on the coffin, get agreed to put it to bed, to rest.").

131. On a call at some point between October 20, 2025, and November 24, 2025, Spofford represented that he had received approval from upper management to proceed with HOS BRIARWOOD. Exhibit M at 152:18–155:4 (Bojé Deposition).

132. Bojé is not aware of any instance when, after Spofford's representation that he had

management approval to proceed with HOS BRIARWOOD, Spofford or anyone else corrected or contradicted that statement. Exhibit M at 254:7–16 (Bojé Deposition).

133. Spofford could not identify a specific instance when, after his representation that he had management approval to proceed with HOS BRIARWOOD, he mentioned the need for further management approval. Exhibit G at 211:17–18, 260:18–24 (Spofford Deposition).

134. Furic could not identify a specific instance when, after Spofford's representation that Spofford had management approval to proceed with HOS BRIARWOOD, Furic mentioned the need for further management approval. Exhibit I at 155:21–157:25 (Furic Deposition).

135. The following clause, included in the Bimcos, does not say that the Owner acknowledges that it has received a copy of the No PO No Pay policy:

> (i) Owners acknowledge that they have received a copy of the following documents: (i) Guidelines – Third Party Suppliers (the "Guidelines"), and (ii) the GE Integrity Guide for Suppliers, Contractors and Consultants, which may be updated or modified by General Electric Company from time to time (the "Guide") located at the following Internet address http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm.

Exhibit U at 62 (Hornbeck 1193–1280 at 1254).

136. Hornbeck was not notified of GE Vernova's No PO No Pay policy in an October 15, 2025 email. Exhibit AA at 1–2 (GERE 2056–2058 at 2056–2057); Exhibit D at ¶ 6 (Shrives MSJ Decl.).

137. Even GERE's own broker was unaware of the "No PO No Pay" policy. Exhibit M at 228:13–15 (Bojé Deposition).

**I. Hornbeck considered itself bound to a fixture.**

138. Hornbeck considers itself bound when the parties agree to the essential terms of the charter party. Exhibit C at 60:2–3 (Shrives Deposition).

139. An Early Works Agreement is not part of a charter; it is a separate instrument about procurement money prepared to allow Hornbeck to purchase long-lead equipment to hold a delivery schedule. Exhibit E at 210:3–19, 232:19–21 (Dennis Deposition); Exhibit N (Hornbeck 9635).

140. The Early Works Agreement letter in this case was never executed. Exhibit C at 71:13–20 (Shrives Deposition).

141. Cook was not intimately involved in the negotiations for this charter party. His review of the Early Works Agreement was done in a vacuum. He considered the letter "as a standalone document." Exhibit L at ¶¶ 3, 7 (Cook Decl.).

142. Cook's reference to "time charter" was to the long-form written charter party. Exhibit L at ¶ 10 (Cook Decl.).

143. Cook's motivation for making the deposit non-refundable was to ensure that Hornbeck would be paid for its work if the vessel could not be delivered due to, for example, the vessel breaking down. Exhibit L at ¶¶ 11, 12 (Cook Decl.).

144. Hornbeck does not perform early works for a charterer without an early works agreement to protect its interests, and it does not modify a vessel to one customer's needs out of pocket. Exhibit L at ¶¶ 12, 13 (Cook Decl.).

145. The fact that Hornbeck and GERE were discussing early works indicated that the parties had a deal. Exhibit L at ¶ 13 (Cook Decl.); Exhibit M at 176:19–177:23 (Bojé Deposition).

146. Hornbeck tests the market with indicatives, but it does not "fix a vessel for a period where that vessel was . . . not available." Exhibit E at 130:16–20 (Dennis Deposition).

147. The November 19, 2025 indicative proposal is a multi-vessel indicative offer, and an indicative "does not incorporate a fixture." Exhibit E at 103:23–24 (Dennis Deposition); Exhibit

K (Hornbeck 2395–2400).

148. Hornbeck's operating system records a charter when the vessel goes on hire, not when it is fixed. Exhibit C at 38:4–6 (Shrives Deposition); Exhibit E at 65:16–23 (Dennis Deposition).

149. Hornbeck acted on the commitment by alerting its prior charterer that the vessel "would be going to GERE" and informing its gangway vendor of the coming charter. Exhibit C at 85:16–86:13 (Shrives Deposition).

150. Hornbeck understood that, having committed the Vessel to GERE beginning December 15, 2025, it could not enter into a new, uncontracted charter term with its prior charterer or enter into any new contracts with other clients without breaching its obligations to GERE. Exhibit D at ¶ 12 (Shrives MSJ Decl.).

**J. There were no subjects that prevented fixture.**

151. No provision or language in any of the Bimcos made fixture subject to vessel availability. Exhibit Z (Hornbeck 1352, Hornbeck 4058–4104); Exhibit DD (Hornbeck 17–68); Exhibit EE (Hornbeck 123–177); Exhibit FF (Hornbeck 354–360, Hornbeck 430–487); Exhibit R (Hornbeck 863–945); Exhibit S (Hornbeck 946–961, Hornbeck 1014–1082); Exhibit T (Hornbeck 1101–1189); Exhibit U (Hornbeck 1193–1280).

152. A "subject to availability" refers to whether the vessel is "still being available and not committed to anybody else." Exhibit M at 251:7–18 (Bojé Deposition).

153. A "subject to availability" can be lifted by request or by conduct, or can fall away without any express lifting when the parties move "straight from receiving an offer to negotiating the charter party details." Exhibit O at 6 (Perrott Report); Exhibit P at 144:24–145:11, 148:5–11 (Perrott Deposition).

154. A “subject to availability” is also “removed when there’s a fixture.” Exhibit E at 104:4–5 (Dennis Deposition).

155. Even if the Early Works Agreement were binding or relevant to the parties’ agreement, “until such time as all details of a Time Charter have been agreed to by Owners” was satisfied when Hornbeck agreed to every remaining comment on the November 18, 2025 call. Exhibit C at 136:10–14, 192:20–23 (Shrives Deposition).

Dated: November 18, 2026

Respectfully submitted,

*/s/ Daniel H. Charest*

Daniel H. Charest (*pro hac vice* applicant)
BURNS CHAREST LLP
901 Main Street, Suite 5800
Dallas, Texas 75202
Tel.: (469) 904-4550
Fax: (469) 444-5002
dcharest@burnscharest.com

Claire B. Curwick (admitted *pro hac vice*)
Natalie R. Earles (*pro hac vice* applicant)
Lauren M. Perry (admitted *pro hac vice*)
BURNS CHAREST LLP
201 St. Charles Avenue, Suite 2900
New Orleans, Louisiana 70170
Tel.: (504) 799-2845
Fax: (504) 881-1765
ccurwick@burnscharest.com
nearles@burnscharest.com
lperry@burnscharest.com

Matthew Tripolitsiotis (MT9413)
BURNS CHAREST LLP
757 Third Avenue, 20th Floor
New York, New York 10017
Tel.: (469) 895-5269
Fax: (469) 444-5002
mtripolitsiotis@burnscharest.com

*Counsel for Hornbeck Offshore Operators, LLC*